## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JOSE PINEDA, JOSE MONTENEGRO, MARCO LOPEZ, and JOSE HERNANDEZ, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**SKINNER SERVICES, INC., d/b/a SKINNER DEMOLITION, THOMAS SKINNER, DAVID SKINNER, ELBER DINIZ, and SANDRO SANTOS,**<br><br>**Defendants.** | Civil Action No.<br>16-12217-FDS |

### MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, DEFENDANTS' MOTION TO DECERTIFY THE FLSA COLLECTIVE, AND PLAINTIFFS' MOTION TO REFORM THE FLSA COLLECTIVE

**SAYLOR, J.**

This case concerns claims by manual laborers against their employer, Skinner Services, Inc. d/b/a Skinner Demolition ("Skinner"), and supervisors Thomas Skinner, David Skinner, Elber Diniz, and Sandro Santos, for violating the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* and Massachusetts wage laws.

On September 6, 2017, this court conditionally certified a FLSA collective action. After discovery, plaintiffs moved to certify two classes as to their state-law claims pursuant to Federal Rule of Civil Procedure 23. The first putative class, the "Reporting Class," consists of individuals who allege that they were not compensated for travel time between Skinner's headquarters and jobsites. The second putative class, the "Uniform Class," consists of

individuals who allege that their paychecks were subject to mandatory deductions for uniform cleaning services.  Defendants have moved to decertify the FLSA collective action, and plaintiffs have further moved to reform the FLSA action as to the reporting and travel claims to exclude a group of laborers living in or around Boston, who would typically report directly to Boston-area jobsites.  For the following reasons, plaintiffs' motion for class certification will be granted, defendants' motion to decertify the FLSA collective action will be denied, and plaintiffs' motion to reform the collective action will be granted.

## I.     Factual Background

The following facts are as set forth in the record.  Because the factual record is voluminous, some potentially relevant matters have been omitted for the sake of brevity.

Skinner Services, Inc. is a construction company with its principal place of business in Avon, Massachusetts.  (Am. Compl. ¶ 15).  It was founded by David Skinner, Thomas Skinner, and Elber Diniz, all of whom are owners and managers in the company.  (*Id.* ¶ 17-39).  Sandro Santos also serves as a manager in the company.  (*Id.* ¶¶ 40-43).

Skinner performs demolition work on construction sites, primarily in Massachusetts, although it also performs work elsewhere in New England and in New York.  (*Id.* ¶ 16).

Named plaintiffs Jose Pineda, Jose Montenegro, Marco Lopez, and Jose Hernandez are manual laborers who have worked for Skinner.  (*Id.* ¶¶ 48-177).  Most of the employees of Skinner are Cape Verdean and many have limited English language skills.

### A.     Reporting to the Yard

The named and opt-in plaintiffs testified that, until February 2016, Skinner had a policy (the "Policy") requiring its laborers to report at approximately 5:45 a.m. to the company's Avon headquarters (the "Yard"), where they would receive jobsite assignments.  (Pl. Ex. E at 85:14-22;

Pl. Ex. F at 51:16-53:4; Pl. Ex. G at 61:8-63:13; Pl. Ex. H at 102:2-17; Pl. Ex. I at 39:19-40:7; Pl. Ex. J at 24:22-25:4; Pl. Ex. K at 19:24-20:2; Pl. Ex. L at 55:6-9; Pl. Ex. M at 63:14-64:14).  At least 36 opt-in plaintiffs have also attested to that requirement in their answers to interrogatories. (*See generally* Pl. Ex. N).  Skinner employees who are not parties to this litigation further attested in affidavits that such a Policy existed.  (ECF No. 61, Ex. B at 6; ECF No. 79, Ex. 1 at 5).

According to plaintiffs, laborers were not informed about the location of their respective jobsites by Diniz until they arrived at the Yard, even if the laborers would be assigned to the same worksite for multiple days in a row.  (Pl. Ex. G at 68:16-69:11; Pl. Ex. H at 89:10-21; Pl. Ex. I at 17:20-18:3; Pl. Ex. J at 19:23-20:6; Pl. Ex. L at 26:5-23; Pl. Ex. M at 18:15-24).  Once at the Yard, laborers would also load tools and equipment onto vehicles before departing.  (Pl. Ex. E at 61:1-11; Pl. Ex. F at 39:15-18; Pl. Ex. G at 65:14-20; Pl. Ex. H at 89:3-6; Pl. Ex. I at 14:18-16:17; Pl. Ex. J at 26:5-28:18; Pl. Ex. K at 31:11-32:11; Pl. Ex. L at 42:10-43:14; Pl. Ex. M at 36:12-24).

According to plaintiffs, despite being required to first report to the Yard and obtain tools there, laborers were not paid for their time until they arrived at their jobsite for the day.  (Pl. Ex. F at 40:5-7; Pl. Ex. G at 61:16-62:16; Pl. Ex. H at 102:18-103:9; Pl. Ex. I at 19:12-19; Pl. Ex. J at 16:22-24; Pl. Ex. K at 37:1-3; Pl. Ex. L at 48:16-24).  After leaving the jobsite, laborers would return to the Yard and unload tools there—however, they were also not compensated for time spent traveling back to the Yard.  (Pl. Ex. E at 61:12-17; Pl. Ex. G at 107:17-110:15; Pl. Ex. K at 32:4-13; Pl. Ex. Q at 53:1-10).  Personnel who drove crew to jobsites would be compensated for up to one hour's driving time, regardless of the amount of time actually spent driving.  (Pl. Ex. D at 162:23-163:16; Pl. Ex. E at 123:5-23).

Infrequently, laborers would report directly to a jobsite.  That would occur when the jobsite was close to the laborer's home or when a supervisor ordered it.  (Pl. Ex. G at 67:1-11; Pl. Ex. H at 96:2-13; Pl. Ex. L at 67:12-20; Pl. Ex. M at 17:2-19).  However, Skinner laborers living in or around Boston (the "Boston Crew") would by default report directly to Boston-area jobsites.  (Pl. Ex. Q at 14:18-20; Pl. Ex. T at 40:5-19).  According to plaintiffs, Skinner exempted the Boston Crew from the Yard-reporting requirement beginning in 2012.  (Pl. Ex. U at 22:9-13).

Around January 2016, Skinner purchased vans to transport its laborers to worksites.  (Pl. Ex. G at 75:15-23).  Soon afterward, plaintiffs contend that Skinner changed the Policy so that laborers would no longer have to report to the Yard in the early morning—instead, supervisors would communicate directly to laborers their daily assignments during the prior evening.  (Pl. Ex. G at 77:11-21; Pl. Ex. H at 106:18-107:12; Pl. Ex. K at 25:8-19).  A company memorandum dated February 26, 2016, confirms that employees could "use their own their own transportation to and from customer worksites."  (Pl. Ex. S).  The memo also states that Skinner would provide company transportation for employees who wished to use it, but that those employees would have to report to the Yard by 5:45 a.m.  (*Id.*).

Defendants deny the existence of the Policy, contending that laborers would only report to the Yard if summoned by their supervisors.  (Def. Ex. 3 at 139:21-142:12; Def. Ex. 4 at 102:7-14).  They contend that supervisors had always notified employees of their jobsite assignments the prior day and were free to make their own travel arrangements.  (Def. Ex. 5 at 38:22-41:9; Def. Ex. 6 at 141:3-143:16).  Moreover, they contend that laborers were simply given an option to meet at the Yard to use company transportation to jobsites to save on travel costs.  (Def. Ex. 7 at 137:3-138:24).  To the extent that laborers were required to report to the Yard in the morning or bring equipment back from the jobsite, defendants contend that they were compensated for

their time.  (*Id.* at 108:19:113:18; 142:8-19).

### B.     Uniform Deductions

Beginning on August 2, 2013, Skinner contracted with a company called Cintas to provide uniform-cleaning services.  (Def. Ex. 9 ¶ 5).  Defendants contend that the program was voluntary and that participating employees could cancel their participation at any time.  (*Id.* ¶ 6). Participants were provided with eleven free polo shirts and eleven free pairs of pants.  (*Id.* ¶ 9). In return, Skinner would deduct approximately one hour of pay per week.  (*Id.* ¶ 10; Pl. Ex. Z).

Several plaintiffs, however, testified that Skinner coerced them into signing up for the Cintas uniform program by threatening to withhold work from, or fire, employees who refused. (Pl. Ex. E at 152:11-153:7; Pl. Ex. G at 158:2-19; Pl. Ex. H at 77:21-78:2).  Another plaintiff testified that Skinner supervisors strongly indicated that participation in the Cintas program was mandatory.  (Pl. Ex. M at 47:6-14; 52:9-11).  Named plaintiff Jose Montenegro testified that Santos forged his signature, forcing him to take the uniforms and pay for the services.  (Pl. Ex. H at 82:18-83:3).  Moreover, there is evidence that laborers' weekly paychecks were deducted for the uniform service even if they expressly refused to enroll in the program.  (*Compare* Pl. Ex. BB at 43-46 (showing that four individuals refused to sign) *with* Pl. Ex. Z and AA (showing that Skinner still deducted an hour's pay every week for those employees)).

The weekly Cintas deductions appear to have varied from employee to employee.  For example, Jose Pineda was charged $14 per week (Pl. Ex. BB at 1), Jose Hernandez was charged $7 per week (*id.* at 3), Divino Dulco was charged $13 per week (*id.* at 5), and Orlando Cruz was charged $15 per week (*id.* at 12).  There appears to have been no reason for the variance in weekly charges other than the individual laborer's hourly pay.

C.      **Department of Labor Investigation**

Between 2013 and 2015, the Wage and Hour Division of the U.S. Department of Labor investigated Skinner's wage practices.  (Pl. Reply Ex. F at 9).  The primary investigator submitted a ten-page report on April 17, 2017, concluding that Skinner had violated Section 7 of the FLSA.  (*Id.* at 3).  The report noted that "[t]he violations did not appear on the records and thus had to be reconstructed from employee interviews."  (*Id.*).  According to the report, Skinner mandated that

> the employees would show up at the shop in Avon, participate in "pre-tour" activities such as loading the truck with tools and other equipment and being assigned work, and then ride to the job site on the company vehicle, all at the instruction of the employer.  All of this work was unpaid for the purposes of hours worked as defined under 29 CFR 785.38 (Travel that is all in the day's work).  The employees would only begin getting paid upon arrival at the job site, by punching in on a smart phone app called "My Time Station."

(*Id.*).  The investigator estimated that Skinner owed back wages of $836,819.46 to 102 employees.  (*Id.* at 5-6).  Because Skinner failed to properly compensate its laborers, the investigator further concluded that the company kept inaccurate time records in violation of Section 11 of the FLSA.  (*Id.* at 6).

After the primary investigator submitted her report, her supervisor, Assistant District Director Carl Loria, prepared a memorandum for the investigatory file.  (Pl. Reply Ex. H).  In his memorandum, Loria summarized the positions of the parties and expressed doubt as to whether there was a FLSA violation because certain employees (namely, the Boston Crew) would directly report to their jobsites.  (*Id.*).  He further noted that the Massachusetts Attorney General's office had "found no cause to continue an investigation."  (*Id.*).  However, in light of the present litigation and a separate complaint before the Equal Employment Opportunity Commission, Loria ended the Department of Labor's investigation.  (*Id.*).

II.   **Procedural Background**

The complaint in this action was filed on November 2, 2016.  An amended complaint was filed on December 9, 2016.

The amended complaint asserts eight claims.  Counts One and Two, respectively, assert claims that defendants failed to pay plaintiffs wages at one-and-a-half-times their hourly rates for overtime in violation of 29 U.S.C. § 207, and the Massachusetts Overtime Law, Mass. Gen. Laws ch. 151, §§ 1A & 1B.  Counts Three and Four, respectively, assert claims that defendants failed to pay plaintiffs minimum wages for a significant number of hours worked in violation of 29 U.S.C. § 206 and the Massachusetts Minimum Wage Act, Mass. Gen. Laws ch. 151, §§ 1 & 20.  Count Five asserts a claim that defendants failed to pay plaintiffs wages owed under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148.  Counts Six, Seven, and Eight, respectively, assert claims that defendants took adverse employment actions against certain plaintiffs for taking part in this action in violation of 29 U.S.C. § 215(a)(3), the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148A, and the Massachusetts Fair Wages Act, Mass. Gen. Laws ch. 151, § 19(5).  The retaliation claims apply only to plaintiffs Pineda, Lopez, and Hernandez.  (Am. Compl. ¶¶ 250-64).

On September 6, 2017, the Court conditionally certified a FLSA collective action.  Nine days later, the Court entered a protective order prohibiting defendants from retaliating against Skinner employees for participating or assisting in this litigation, or otherwise engaging in conduct intended to discourage employees from doing so.

Over the next year, the parties engaged in multiple discovery disputes requiring court intervention.  On August 24, 2018, defendants terminated the employment of opt-in plaintiff Manuel Goncalves.  Plaintiffs' counsel subsequently filed a motion to hold defendants in civil

contempt of the Court's September 15, 2017 protective order.  A three-day evidentiary hearing was held on October 26, November 7, and November 13, 2018, during which the Court heard the testimony of multiple witnesses.  At the conclusion of the hearing, the Court found by clear and convincing evidence that Goncalves's termination was motivated at least in part by his participation in this litigation.  (Nov. 13, 2018 Tr. at 22:10-14).  The Court also noted that the testimony of defendant Thomas Skinner "had a variety of inconsistencies and some illogical aspects to it."  (*Id.* at 23:17-21).  Accordingly, on December 10, 2018, the Court awarded front and back pay and reasonable attorneys' fees related to the bringing of the contempt motion to Goncalves.  Defendants have filed an interlocutory appeal of that order with the First Circuit.

Plaintiffs subsequently moved to certify the Reporting and Uniform Classes pursuant to Rule 23.  Defendants cross-moved to decertify the collective action, and plaintiffs moved to reform the FLSA collective to exclude the Boston Crew as to the reporting and travel claims.

### III.   Legal Standard

Generally, courts have held that class actions may not be brought under the FLSA.  *See, e.g.*, *Trezvant v. Fidelity Emp'r Servs. Corp.*, 434 F. Supp. 2d 40, 57 (D. Mass. 2006).  As the Eleventh Circuit explained, Congress intended that suits to vindicate FLSA rights be brought as collective actions under 29 U.S.C. § 216(b).  *See Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1247-48 (11th Cir. 2003).  "Unlike . . . Rule 23 class actions, FLSA collective actions require similarly situated employees to affirmatively opt-in and be bound by any judgment."  *Pike v. New Generation Donuts, LLC*, 2016 WL 707361, at *3 (D. Mass. Feb. 20, 2016) (quotation marks and citations omitted).

District courts "have developed two methods for determining whether potential plaintiffs are 'similarly situated' for purposes of class certification under [Section] 216(b)."  *Kane v. Gage*

*Merch. Servs., Inc.*, 138 F. Supp. 2d 212, 214 (D. Mass. 2001). Some have followed "an approach coextensive with the requirements of class certification under [Rule 23]." *Id.* (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995)). Others, including most district courts in the First Circuit, have followed "a 'two-step' approach involving notification to potential class members of the representative action followed by a final 'similarly situated' determination after discovery is complete." *Id.* At the second step, courts have considered various factors, including:

> 1) the disparate factual and employment settings—e.g. whether plaintiffs were employed in the same corporate department, division, and location; 2) the various defenses available to defendant which appear to be individual to each plaintiff; and 3) fairness and procedural considerations.

*Trezvant*, 434 F. Supp. 2d at 45 (citations omitted).

Plaintiffs may bring FLSA collective actions and state-law class actions under Rule 23 of the Federal Rules of Civil Procedure in tandem. *See Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 39 (1st Cir. 2013); *see also Calderone v. Scott*, 838 F.3d 1101, 1104 (11th Cir. 2016); *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 247 (2d Cir. 2011); *Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 977 (7th Cir. 2011).[1] Rule 23 mandates that a district court may certify a class where:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

---

[1] However, where plaintiffs assert state-law claims predicated solely on the existence of a violation of federal law, Rule 23 class certification as to the state-law claims is inappropriate. *See Brayak v. New Bos. Pie, Inc.*, 292 F. Supp. 3d 520, 523 (D. Mass. 2017).

Fed. R. Civ. P. 23(a).  In addition, because plaintiffs seek certification pursuant to Rule 23(b)(3), they must also establish that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Plaintiffs must establish each of those elements by a preponderance of the evidence. *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015).  The Supreme Court has cautioned, however, that "what matters to class certification . . . is not the raising of common questions . . . but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation marks, alterations, and citation omitted).

As a practical matter, however, some courts have held that "there [is no] good reason to have different standards for the certification of [FLSA and Rule 23 class actions], and the case law has largely merged the standards."  *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013); *see also Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001).  Others, including some district courts in this circuit, have interpreted the FLSA to impose a more lenient certification standard than Rule 23.  *See Grayson v. K Mart Corp.¸* 79 F.3d 1086, 1095-96 (11th Cir. 1996); *Yayo v. Museum of Fine Arts*, 2014 WL 2895447, at *3 (D. Mass. June 26, 2014) (citing *Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 359 (D. Me. 2010)). However, because the Court finds that the Rule 23 certification requirements have been satisfied as to both classes, it need not resolve that difference today, and will apply the same substantive legal standard to both plaintiffs' motion for class certification and defendants' motion to decertify the FLSA collective action.

IV.    **Analysis**

A.    **The Reporting Class**

State and federal law require that employers compensate employees starting at the time of

their first "principal activity." *Dooley v. Liberty Mut. Ins. Co.*, 307 F. Supp. 2d 234, 241 (D.

Mass. 2004); *see also Mullaly v. Waste Mgmt. of Mass., Inc.*, 452 Mass. 526, 531 (2008).

Loading tools and receiving jobsite assignments can constitute "principal activities." *See Gaytan*

*v. G&G Landscaping Constr. Inc.*, 145 F. Supp. 3d 320, 325 (D.N.J. 2015); 454 C.M.R. §

27.04(4)(c).  Because plaintiffs allege the existence of the Policy, which requires Skinner

laborers to report to the Yard to load equipment and receive jobsite assignments, they seek to

certify a Reporting Class defined as follows:

> All manual laborers who worked at Skinner Services, Inc. at any time from
> August 5, 2013 through February 29, 2016, except those laborers (a) residing
> exclusively in Boston, Cambridge, Somerville, Medford, Everett, Chelsea, or
> Brookline, Massachusetts during the time period; and/or (b) who are immediate
> family members of the Defendants.

(Pl. Mem. in Supp. at 13).[2]

1.    **Numerosity**

In the First Circuit, a class size of more than 40 persons is "generally found to establish

numerosity." *In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 342 (D. Mass. 2003).  The putative

Reporting Class includes approximately 109 persons.  Therefore, the numerosity requirement is

satisfied.

2.    **Common Questions of Law and Fact**

As the Supreme Court has stated, district courts are to "give careful scrutiny to the

---

[2] Although plaintiffs suggest that the Policy was in effect before August 5, 2013, the applicable statute of limitations bars recovery for any violations before that date.

relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.'" *Id.* (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50 (5th ed. 2012) (alteration omitted)).

With respect to the Reporting Class, it is clear that there are common questions of law and fact concerning the existence of the Policy. If, as plaintiffs allege, Skinner required its laborers during the class period to report to the Yard to load equipment and receive jobsite assignments without compensation, that would likely be a clear violation of Massachusetts wage laws. There is no reason to think that the resolution of this inquiry will vary between class members.

In their opposition brief, defendants raise a variety of counterarguments.[3] First, they attack the credibility of the named and opt-in plaintiffs and note various inconsistencies in their deposition testimony.[4] For example, Pineda testified as follows:

> Q:    I need to get it clear on the record. If you drove to a work site or to the shop, it was at your own will and not at the direction of Skinner Services, correct?
>
> A:    It is correct.

(Def. Ex. 11 at 46:21-47:1). He also testified, "If the jobsite was near my house, I would drive there directly." (Def. Ex. 10 at 87:14-15). However, as plaintiffs note, in response to a separate

---

[3] Because defendants make several arguments that are duplicated throughout their brief, for simplicity those arguments have been grouped into broad categories, such as attacks on witness credibility.

[4] Many of the plaintiffs have little or no understanding of the English language, and thus required the assistance of translators in their depositions. The most common languages spoken by plaintiffs are Spanish and Portuguese. Moreover, several plaintiffs have little formal education, and some only attended a few years of primary grade school.

line of questioning by defense counsel, Pineda clearly testified that he always "had to go to the [Yard]." (*Id.* at 86:1-4). Defendants further note that Pineda testified that "[p]resently," he "prefer[s] to go to the shop" because it "reduces [his] cost." (*Id.* at 137:12-13). But the operative word is "presently"—Pineda's current preference to arrive at the Yard to use company transportation does not undermine his assertion that during the relevant class period, he was *required* by Skinner management to do so.

Hernandez similarly testified that sometimes he and other laborers would directly go to their jobsites. (Def. Ex. 13 at 58:12-59:20). He further stated that his supervisors would sometimes text him the address of the jobsite the day before. (*Id.* at 56:9-18). Defendants contend that this "directly contradicts the [p]laintiffs' assertion of an unwritten policy requiring all laborers to report to the Yard." (Def. Opp. at 10). However, in the context of this line of questioning, defense counsel did not clearly specify the time period in question. Therefore, as with Pineda, Hernandez could have been referring to Skinner's practices after the class period. Moreover, Hernandez had earlier testified that when he first started working for Skinner in 2014, he was instructed by Diniz to arrive at the Yard each morning at 5:45 a.m. (Def. Ex. 13 at 53:1-16).

Defendants' other attacks on the credibility of other plaintiffs do not change the disposition of the class-certification motion. For example, defendants note that Lopez testified that he had never seen a written statement memorializing the Policy. (Def. Ex. 14 at 102:1-4). It goes without saying that such an admission is hardly surprising—indeed, plaintiffs allege that the Policy was unwritten, and that is supported by the report written by the primary Department of Labor investigator. (Pl. Reply Ex. F at 3 (noting that FLSA violations "had to be reconstructed from employee interviews")). Defendants make a stronger attack on Montenegro's credibility.

13

Montenegro alleged that Santos forged his signature on the Cintas uniform laundering agreement, but later appeared to backtrack, claiming that the signature on the form was his. (Def. Ex. 15 at 85:3-86:2).

However, to the extent defendants rely on their own deposition testimony in support of their opposition to class certification, such testimony is also clouded by inconsistencies. For example, defendants testified that, during the class period, supervisors would tell laborers which jobsites to report to for the following day. (Pl. Reply Ex. J at 142:5-13; Pl. Reply Ex. K at 142:9-22; Pl. Reply Ex. L at 121:12-17; Pl. Reply Ex. M at 102:2-103:7; Pl. Reply Ex. N at 41:4-11). However, defendants have not produced any corroborating evidence, such as printouts of e-mail or text messages, to substantiate that assertion, despite a discovery request. (Pl. Reply Ex. O). Similarly, although several defendants denied the existence of a reporting policy altogether, (Pl. Reply Ex. J at 125:23-126:24; Pl. Reply Ex. K at 141:16-142:8), one Skinner supervisor, Ubriata Ferreira, testified that the travel and reporting "protocol" had changed in February 2016. (Pl. Reply Ex. M at 130:3-131:5; 137:3-141:15) (admitting that fewer laborers reported to the Yard after February 2016)). In any event, the bulk of plaintiffs' testimony clearly support the proposition that Skinner maintained a reporting policy in violation of Massachusetts wage laws.[5]

Second, defendants contend that "[o]ne 'common answer' is not possible based on the unique circumstances of each individual employee." (Def. Opp. at 15). They raise a variety of issues that they claim require individualized analyses that preclude class certification. However, some of these issues are irrelevant to the class-certification question. For example, whether laborers "reli[ed] on public transportation [or] their co-workers for rides" does not affect whether

---

[5] Defendants' testimony is so diametrically opposed to plaintiffs' that a factfinder must make a credibility determination at trial.

they were required to report to the Yard in the first instance. (*Id.* at 16). Other issues raised by defendants, such as the extent to which laborers were compensated for "driv[ing] vans, trucks, or the large 'dumpster trucks,'" (*id.* at 16), or "performed tasks that were 'preliminary' or 'postliminary' to their principal jobs," (*id.* at 18), concern individual damages, not the issue of certification. *See DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 406 (D. Mass. 2017).[6] And defendants' argument that laborers reported to the Yard of their own volition or upon an order by their supervisors only bolsters the rationale for class certification. As plaintiffs note, "[i]f [d]efendants are correct that reporting was not mandatory, then [they] will prevail on [the] common and predominant issue." (Pl. Reply at 9).

Third, defendants dispute that common evidence exists that will resolve the question of class certification. In support, they rely on *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279 (S.D.N.Y. 2015), where the district court held that plaintiffs not adduced sufficient evidence to support the inference of a *de facto* illegal labor policy. *Id.* at 289-90. Because "smoking guns are . . . quite rare," plaintiffs must provide "either (i) comprehensive statistical analyses or (ii) anecdotal evidence that reaches a certain critical mass" to satisfy Rule 23's commonality requirement. *Id.* at 289. The district court noted that the 31 plaintiffs, declarants, and sample opt-in plaintiffs who had attested to Citibank's alleged illegal labor policy amounted to, at best, one out of every 76 putative class members. *Id.* at 291. That ratio was too small to permit the court to "confidently . . . extrapolate[]" the allegations "to the class as a whole." *Id.* By contrast, in this litigation 40 of the approximately 109 putative class members have claimed that Skinner had an illegal policy requiring them to report to the Yard in the morning. Therefore, plaintiffs have

---

[6] In a similar vein, defendants attack the reliability of the statistical analysis used by plaintiffs' expert witness to calculate damages. (Def. Opp. at 20). That has no bearing on certification.

established the requisite "critical mass" defendants suggest is required.

Fourth, defendants briefly state that "hours spent by [laborers] may be exempt from the overtime regulations of the FLSA and Massachusetts law pursuant to . . . the Motor Carrier Exemption . . . for time spent working as a truck driver, loader, or truck driver's helper." (Def. Opp. at 19-20). However, as a procedural matter, FLSA exemptions must be asserted in pleadings as an affirmative defense. *See Sec'y of Labor v. DeSisto*, 929 F.2d 789, 797 (1st Cir. 1991). Defendants failed to do so here, and thus have waived this argument.

Fifth, defendants rely on the Loria memo, which expressed skepticism about plaintiffs' allegations. (Def. Opp. at 2-4). However, it is unclear what weight, if any, should be assigned to that document, as it appears that Loria's role in the Department of Labor's investigation into Skinner was minimal.[7] Indeed, the unnamed investigator who actually conducted the Skinner investigation issued a report that largely corroborates plaintiffs' theory. (Pl. Reply Ex. F).

### 3.   **Typicality**

"The typicality requirement is satisfied 'when the named plaintiff's injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims,' and 'when the plaintiff's claims and those of the class are based on the same legal theory.'" *Guckenberger v. Bos. Univ.*, 957 F. Supp. 306, 325 (D. Mass. 1997) (quoting *In re Bank of Bos.*, 762 F. Supp. 1525, 1532 (D. Mass. 1991) (alteration omitted)). Here, the alleged injuries—lost wages—all arise out of plaintiffs' allegation that Skinner refused to pay them for mandatory time spent loading tools at and traveling to and from the Yard. Accordingly, plaintiffs have met the typicality requirement.

Nevertheless, defendants offer two arguments that two of the named plaintiffs are not

---

[7] Plaintiffs further challenge the admissibility of the Loria memo.

suitable class representatives.  Defendants first attack Pineda's testimony, stating that he was "not aggrieved by [the Policy] . . . because he was routinely asked to serve as a driver of company trucks . . . for which [he] was paid over 270 hours."  (Def. Opp. at 24-25).  Similarly, defendants note that Lopez testified that he was paid in his capacity as a company driver.  (*Id.* at 26).  Yet again, however, that is a question of damages, separate from certification.  Where, as is here, the named plaintiffs' alleged injuries "are based on the same legal theory" and "arise from the same events" as the rest of the putative class, a difference in damages does not defeat typicality.  *See Applegate v. Formed Fiber Techs., LLC*, 2012 WL 3065542, at *6 (D. Me. July 27, 2012).[8]  Second, defendants selectively quote Pineda's deposition testimony, relying on his statement that *presently* he reports to the Yard of his own volition to save on gasoline costs.  As previously explained, Pineda's current preferences do not shed any light on whether he was required to report to the Yard during the class period, and thus do not affect typicality.

### 4.     __Adequacy__

To satisfy the adequacy requirement, "[t]he moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation."  *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985) (citing *Weiss v. York Hosp.*, 745 F.2d 786, 811 (3d Cir. 1984)).  It is undisputed that plaintiffs' counsel are well qualified to handle this litigation.

Rather, defendants only contend that the named plaintiffs' interest conflict with those of the FLSA collective.  After this court conditionally certified the collective action, several dozen

---

[8] Defendants also argue, without citing to any authority, that the fact certain named plaintiffs have individual claims separate from those of the class precludes them from serving as class representatives.  (Def. Opp. at 27-28).

Skinner laborers opted into the FLSA action, of which nine were discovered to be members of the Boston Crew.  As explained above, plaintiffs concede that the Boston Crew was never subject to the Policy, and thus have excluded them from the Reporting Class.  Defendants contend that the "exclusion of [the Boston Crew]" "demonstrates a bias toward the proposed Rule 23 Reporting class that could substantially prejudice a substantial portion of the FLSA Opt-in class," as "[p]laintiffs have to argue that . . . laborers who reside in greater Boston were not similarly aggrieved by the alleged unwritten reporting policy."  (Def. Opp. at 26-27).  Plaintiffs counter that it was impossible to know that the Policy did not apply to the Boston Crew until conditional certification was granted and discovery was underway.  (Pl. Reply at 17).  In any event, however, plaintiffs' separate motion for reformation, which will be addressed below, moots this objection.  *See O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 586 (6th Cir. 2009) (abrogated on other grounds by *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016)).

### 5. <u>Whether Common Questions of Law and Fact Predominate</u>

"The aim of the predominance inquiry is to test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not inefficient or unfair." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018) (internal quotation marks and citation omitted).  Here, the predominance factor weighs strongly in favor of certification.  As noted, the relevant inquiry is whether Skinner maintained a policy requiring class members to report to the Yard in the early morning without compensating them for their time.  Thus, "a sufficient constellation of common issues binds [the] class members together," such that certification is appropriate under the predominance requirement of Rule 23(b)(3).  *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000).

Defendants' predominance arguments, distilled to their essence, amount to either outright

18

denials of the existence of such a policy (which again, only strengthens plaintiffs' case for class

certification) or claims that individualized proof of damages predominate.  (Def. Opp. at 22-24).

Plaintiffs dispute that an individual damages inquiry is necessary, as they have proffered an

expert report and model that may be used to calculate classwide damages.  (Pl. Mem. in Supp. at

22).[9]  But even if such an inquiry were necessary, the Court could bifurcate the liability and

damage trials, appoint a special master to preside over individual damages proceedings, or

simply decertify the class after the liability trial.  *See In re Visa Check/MasterMoney Antitrust*

*Litig.*, 280 F.3d 124, 141 (2d Cir. 2001).

### 6. <u>Superiority</u>

"Finally, a Rule 23(b)(3) class should only be certified where 'a class action is superior to

other available methods for fairly and efficiently adjudicating the controversy.'"  *Garcia v. E.J.*

*Amusements of N.H., Inc.*, 98 F. Supp. 3d 277, 292 (D. Mass. 2015) (quoting Fed. R. Civ. P.

23(b)(3)).  "A Rule 23(b)(3) class action is particularly superior where class treatment can

vindicate the claims of 'groups of people whose individual claims would be too small to warrant

litigation.'"  *Id.* (quoting *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 41 (1st Cir. 2003)).

Here, several factors support the conclusion that a class action is superior to other

available methods of adjudication.  In light of the common questions of law and fact, only a

limited number of plaintiffs need testify to establish liability.  And because almost all of the

putative class members would recover at most a few thousand dollars, (Def. Ex. 22), it is

doubtful that plaintiffs would be able to bring individual lawsuits.  Furthermore, a class

adjudication is often superior in the employment context where the risk of employer reprisal may

---

[9] Because defendants do not have time records of time spent by laborers at the Yard, plaintiffs intend to
model wages owed by using existing jobsite time records and testimony to estimate reporting and travel time.

deter employees from bringing claims on an individual basis.  *See Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 24 (D. Mass. 2010).  Because a class action will more efficiently resolve the Reporting Class claims than would a series of individual cases, plaintiffs' motion to certify will be granted as to the Reporting Class.

### B.    Uniform Class

The Supreme Judicial Court has held that an employer may not pass the ordinary cost of doing business onto its employees.  *See Camara v. Attorney Gen.*, 458 Mass. 756, 760-64 (2011); *Awuah v. Coverall N. Am., Inc.*, 460 Mass. 484, 493-97 (2011).  In doing so, the SJC noted that Section 148 of the Wage Act prohibits employers from evading the timely payment of wages "by a special contract."  *See Camara*, 458 Mass. at 759 (citing Mass. Gen. Laws ch. 149, § 148).  The SJC further noted that Section 150 of the Wage Act prohibits employers from making deductions or withholding payments unless there is a valid attachment, assignment, or set-off.  *Id.* at 759-60 (citing Mass. Gen. Laws ch. 149, § 150).  At least one judge in this district has concluded that uniform fees are "not properly deductible from [employees'] pay and are therefore recoverable as damages" under the Wage Act.  *Martins v. 3PD Inc.*, 2014 WL 1271761, at *8 (D. Mass. Mar. 27, 2014) (Woodlock, J.).

Because plaintiffs allege that Skinner forced its employees to enroll in the Cintas uniform cleaning service, they seek to certify a Uniform Class defined as follows:

> All manual laborers who worked at Skinner Services, Inc. at any time from August 5, 2013 through present, from whose paychecks a "uniform" cost was deducted.

(Pl. Mem. in Supp. at 26).  As defendants' arguments pertaining to the Uniform Class are largely duplicative of those previously discussed in the Reporting Class section, the court will limit its analysis here to new arguments.

1.     **Numerosity**

The putative Uniform Class includes approximately 43 persons, which exceeds the

threshold required to establish numerosity.  *See In re Relafen Antitrust Litig.*, 218 F.R.D. at 342.

2.     **Common Questions of Law and Fact**

There are common questions of law and fact as to the Uniform Class.  Whether Skinner

violated the Massachusetts Wage Act depends on whether it forced plaintiffs, through coercion

or intimidation, into signing up for the Cintas uniform cleaning program, and whether the

deductions were valid attachments, assignments, or set-offs.  These questions may be answered

through common evidence, and there is no reason to think that the answers will vary between

class members.

In opposition, defendants contend that the "uniform deductions are permissible as a valid

set-off" because "the employees voluntarily used and benefitted from the" program.  (Def. Opp.

at 21).  In support, they rely on *Cormier v. Landry's Seafood House-N.C., Inc.*, 2015 WL

12732419 (D. Mass. Feb. 23, 2015), in which the putative class was comprised of servers at

Massachusetts restaurants.  The defendant maintained an Employee Discount Program, through

which employees could for example receive complimentary coffee and drinks and 50% discounts

on food and entertainment options at defendant's facilities.  *Id.* at *2.  To participate in the

program, employees had to "agree to have a bi-weekly $9.50 enrollment fee deducted from their

paychecks."  *Id.*  However, because it was undisputed that enrollment in the benefit program was

completely voluntary and that plaintiffs encountered no difficulty in unenrolling, the court held

that the bi-weekly deductions were "valid set-offs" under Section 150 of the Wage Act.  *Id.* at

*6-7.  By contrast, even if one were to assume that uniform costs could be properly deducted

from wages, here plaintiffs have proffered evidence that their enrollment in the Cintas cleaning

program was *involuntary*.  Accordingly, whether the deductions are valid set-offs is a common question of fact.

### 3.  Typicality

The typicality requirement is also satisfied.  As with the Reporting Class, the alleged injuries—lost wages—arise out of the same course of conduct, Skinner's putative coercion of laborers into enrolling into the cleaning program.

### 4.  Adequacy

Defendants do not appear to contest the adequacy prong of the Rule 23(a) analysis as to the Uniform Class.  In any event, there is no reason to doubt that the named plaintiffs will adequately represent the interests of the putative class, and that plaintiffs' counsel are qualified to prosecute the class claims.

### 5.  Predominance

Common questions of law and fact predominate over questions concerning only individual class members.  Indeed, the threshold question is whether Skinner required its laborers to enroll in the Cintas cleaning program.  If, as defendants contend, enrollment was entirely voluntary, then they will prevail on the issue of liability if the weekly deductions were valid set-offs.  If not, then the only other substantial question is damages, which presumably may be calculated without undue difficulty from Skinner's payroll records.

### 6.  Superiority

Finally, a class action is superior to other available methods of adjudication.  There are a limited number of issues of law and fact that will control the outcome of the Uniform Class claims.  Moreover, the potential amount of damages is considerably less than at stake in the Reporting Class, further strengthening the argument for certification.  For those reasons,

plaintiffs' motion to certify will be granted as to the Uniform Class.

**C.      Defendants' Motion to Decertify the Collective Action**

As noted earlier, there is a circuit split as to whether Rule 23 imposes heightened requirements for class certification compared to the FLSA, or if the standards are substantively the same.  *Compare Espenscheid*, 705 F.3d at 772, *with Grayson¸*79 F.3d at 1095-96.  However, because the Court will certify both the Reporting and Uniform Classes, it need not resolve this split.  Accordingly, defendants' motion to decertify the collective action will be denied.

**D.      Plaintiffs' Motion to Reform the Collective Action**

Finally, plaintiffs have moved to reform the collective action to exclude nine members of the Boston Crew who had opted into the FLSA action.  Plaintiffs contend, and defendants do not dispute, that they discovered that the Boston Crew was not subject to Skinner's reporting policy only "after extensive and difficult discovery subsequent to Conditional Certification."  (Pl. Reply at 17).

In *O'Brien*, the Sixth Circuit stated that "a district court should examine whether partial decertification [of a FLSA action] is possible, when faced with the situation where a subset of the plaintiffs fail to allege violations of the FLSA."  575 F.3d at 586.  It reasoned that otherwise, plaintiffs who are in fact "similarly situated to the lead plaintiffs" would be "barred from the opportunity to be part of a FLSA collective action," which "serves an important remedial purpose."  *Id.* (citing *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).  Although the First Circuit has not directly addressed the issue of reforming a FLSA collective action, it has stated that, in the context of a Rule 23 class action, a district court may "redefin[e] the class during the certification process or creat[e] subclasses" to "address concerns regarding the appropriate contours of the putative class."  *Manning*, 725 F.3d at 60.

From these cases, defendants contend that the Court cannot "reform" the FLSA collective action and plaintiffs must instead move for partial decertification. (Def. Opp. to Mot. to Reform at 2). However, this appears to be a distinction without a difference, as the end result is the same—the Boston Crew members will be excluded from the FLSA collective action as to the reporting-time claims. Accordingly, the motion to reform the collective action, which the Court will also construe to be a motion to partially decertify the collective action, will be granted.[10]

Defendants separately suggest that plaintiffs have made a procedural error by failing to file a second motion for conditional certification. (Def. Opp. to Mot. to Reform at 3). However, the second stage of the FLSA certification process is "typically precipitated by [defendants'] motion for decertification." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) (internal quotation marks and citation omitted). As defendants have already filed such a motion in this litigation, it is unnecessary for plaintiffs to file a duplicative motion for final certification.[11]

## V.  <u>Conclusion</u>

For the foregoing reasons, plaintiffs' motion for class certification is GRANTED, defendants' motion to decertify the FLSA collective is DENIED, and plaintiffs' motion to reform the collective is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  August 8, 2019                          United States District Judge

---

[10] In their opposition, defendants again contend that reformation of the FLSA collective action is improper because individualized inquiries will predominate this litigation. (Def. Opp. to Mot. to Reform at 1). The Court has already rejected those arguments in the Rule 23 class-certification analysis.

[11] To the extent defendants argue that plaintiffs have "fail[ed] to set forth how . . . they intend to notify [the Boston Crew] members that their [FLSA reporting] claims will be dismissed," (Def. Opp. to Mot. to Reform at 2), plaintiffs represent that they have already sent letters by certified mail to the affected individuals notifying them of the Motion to Reform. (Pl. Reply to Mot. to Reform at 4).