**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                              )
**JOSE PINEDA, JOSE MONTENEGRO,**      )
**MARCO LOPEZ, and JOSE HERNANDEZ,**   )
**on behalf of themselves and all others**      )
**similarly situated,**                                  )
                                                              )
            **Plaintiffs,**                                )
                                                              )         **Civil Action No.**
            **v.**                                          )         **16-12217-FDS**
                                                              )
**SKINNER SERVICES, INC., d/b/a SKINNER**  )
**DEMOLITION, THOMAS SKINNER, DAVID**    )
**SKINNER, ELBER DINIZ, and SANDRO**        )
**SANTOS,**                                            )
                                                              )
            **Defendants.**                              )
_____)

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY**
**JUDGMENT AND DISMISSAL AND RELATED MOTIONS TO STRIKE**

**SAYLOR, C.J.**

This case concerns claims by manual laborers against their employer, Skinner Services,

Inc., d/b/a Skinner Demolition ("Skinner"), and supervisors Thomas Skinner, David Skinner,

Elber Diniz, and Sandro Santos, for violating the Fair Labor Standards Act ("FLSA"), 29 U.S.C.

§§ 201 *et seq.*, and Massachusetts wage laws.

On September 13, 2019, defendants filed a motion seeking summary judgment and

dismissal as to Counts 1 and 3, which are the FLSA claims of the named plaintiffs Jose Pineda,

Jose Montenegro, Marco Lopez, and Jose Hernandez, due to their alleged failure to "commence"

the FLSA collective action by filing consents to sue within the applicable statute of limitations

period, as mandated by 29 U.S.C. § 256.  Defendants also filed a second motion for summary

judgment, contingent on the first, seeking dismissal of the entire complaint on the ground that the

court lacks subject-matter jurisdiction because the FLSA action was never properly commenced, or in the alternative because the plaintiffs cannot meet their burden of proving damages. Defendants filed a third motion for summary judgment as to the claims against individual defendants David Skinner, Sandro Santos, and Elber Diniz on the basis that those persons are not individually liable for the actions of the company.

Plaintiffs oppose summary judgment and dismissal, and have also moved to strike certain paragraphs in defendants' Statement of Undisputed Material Facts ("Def. SMF"). Defendants have moved to strike certain paragraphs in plaintiffs' Counter-Statement of Material Facts ("Pl. SMF"). Defendants have also moved to strike plaintiffs' September 19, 2019 letter and the signed consents to sue that are attached to it.

For the following reasons, defendants' first motion for summary judgment and dismissal of Counts 1 and 3 will be denied; defendants' second motion for summary judgment and dismissal of the complaint will be denied; and defendants' third motion for summary judgment and dismissal of claims against the individual defendants will be denied as to David Skinner and Sandro Santos and granted as to Counts 1, 3, and 5 asserted against Elber Diniz. Plaintiffs' motion to strike and defendants' two motions to strike will be denied.

## I.     Background

### A.     Factual Background

The following facts are as set forth in the record and are undisputed except as noted.

#### 1.     The Parties

Skinner Services, Inc., doing business as Skinner Demolition, is a construction company based in Avon, Massachusetts. (Am. Comp. ¶ 15). It performs work at construction sites in Massachusetts, New Hampshire, Maine, Rhode Island, Connecticut, and New York. (*Id.* ¶ 16).

Jose Pineda, Jose Montenegro, Marco Lopez, and Jose Hernandez are manual laborers who have worked for Skinner.  (*Id.* ¶¶ 48-177).

### 2.   The Reporting Policy

The named and opt-in plaintiffs allege that, until February 2016, Skinner had a policy (the "Reporting Policy") requiring its laborers to report at approximately 5:45 a.m. to the yard at the company's Avon headquarters, where they would receive jobsite assignments, and to return to the yard after leaving their jobsites.  (Am. Compl. ¶¶ 48-211).  According the plaintiffs, they were not compensated for the time spent reporting to the yard, waiting for job assignments, loading tools and equipment onto vehicles, traveling to jobsites, traveling back to the yard after leaving the jobsites, and unloading tools and equipment in the yard.  (*Id.*).  Plaintiffs allege that personnel who drove crew to jobsites would be compensated for up to one hour's driving time, regardless of the amount of time actually spent driving.  (*Id.*).  They allege that as a result, they were not paid wages to which they were entitled, whether as overtime or otherwise.

Defendants deny that such a mandatory reporting policy existed and contend that laborers were free to make their own travel arrangements and were properly compensated for their travel time.  It is undisputed that the policy, if it existed, ended in February 2016.  (Pl. SMF ¶¶ 136-37).

### 3.   The Uniform Policy

Plaintiffs also allege that starting on August 2, 2013, Skinner improperly deducted money from employees' weekly paychecks for a uniform laundering and repair service (the "Uniform Policy") through an outside vendor, Cintas Corporation.  (Def. SMF ¶¶ 71-82; Pl. SMF ¶¶ 71-82).  Plaintiffs allege that Skinner coerced employees into participating in the program, deducted varying amounts of money from the paychecks of even those employees who expressly refused to participate, and did not consistently provide the promised laundry and repair services.  (Pl.

SMF ¶¶ 71-82).

Defendants allege that participation in the program was voluntary, subject to a signed agreement form, and that the program provided measurable benefits, including free clothing, laundry, and repair services.  (Def. SMF ¶¶ 71-82).  It is undisputed that the weekly payroll deduction was approximately one hour's pay and varied among employees depending on their hourly wage.  (Def. SMF ¶ 76; Pl. SMF ¶ 76).  It is also undisputed that the last uniform deductions taken from the paychecks of named plaintiffs Jose Pineda, Marco Lopez, Jose Montenegro, and Jose Hernandez occurred on, respectively, January 30, 2015; March 30, 2015; August 5, 2016; and August 5, 2016.  (Def. SMF ¶¶ 80-82; Pl. SMF ¶¶ 80-82).

### 4.    Alleged Willfulness of Violations

Plaintiffs further allege that the FLSA violations were willful—that is, that Skinner's principals either knew their policies violated FLSA or showed reckless disregard as to that possibility.  (Pl. SMF ¶¶ 117-25; Am. Compl. ¶¶ 212-22, 230-34, Counts 1 and 3).  In support of that position, plaintiffs allege that defendants knew they were required to pay overtime under FLSA, as evidenced by the fact that they paid overtime for at least some of the work performed by employees on jobsites that exceeded 40 hours in a week and for some of employees' driving time, and had a federal poster regarding FLSA requirements posted in the yard.  They also allege that three Skinner managers admitted that they knew work in the yard and travel time should be compensated.  (Pl. SMF ¶ 117).[1]

Plaintiffs further allege that defendants deliberately failed to keep records of the time employees spent working at the yard and traveling to jobsites to avoid having to compensate

---

[1] Plaintiffs allege that Skinner did, at times, properly pay overtime if employees' work at jobsites exceeded 40 hours in a week.  However, according to plaintiffs, Skinner did not properly pay overtime if the employees' travel time and/or time spent working in the yard, in addition to their work at jobsites, caused their weekly hours worked to exceed 40 hours.  (Pl. SMF  117).

employees for that time.  (Pl. SMF ¶¶ 118-19).  Allegedly, defendants instructed employees to "punch in" only upon arriving at jobsites rather than upon arriving at the yard, unless they were driving Skinner company vehicles or a dump truck.  (*Id.*).  They also allege that defendants manipulated employees' time records in the TimeStation tracking system; according to plaintiffs, defendants altered the recorded time spent driving 1,499 times—1,060 of which resulted in the driving times being manually re-set to 59 minutes, 1 hour, or 1 hour and 1 minute—and eliminated records of punch-ins and punch-outs at the yard at least 12 times.  (Pl. SMF ¶¶ 120-21).

Finally, plaintiffs allege that defendants paid employees in cash to prevent the payments from appearing on official records; ignored repeated complaints from employees requesting to be paid for their reporting and travel time; never consulted an attorney about paying for reporting and travel time; and generated a memorandum on February 26, 2016, after becoming subject to a Department of Labor investigation about inaccurate time reporting in violation of the FLSA, claiming that they had never required employees to report to the yard.  (Pl. SMF ¶¶ 122-25).

### 5.    Alleged Retaliation

Plaintiffs further allege unlawful retaliation against Jose Pineda, Marco Lopez, and Jose Hernandez in violation of FLSA and Massachusetts wage laws.  Specifically, plaintiffs Pineda, Lopez, and Hernandez allege that after filing their original complaint in this case in November 2016, Skinner subjected them to adverse employment actions, including reduction of hours, assignment of less desirable jobs that were further away from home, and denial of previously available transportation to jobsites.  (Pl. SMF ¶¶ 66-70; Def. SMF ¶¶ 66-70).

### 6.    Individual Defendants

The complaint names four individuals as defendants in addition to Skinner Services, Inc.,

d/b/a Skinner Demolition:  Thomas Skinner, David Skinner, Elber Diniz, and Sandro Santos. The evidence concerning their roles in the company is set forth later in this memorandum.

### B.      Procedural Background

Plaintiffs filed the complaint in this action on November 2, 2016.  They filed an amended complaint on December 9, 2016.

The amended complaint asserts eight claims.  Counts One and Two, respectively, assert claims that defendants failed to pay plaintiffs wages at one-and-a-half-times their hourly rates for overtime, in violation of 29 U.S.C. § 207 and the Massachusetts Fair Wage Law, Mass. Gen. Laws ch. 151, §§ 1A, 1B.  Counts Three and Four, respectively, assert claims that defendants failed to pay plaintiffs minimum wage for a significant number of hours worked, in violation of 29 U.S.C. § 206 and the Massachusetts Fair Wage Law, Mass. Gen. Laws ch. 151, §§ 1, 20. Count Five asserts a claim that defendants failed to pay plaintiffs wages owed, in violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148.  Counts Six, Seven, and Eight, respectively, assert claims that defendants took adverse employment actions against certain plaintiffs for taking part in this action, in violation of 29 U.S.C. § 215(a)(3), the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148A, and the Massachusetts Fair Wage Law, Mass. Gen. Laws ch. 151, § 19(5).  The retaliation claims apply only to plaintiffs Pineda, Lopez, and Hernandez.  (Am. Compl. ¶¶ 250-64).

On July 19, 2017, plaintiffs filed a motion requesting the Court to conditionally certify a FLSA collective action for all individuals employed as manual laborers by Skinner between November 2, 2013, through the present day; to authorize the issuance of a notice and consent to join the collective action; and to toll the limitations period for collective members' FLSA claims from November 2, 2016, through 40 days following the issuance of the Court's order.  They

contemporaneously filed consents to sue of six opt-in plaintiffs.  With their motion, they filed a declaration of named plaintiff Jose Pineda, in which he identified himself as a named plaintiff and attested to his experiences with the Reporting Policy and Uniform Policy.  (Pl. SMF ¶ 24; Pl. Mem. in Support of Mot. for Conditional Certification and Issuance of Notice, Ex. B).[2]

On August 18, 2017, defendants opposed the conditional certification on the ground that there was no class of similarly situated employees at Skinner, and opposed the tolling of the FLSA claims.  Attached to their opposition, defendants filed interrogatories signed by each of the named plaintiffs, in which each one identified himself as a plaintiff and attested to his experiences with the Reporting Policy and Uniform Policy.  (Pl. SMF ¶ 24; Def. Opp. to Mot. for Conditional Certification and Issuance of Notice, Ex. 4).

On September 6, 2017, the Court granted plaintiffs' motion and conditionally certified the FLSA collective action, subject to hearing and finalization of notice.  It granted the motion orally from the bench, without specifically addressing the issue of tolling the limitations period. Thereafter, plaintiffs filed their proposed notices on September 14 and defendants filed their objections on September 22.  The parties finalized their agreed-upon, court-authorized opt-in notice, consent-to-join, and reminder forms on October 25, thereby beginning the 90-day opt-in period on October 27, 2017.

Before the expiration of the 90-day opt-in period on January 25, 2018, plaintiffs obtained and filed 54 signed "Consent to Join Collective Action" forms from Skinner employees.[3]  Each consent-to-sue form includes the statement "I hereby consent to become a plaintiff and to be

---

[2] Plaintiffs later filed a second and third declaration by Pineda, attached to, respectively, a February 16, 2018 motion to compel discovery and a September 25, 2018 motion for contempt.  In each one, he identified himself as a named plaintiff and signed it.  (Pl. SMF ¶ 24).

[3] This includes the six consents to sue filed alongside the motion for conditional certification, but not any consents to sue filed by the four named plaintiffs.

bound by the judgment by the court or any settlement or resolution of this lawsuit"; designates

plaintiffs' counsel Segal Roitman to represent the signee and the named plaintiffs as the signee's

agents; and concludes with a signature, date, and contact information.  (*See, e.g.,* Oct. 25, 2017

Stip. Re Status Conference and Beginning of Opt-In Period, Ex. B).  The four named plaintiffs

did not file consent-to-sue forms signed by themselves with the court during the 90-day opt-in

period.

Over the next year, the parties engaged in multiple discovery disputes requiring court

intervention.  During the discovery phase, from November 2017 to July 2018, each of the named

plaintiffs sat for a deposition at the office of defendants' counsel, during which each one

identified himself as a plaintiff and described his knowledge of the lawsuit's allegations

concerning retaliation, the Reporting Policy, and the Uniform Policy.  (Pl. SMF ¶¶ 107-15).[4]  On

August 24, 2018, defendants terminated the employment of opt-in plaintiff Manuel Goncalves.

(Pl. SMF ¶ 116).  Plaintiffs' counsel moved to hold defendants in civil contempt of the Court's

September 15, 2017 protective order prohibiting retaliation against employees for participating

or assisting in the ongoing litigation.  (*Id.*).  The Court held a three-day evidentiary hearing on

the matter and, on November 13, 2018, found by clear and convincing evidence that Goncalves's

termination was motivated at least in part by his participation in this litigation.  (*Id.*; Nov. 13,

2018 Tr. at 22:10-14).  On December 10, 2018, the Court awarded front and back pay and

reasonable attorneys' fees.  (Order Concerning Sanctions for Defs.' Contempt of Court).

In October 2018, during the discovery phase, plaintiffs retained David Breshears,

---

[4] Plaintiff Jose Pineda was deposed on December 5, 2017, and June 12, 2018; Jose Montenegro was deposed on November 20, 2017; Marco Lopez was deposed on December 14, 2017; and Jose Hernandez was deposed on January 23, 2018.  (Pl. SMF ¶¶ 107-15).  Each affirmed that he knew he was part of a lawsuit against Skinner Services, seeking to recover unpaid wages for time spent traveling and reporting to the yard, among other allegations.  (*Id.* at ¶¶ 111-14).  Pineda, Lopez, and Hernandez testified that they faced retaliation from Skinner as a result of joining the lawsuit.  (*Id.* at ¶¶ 111, 113-14).

CPA/CFF, to serve as a damages expert.  (Pl. SMF ¶¶ 137-49; Pl. Ex. CCC, Breshears Aff. and Report).  Because Skinner allegedly did not allow its employees to "punch in" and "punch out" to account for all the time they spent reporting to the yard and traveling, the purpose of Breshears's report was to estimate uncompensated travel and reporting time for the class members and total wages due.  (Pl. SMF ¶¶ 137-49).  He based his estimates on the deposition testimony of plaintiffs concerning the policies, as well as Skinner's own timekeeping software that recorded payroll, shifts worked, and jobsite assignments for each plaintiff.  (*Id.*).

Breshears modeled uncompensated travel time by using Google Maps to estimate the transportation time between Skinner's Avon headquarters and the location of each employee's "punch-in" entry.  (*Id.* at ¶¶ 138-39).  He discounted the estimated travel times by 20%, to account for the testimony of multiple plaintiffs that they were required to report to Skinner headquarters before leaving for a jobsite approximately 80% of the time.  (*Id.* at ¶ 140).[5]  He also discounted the roughly 11% of shift entries that lacked a latitude and longitude; suggested overnight or out-of-town work; or were non-jobsite-related work, such as "office," "no call/no show," or "truck drivers."  (*Id.* at ¶ 141).

Breshears modeled uncompensated reporting time, or time spent waiting and working in the yard, based on the testimony of witnesses as to their average daily time spent at the yard (which averaged 40 minutes across employees) and the uncontested fact that employees reported to the yard between 5:30 and 5:45 a.m.  (*Id.* at ¶ 135-36, 143).  He discounted the reporting time estimates to account for days when employees were not required to report to the yard, performed non-jobsite-related work, or did not travel due to staying overnight on out-of-town assignments.  (*Id.* ¶¶ 143).  He used his model of uncompensated hours worked, along with the verified payroll

---

[5] Breshears also calculated alternative estimated damages, based on the same methodology, if one were to assume that the laborers had to report to the yard 60%, 70%, or 90% of the time.  (*Id.* at ¶ 148).

deductions for the uniform program, to estimate unpaid straight time and overtime wages for each employee based on his individual hourly wage rate.  (*Id.* at ¶¶ 145-46).

On December 21, 2018, plaintiffs moved to certify two classes pursuant to Fed. R. Civ. P. 23 and the FLSA.  The first class, the "Reporting Class," consisted of individuals who worked for Skinner from August 5, 2013, to February 29, 2016, who alleged that they were not compensated for work time at the yard and travel time between the yard and jobsites.  The second class, the "Uniform Class," consisted of individuals who worked for Skinner Services from August 5, 2013, through the present, who alleged that their paychecks were subject to mandatory deductions for uniform cleaning services.  Defendants moved to decertify the FLSA collective action, and plaintiffs further moved to reform the FLSA action as to the reporting and travel claims to exclude a group of laborers living in or around Boston ("The Boston Crew"), who would typically report directly to jobsites.  On August 8, 2019, the Court granted plaintiffs' motions for class certification and to reform the FLSA collective, and denied defendants' motion to decertify the FLSA action.

On September 13, 2019, defendants filed three motions for summary judgment.  On September 19, 2019, plaintiffs filed consents to sue, modeled after the consents to sue that the opt-in plaintiffs had submitted, signed by all four named plaintiffs.  On October 18, 2019, plaintiffs opposed the motions for summary judgment and moved to strike portions of defendants' Statement of Material Facts.  On November 15 and 21, 2019, respectively, defendants moved to strike the September 19, 2019 letter with attached consents to sue, and portions of plaintiffs' Counter-Statement of Material Facts.

## II.   <u>Legal Standard</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.   **Analysis**

Defendants' first motion for summary judgment seeks to dismiss Counts 1 and 3, which are the FLSA claims of the named plaintiffs, on the ground that plaintiffs failed to file the named plaintiffs' consents to sue within the applicable limitations period. The second motion seeks to dismiss the entire action if the Court grants the first motion due to lack of subject-matter jurisdiction and, in the alternative, on the ground that plaintiffs' evidence of damages is insufficient. The third motion seeks summary judgment on all counts asserted against individual defendants David Skinner, Elber Diniz, and Sandro Santos, on the ground that they are not personally liable for the behavior attributed to Skinner Services. Plaintiffs have moved to strike

portions of defendants' Statement of Material Facts.  Defendants have moved to strike portions

of plaintiffs' Counter-statement of Material Facts and the September 19, 2019 letter with

attached consents to sue of the named plaintiffs.

A.      **Motions to Strike**

Because the disposition of the motions to strike may affect the evidentiary record, they

will be addressed first.

Pursuant to Fed. R. Civ. P. 12(f), the court may strike from a pleading "any redundant,

immaterial, impertinent, or scandalous matter." However, Rule 12(f) specifically gives the Court

discretion as to whether to strike a particular matter, and motions to strike are generally

disfavored.  *See Zurich Am. Ins. Co. v. Watts Regulator Co.*, 796 F. Supp. 2d 240, 246 (D. Mass.

2011) (citing *Soni v. Boston Med. Ctr. Corp.*, 683 F. Supp. 2d 74, 92 (D. Mass. 2009); *Alvarado-*

*Morales v. Digital Equip. Corp.*, 843 F.2d 613, 618 (1st Cir. 1988) (district court has

"considerable discretion" in deciding a motion to strike)); *Boreri v. Fiat S.p.A.*, 763 F.2d 17, 23

(1st Cir. 1985) (motions to strike "disfavored in practice").  Moreover, motions to strike are

rarely granted without a showing of prejudice to the moving party.  *See Ross-Simons of Warwick,*

*Inc. v. Baccarat, Inc.*, 182 F.R.D. 386, 398 (D.R.I. 1998) ("Mere redundancy is insufficient to

support a motion to strike; the movant must demonstrate that prejudice would result if the

offending material remained in the pleadings.")

Plaintiffs have moved to strike Paragraphs 71 through 79 of the Defendants' Statement of

Facts and Paragraphs 5 through 15 of the Declaration of Sandro Santos, all of which concern the

Uniform Policy.  (Pl. Mot. to Strike at 1-2).  Specifically, defendants allege that the Uniform

Policy was strictly voluntary and otherwise permissible.  (*Id.*).  Plaintiffs contend that such

information is irrelevant because the legality of the Uniform Policy was not the subject of

12

defendants' motion for summary judgment.  Defendants counter that the paragraphs are relevant background information for their argument concerning the statute of limitations for Uniform Policy claims.  Because defendants' summary judgment motion turns on the application of the statute of limitations to various FLSA claims, such background information cannot be said to be "immaterial" or "impertinent."  *See* Fed. R. Civ. P. 12(f).  Moreover, its inclusion is not demonstrably prejudicial to plaintiffs, who have disputed the truth of those paragraphs. Plaintiffs' motion to strike will therefore be denied.

Defendants have moved to strike Paragraphs 116-130, 135-136, and 152-161 of Plaintiffs' Counter-Statement of Material Facts on the ground that those paragraphs are irrelevant to the contested issues at summary judgment.  Each of the topics of those paragraphs—the FLSA statute of limitations, the ability of plaintiffs to prove damages, and the individual liability of David Skinner—is a ground on which defendants have moved for summary judgment.  The information is likely relevant to issues of summary judgment and defendants have not demonstrated prejudice.  Defendant's motion to strike will therefore be denied.

Finally, defendants have moved to strike the September 19, 2019 letter that plaintiffs filed with the consent-to-sue forms signed by the four named plaintiffs, on the ground that the limitations period in which the forms must be filed has expired and they are therefore "a nullity." (Def. Mot. to Strike Consents at 1).  Whether those consent-to-sue forms were timely filed is a key legal issue to be resolved in summary judgment that has been extensively briefed by both sides.  Therefore, the forms are relevant and the motion to strike will be denied.

### B.  Whether Named Plaintiffs Commenced the FLSA Collective Action Within the Limitations Period

Defendants' first motion for summary judgment contends that plaintiffs did not timely file the consents to sue of the four named plaintiffs within the applicable two- or three- year

limitations period for FLSA claims, and therefore that the FLSA claims of the named plaintiffs must be dismissed as time-barred.

The statute of limitations for claims of unpaid minimum wage or unpaid overtime under the Fair Labor Standards Act is "two years after the cause of action accrued," or three years for a "cause of action arising out of a willful violation."  29 U.S.C. § 255(a).  A cause of action accrues when the allegedly illegal employment practice occurs, and no later than the termination of such practice or the termination of the plaintiff's employment.  *See, e.g.*, *Unexcelled Chemical Corp. v. United States*, 345 U.S. 59, 65 (1953) (for purpose of statute of limitations under 29 U.S.C. § 255, cause of action accrues when the plaintiffs were employed); *O'Connell v. Champion Intern. Corp.*, 812 F.2d 393, 394 (8th Cir. 1987) (for purposes of Age Discrimination in Employment Act, which incorporates statute of limitations set forth in 29 U.S.C. § 255, two- or three-year statute of limitations period "runs from the time the defendant takes the allegedly [illegal] actions and the plaintiff learns of them" and ends when plaintiff "'commences' his action"); *Ikossi-Anastasiou v. Board of Supervisors of La. State Univ.*, 579 F.3d 546, 553 (5th Cir. 2009) (latest date that FLSA claim accrued was the date of plaintiff's last paycheck); *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 187 (6th Cir. 2008) ("Under the FLSA . . . a cause of action is deemed to accrue . . . at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed.") (internal citations and quotations omitted); *McLaughlin v. Boston Harbor Cruises, Inc.*, 2006 WL 1998629, at *2 (D. Mass. July 17, 2006) (FLSA claim accrued, at the latest, on date the plaintiff's employment terminated).

The parties do not dispute that the Reporting Policy claims accrued at the latest on February 29, 2016, the last day of the collective period for such claims and arguably the last day

14

that the challenged policy was in effect.  (Def. First Mot. for Summ. J. at 6; Pl. First Opp. at 12).

Defendants contend that the Uniform Policy claims have a different accrual date that is distinct

for each plaintiff.  Specifically, they contend that those claims accrued on the last date that

deductions for uniforms were taken out of the paychecks of each named plaintiff:  January 30,

2015, for Jose Pineda; March 30, 2015, for Marco Lopez; and August 5, 2016, for Jose

Montenegro and Jose Hernandez.  (Def. First Mot. for Summ. J. at 7).  For present purposes, the

Court will assume that those accrual dates are correct.

Under Section 255, a potential plaintiff must "commence" his or her FLSA action within

two years of the date of accrual, or three years for a willful violation.  Section 256 defines when

an action is "commenced" for the purposes of the statute of limitations:

> In determining when an action is commenced for the purposes of section 255 of
> this title, an action . . . shall be considered to be commenced on the date when the
> complaint is filed; except that in the case of a collective or class action . . . it shall
> be considered to be commenced in the case of any individual claimant—
>
> (a)      on the date when the complaint is filed, if he is specifically named as a
> party plaintiff in the complaint and his written consent to become a party plaintiff
> is filed on such date in the court in which the action is brought; or
>
> (b)      if such written consent was not so filed or if his name did not so appear—
> on the subsequent date on which such written consent is filed in the court in
> which the action was commenced.

29 U.S.C. § 256.  Thus, for a plaintiff asserting an individual FLSA claim, the action commences

on the date that the complaint is filed.  *Id.*  For a named plaintiff asserting a collective FLSA

claim, the action commences after (1) the complaint is filed naming him party plaintiff *and* (2) a

written consent to serve as party plaintiff is filed with the court.  *See McLaughlin*, 2006 WL

1998629, at *2; 29 U.S.C. § 256(a).  And for an opt-in plaintiff joining a collective FLSA claim,

the action commences when he files a written consent to sue with the court.  29 U.S.C. § 256(b).

The written-consent requirement is repeated in 29 U.S.C. § 216, which states, "No employee

shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."

Defendants contend that the limitations period for the named plaintiffs' Reporting Policy claims expired on March 1, 2018 (or March 1, 2019, using the three-year statute of limitations for willful violations).  (Def. First Mot. for Summ. J. at 6).  Defendants contend that the limitations period for Uniform Policy claims expired on January 30, 2017 (or 2018) for Jose Pineda; March 30, 2017 (or 2018) for Marco Lopez; and August 5, 2018 (or 2019) for Jose Montenegro and Jose Hernandez.  (*Id.* at 7-8).  It is undisputed that the four named plaintiffs did not file forms with the court explicitly labeled "consent to sue," modeled after the consents to sue that opt-in plaintiffs signed in order to join the action, until September 19, 2019.

Defendants contend that because the named plaintiffs filed their consents to sue after the limitations period expired, the collective FLSA claims are time-barred.  They urge the court to follow the example set by *McLaughlin v. Harbor Cruises LLC*, 2006 WL 1998629 (D. Mass. July 17, 2006) and *Pike v. New Generation Donuts*, *LLC,* 2016 WL 707361 (D. Mass. Feb. 20, 2016), in which the district court dismissed the FLSA claims of the named plaintiffs because they did not timely "commence" their FLSA collective action by filing written consents within the applicable two- or three- year statute of limitations period.

According to plaintiffs, (1) defendants have waived the limitations defense, or are estopped from asserting it; (2) the named plaintiffs' consent-to-sue forms filed on September 19, 2019, were timely because the Court had previously tolled the limitations period; (3) certain prior signed writings satisfy the FLSA "consent to sue" requirement; and (4) even if the Court dismisses the collective FLSA claims as time-barred, the individual FLSA claims of each named plaintiff should survive.  Plaintiffs further contend that the three-year statute of limitations for

willful violations of FLSA should govern this action, while defendants contend that the two-year statute of limitations applies.

### 1.      Whether the Limitations Defense Is Barred by Waiver or Estoppel

Plaintiffs contend that defendants have waived their argument that the claims are time-barred because they did not assert the statute-of-limitations defense earlier in the litigation.  They further contend that defendants should be estopped from asserting such a defense because they conducted extensive litigation in this matter as if named plaintiffs were properly a part of the action, including serving lengthy interrogatories and taking depositions.

In fact, however, defendants did assert the statute of limitations (as well as plaintiffs' failure to comply with the procedural requirements of the FLSA) as affirmative defenses in their answer, so they have not waived their limitations argument.  (Answer to First Am. Compl. at 22). And multiple courts have held that asserting a statute-of-limitations defense in an FLSA case is sufficient to preserve a defendant's right to later develop an argument that plaintiffs' claims are time-barred due to failure to file written consents, and that defendants are not estopped from advancing that argument simply because they conducted discovery and did not place plaintiffs on notice that their consents were defective or missing.  *See, e.g.*, *Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 677 (6th Cir. 2012) (no grounds for estoppel or waiver where defendant pleaded the statute-of-limitations defense in its answer and raised it in a motion for summary judgment, even though it did not earlier oppose named plaintiff's attempt to serve as class representative); *Matuska v. NMTC, Inc.,* 2012 WL 1533779, at *3 n.6 (D.N.J. Apr. 30, 2012) (defendant not estopped from raising objection to plaintiffs' failure to file written consents, even after lengthy discovery process, where it raised a statute-of-limitations defense in its answer); *Faust v. Comcast Cable Commc'ns Mgmt., LLC*, 2013 WL 5587291, at *4 (D. Md. Oct. 9, 2013)

(defendant has no obligation to plead insufficiency of written consent as separate affirmative defense outside of statute-of-limitations defense, nor any obligation to inform plaintiff of his failure to file a written consent). Accordingly, defendants are not estopped from raising this argument simply because they conducted discovery earlier in the litigation.

> ### 2.    Whether the Limitations Period Was Tolled

Plaintiffs next contend that the consent-to-sue forms filed on September 19, 2019, were timely because this Court tolled the limitations period for more than a year.

The doctrine of equitable tolling "extends statutory deadlines in extraordinary circumstances for parties who were prevented from complying with them through no fault or lack of diligence of their own."  *Neves v. Holder*, 613 F.3d 30, 36 (1st Cir. 2010).  A party seeking equitable tolling "bears the burden of establishing two elements:  (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Id.* (citing *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005)).  Courts should employ equitable tolling "sparingly," and "not . . . as a means of rescuing a party who has failed to exercise due diligence."  *Guerrero-Santana v. Gonzalez*, 499 F.3d 90, 94 (1st Cir. 2007); *see also Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 90 (1990) ("Federal courts have typically extended equitable relief only sparingly in suits against private litigants, allowing tolling where the claimant has actively pursued his judicial remedies by filing a defective pleading or where he has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass."); *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 278-79 (1st Cir. 1999) (holding that equitable tolling should be employed "sparingly" in discrimination cases, and only when a claimant "misses a filing deadline because of circumstances effectively beyond her control," such as employer misconduct).

Defendants contend that plaintiffs have failed to meet their burden of showing that

extraordinary circumstances or defendants' misconduct have made it impossible for them to

comply with the statute of limitations.  They contend that plaintiffs have been represented by

competent counsel since the outset of this litigation in 2016, have been actively involved in the

litigation, and knew or should have known of their obligation to file consents to sue.  *See Tidd v.

Adecco USA, Inc.*, 2008 WL 4286512, at *5 (D. Mass. Sept. 17, 2009) (granting plaintiffs'

motion to conditionally certify a FLSA class and permit § 216(b) opt-in notice but denying their

request for tolling during the prospective opt-in period, because "the circumstances of this case

are not substantially different from other FLSA cases, and acceptance of the plaintiffs' argument

would essentially mean that equitable tolling should occur in every FLSA collective action").

Plaintiffs contend that in 2017 the court tolled the FLSA limitations period for nearly a

year.  Indeed, plaintiffs' motion for conditional certification and issuance of notice, filed on July

19, 2017—which the Court granted—specifically requested, among other things, the tolling of

the limitations period for collective members' FLSA claims from November 2, 2016, through

forty days following the issuance of the Court's order.  (Pl. Mem. in Support of Mot. for

Conditional Certification at 2).[6]  Plaintiffs briefed that request, essentially arguing that denying

equitable tolling would result in injustice to potential class members whose claims could be time-

barred, through no fault of their own, due to litigation delays in the unfolding of the conditional

certification process.  (*Id.* at 17). And defendants opposed it, asserting largely the same

arguments that they do now—that is, that plaintiffs had not shown extraordinary circumstances.

On September 6, 2017, following oral argument, the Court granted plaintiffs' motion for

---

[6] Plaintiffs also requested conditional certification of the proposed collective action; an order directing defendants to produce the contact information of prospective collective members; issuance of plaintiffs' Notice and Consent to Join Collective Action forms to all collective members; and an order directing defendants to post the notice and consent forms conspicuously at their headquarters and worksites.  (*Id.*).

conditional certification from the bench, subject to finalization of the notice forms.  (Electronic

Order, Dkt. No. 69).  The parties finalized, and the Court approved, English versions of the

notice and consent-to-join forms on October 12, 2017, and Spanish and Portuguese versions of

the same forms on October 25, 2017.

The question here is whether the Court granted all aspects of plaintiffs' motion (including

the portion that requested tolling) when it orally granted the motion.  Defendants characterize the

Court's decision of September 6, 2017, as "only granting plaintiffs' request for conditional

certification" and "not grant[ing] any of the plaintiffs' other requests for relief," including the

request for tolling.  (Def. First Reply at 2).  But the Court did not say that; its ruling did not

specifically address the tolling issue in any way.  And, unfortunately, it did not make clear

exactly what it was doing and why.

Court orders are interpreted according to their natural and ordinary meaning.  *See* 56 Am.

Jur. 2d Motions, Rules, and Orders § 48.  Here, the Court orally granted plaintiffs' motion, with

the only limitation that it was granted pending hearing and subject to finalization of the notice

forms.  Without any other limitation, it was reasonable for plaintiffs to believe that the motion

was granted in its entirety, and to rely on that interpretation in determining when the limitations

period expired.[7]

Defendants nonetheless argue that the Court "would not have imposed such a significant

departure from the normal and statutory FLSA tolling rule without expressly stating so" and

"would not have casually or tacitly made such a ruling."  (Def. First Reply at 2).  But multiple

courts have exercised their authority to toll the FLSA limitations periods when delays in

---

[7] Plaintiffs prevailed in the other forms of relief requested by their motion, such as issuance of notice and consent forms and the requirement that defendants post such forms in their workplace, even though the Court did not explicitly grant those portions in its oral order.  Plaintiffs argue that by the same logic, they reasonably understood the tolling portion of their motion to be granted, even though the Court did not explicitly discuss it.

litigation or the class certification process would have time-barred plaintiffs' claims.  *See, e.g.,*

*Israel Antonio-Morales v. Bimbo's Best Produce*, 2009 WL 1591172, at *2 (E.D. La. Apr. 20,

2009) (tolling FLSA limitations period during stay sought by Department of Justice); *Yahraes v.*

*Restaurant Assocs. Events Corp.*, 2011 WL 844963, at *2 (E.D.N.Y. Mar. 8, 2011) (collecting

cases for the proposition that delay in litigation may be deemed an "extraordinary circumstance"

justifying equitable tolling of the FLSA limitations period); *Beauperthuy v. 24 Hour Fitness*

*USA, Inc.*, 2007 WL 707475, at *8 (N.D. Cal. Mar. 6, 2007) (tolling FLSA limitations period,

not based on wrongdoing by defendant, but to avoid injustice of procedurally barring claims of

potential plaintiffs who had not joined previous lawsuit addressing similar employment

practices); *McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 445 (S.D.N.Y. 2012) (tolling

from date of filing of motion for conditional certification because "those . . . pursuing the claims

should also not be penalized due to the courts' heavy docket and understandable delays in

rulings"); *Stickle v. SCIWestern Mkt. Support Ctr., L.P.*, 2008 WL 4446539, at *22 (D. Ariz.

Sep. 30, 2008) (tolling during time that motions to dismiss and for conditional certification were

under advisement).[8]

    In short, it was well within the authority of this Court to toll the limitations period as

plaintiffs requested, and it was reasonable for plaintiffs to have relied on the court's decision.

Obviously, it would have been preferable if the Court had addressed the issue directly.  But if

defendants were genuinely confused as to the scope of the Court's order, they could have moved

for reconsideration or clarification.  And to be clear, the question at present is not whether that

---

[8] *But see Tidd*, 2008 WL 4286512, at *5 (declining to toll FLSA statute of limitations during notice and opt-in period, as "plaintiffs have not alleged any extraordinary circumstance . . . nor . . . any wrongdoing by the defendants"); *Thomas v. Talyst*, 2008 WL 570806, at *5 (W.D. Wash. Feb. 28, 2008) (declining to toll FLSA limitations period because defendant had not engaged in wrongful conduct that prevented plaintiff from asserting his claims, plaintiff's ability to file his consent form was "solely within his control," and plaintiff did not demonstrate "extraordinary circumstances" meriting tolling).

decision was correct; it is whether plaintiffs reasonably relied upon it.  Under the circumstances, that reliance was reasonable, and to revisit the decision now could cause injustice to those plaintiffs whose claims would be time-barred.

In sum, the Court tolled the limitations period for 348 days, from November 2, 2016, to October 16, 2017, which was 40 days after its order granting plaintiffs' motion.  Therefore, the limitations period on all plaintiffs' Reporting Policy claims, which accrued on February 29, 2016, expired on February 11, 2019 (348 days + 2 years), or February 11, 2020 if the defendants' FLSA violations were willful (348 days + 3 years).  The limitations period on the Uniform Policy claims of the named plaintiffs expired as follows:

| Plaintiff Name | Date of Uniform Policy Claims Accrual | Limitations Deadline, No Willful FLSA Violations | Limitations Deadline, Willful FLSA Violations |
|---|---|---|---|
| Jose Pineda | 1/30/2015 | 1/13/2018 | 1/13/2019 |
| Marco Lopez | 3/30/2015 | 3/12/2018 | 3/12/2019 |
| Jose Montenegro | 8/5/2016 | 7/19/2019 | 7/19/2020 |
| Jose Hernandez | 8/5/2016 | 7/19/2019 | 7/19/2020 |

## 2.     Whether the Applicable Statute of Limitations Is Two or Three Years

Even taking tolling into account, if the two-year statute of limitations for non-willful violations of FLSA applies to plaintiffs' claims, none of their consent-to-sue forms—which were filed on September 19, 2019—were timely.  If the three-year statute of limitations for willful violations applies, the consent-to-sue forms were timely filed to preserve all named plaintiffs' Reporting Policy claims and the Uniform Policy claims of Jose Montenegro and Jose Hernandez.

As noted, the FLSA imposes a two-year statute of limitations, unless the violations are shown to be willful, in which case a three-year statute of limitations applies.  29 U.S.C. § 255(a); *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1079 (1st Cir. 1995).  A violation is willful if "the employer either knew or showed reckless disregard as to whether its conduct was prohibited by the FLSA."  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 128 (1988).

Whether a FLSA violation was willful "is a mixed question of law and fact."  *Newspapers of New England*, 44 F.3d at 1080.

Courts typically examine a number of factors to determine whether an employer's behavior evinces knowledge or reckless disregard as to purported FLSA violations.  For example, an employer's "failure to keep adequate payroll records," "intentional manipulation of [its] records," and practice of paying employees "off the books" could be "sufficient grounds for concluding that [the employer] did not act in good faith or with a reasonable belief that it was in compliance with the FLSA."  *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 35 (1st Cir. 2007) (declining to overturn district court's finding of willfulness because it was not "clearly erroneous").  *See also Lopez v. Corporacion Azucarera de Puerto Rico*, 938 F.2d 1510, 1515 (1st Cir. 1991) (stating hypothetically that a genuine issue of material fact would be raised, sufficient for a claim of willfulness and three-year statute of limitations to survive summary judgment, if employees had attested that employer forbade them from accurately recording their hours in order to exempt them from FLSA protections); *Gonpo v. Sonam's Stonewalls & Art LLC*, 2018 WL 1725695, at *9 (D. Mass. Apr. 9, 2018) (finding that plaintiff's allegations on willfulness survive a motion to dismiss because they allege that defendants "failed to keep full and accurate records of hours worked, underreported his hours on pay slips, [and] sometimes paid wages in cash"); *Lagasse v. Flextronics America, LLC*, 2012 WL 2357442, at *2 (D.R.I. June 1, 2012) (same where plaintiff alleged defendants failed to keep accurate records of hours worked and manipulated time-keeping software records).

Other indicia of willfulness include lack of diligence in researching FLSA requirements and ignoring repeated employee complaints about violations.  *See Hoffman v. Professional Med Team*, 394 F.3d 414, 419 (6th Cir. 2005) ("Cases under . . . FLSA have found willfulness most

frequently in situations in which the employer deliberately chose to avoid researching the law's

terms or affirmatively evaded them."); *Collinge v. IntelliQuick Delivery, Inc.,* 2018 WL

1088811, at *19 (D. Ariz. Jan. 9, 2018) (granting partial summary judgment to plaintiffs on

willfulness in part because defendants never consulted with an attorney or made reasonable

efforts to determine lawfulness of their actions); *Cheng v. IDEAssociates, Inc.*, 2000 WL

1029219, at *8 (D. Mass. July 6, 2000) (plaintiff sufficiently alleged willfulness in Equal Pay

Act case where defendants ignored plaintiff's repeated complaints that she was being

underpaid);[9] *Ketchum v. City of Vallejo*, 523 F. Supp. 2d 1150, 1157 (E.D. Cal. 2007) (plaintiffs

sufficiently alleged willfulness to defeat summary judgment motion, where plaintiffs repeatedly

complained of uncompensated work hours).

     Here, plaintiffs have submitted evidence that defendants did not allow employees to

accurately record their hours spent reporting to the yard and traveling, and often paid them in

cash so that the payments would not appear on official payroll records.  (Pl. SMF ¶¶ 118, 122).

They have also submitted evidence that defendants intentionally manipulated time records,

eliminating punch-ins and punch-outs at the yard and manually re-setting employees' driving

time to intervals of 59 minutes, one hour, or one hour and one minute, consistent with the

company's alleged policy of only compensating one hour of driving time regardless of actual

time spent.  (Pl. SMF ¶¶ 120-21).  And they have submitted evidence that defendants ignored

repeated complaints from employees that they were not being properly compensated for travel

and reporting time and that defendants never consulted with an attorney about their FLSA

obligations.  (Pl. SMF ¶ 123-24).

     Defendants dispute that evidence.  Nonetheless, plaintiffs have raised a genuine dispute

---

[9] The Equal Pay Act uses the same analysis as the FLSA under 29 U.S.C. § 255(a), where the statute of limitations is two years for non-willful violations, and three years for willful violations.

of fact that defendants acted willfully.  The allegations, if proved, that defendants deliberately failed to maintain accurate time records, manipulated the existing records, did not consult with an attorney about their FLSA obligations, and refused to address employees' complaints of underpayment could support a reasonable inference that they knew or were deliberately indifferent to the illegality of their practices.  Therefore, for the purpose of evaluating the statute of limitations at the summary-judgment stage, the three-year statute of limitations for a willful FLSA violation will be assumed to apply.  *See Ketchum*, 523 F. Supp. 2d. at 1159 (denying summary judgment that all claims were time-barred under the two-year FLSA statute of limitations, because a genuine issue of material fact existed as to willfulness); *Cachola-Bonilla v. Wyndham El Conquistador Resort & Country Club*, 577 F. Supp. 2d 566, 577-78 (D.P.R. 2008).

After accounting for tolling and the three-year statute of limitations, the consent-to-sue forms were timely filed on September 19, 2019, to preserve all named plaintiffs' Reporting Policy claims, and the Uniform Policy claims of Jose Montenegro and Jose Hernandez.

### 3. Whether Certain Filings Satisfy the FLSA "Consent to Sue" Requirement

In the alternative, even if no tolling period applies and the two-year statute of limitations governs the claims, plaintiffs contend that the filing of certain documents, signed by named plaintiffs and demonstrating their understanding of their role in the suit, satisfy the FLSA "consent to sue" requirement pursuant to 29 U.S.C. § 256.  Essentially, plaintiffs argue that while the requirement to file a "written consent to become a party plaintiff" is strictly enforced, the form of that written consent is not.

The First Circuit has not ruled on what type of document satisfies the requirement of a "written consent to become a party plaintiff."  Certainly the filing requirement has been strictly construed, and multiple courts have held that the mere filing of a complaint is insufficient to

satisfy that requirement.  *See, e.g., Frye v. Baptist Mem'l Hosp.*, 495 F. App'x 669, 677 (6th Cir. 2012) (affirming district court's dismissal of a FLSA collective action because "courts construe the [§ 256] language to do what it says:  require a named plaintiff in a collective action to file a written consent to join the collective action"); *Harkins v. Riverboat Servs., Inc.*, 385 F.3d 1099, 1101 (7th Cir. 2004) (Posner, J.) ("If you haven't given your written consent to join the suit, or if you have but it hasn't been filed with the court, you're not a party.  It makes no difference that you are named in the complaint, for you might have been named without your consent.  The rule requiring written, filed consent is important because a party is bound by whatever judgment is eventually entered in the case . . . ."); *Acosta v. Tyson Foods,* 800 F.3d 468, 472 (8th Cir. 2015) (dismissing FLSA collective action because no named plaintiff filed a written consent to proceed as party plaintiff before the statute of limitations expired); *Gomez v. Tyson Foods*, 799 F.3d 1192, 1194 (8th Cir. 2015) (same); *In re Food Lion, Inc.*, 151 F.3d 1029, at *13 (4th Cir. 1998) (unpublished table opinion) ("Redundant though it may seem to require consents from the named plaintiffs in a class action, the district court did not abuse its discretion in ordering such consents nor in dismissing the appellants' claims which exceeded the limitations period when no consents were filed within the applicable three year period.").

However, courts have differed in their interpretation of what form of notice is required. The FLSA "does not specify the form of written consent."  *Frye*, 495 F. App'x at 676.  The text of § 216(b), which sets forth the criteria to be a party plaintiff, and § 256, which sets forth the criteria to commence a collective action, simply require, respectively, "consent in writing to become such a party . . . filed in the court in which such action is brought" (§ 216(b)) and "written consent to become a party plaintiff . . . filed . . . in the court in which the action is brought" (§ 256).

The only Supreme Court decision to address the topic stated in a footnote that "[e]ven if this requirement [to file a written consent] were to apply to petitioner's suit, . . . it was satisfied when petitioners individually signed at least two sets of interrogatories." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 736 n.11 (1981).  While that is arguably dicta, it certainly supports the contention that no particular form of consent is required, and any document that is signed under oath by a plaintiff and that manifests an understanding of the litigation, and a willingness to be represented by class counsel and bound by the lawsuit, will suffice.

Multiple courts have found that signed affidavits or declarations indicating that the signee is willing to serve as a party plaintiff in a collective action are sufficient.  *See, e.g., Contrera v. Langer*, 290 F. Supp. 3d 269, 278 (S.D.N.Y. 2018) (collecting cases for the proposition that "courts have routinely found that § 256's requirement is satisfied where a named plaintiff files a sworn declaration with the court stating that he or she is the named plaintiff in a collective action");  *Callari v. Blackman Plumbing Supply*, 988 F. Supp. 2d 261, 281-82 (E.D.N.Y. 2013) (holding that "courts have generally not taken a strict approach with regard to the *form* of the written consent, at least with respect to named plaintiffs," and finding that declaration in which plaintiff identifies self as named plaintiff, bringing suit on behalf of self and others similarly situated, was sufficient);  *Mendez v. The Radec Corp.,* 260 F.R.D. 38, 52 (W.D.N.Y. 2009) (same); *Manning v. Gold Belt Falcon, LLC,* 817 F. Supp. 2d 451, 454-55 (D.N.J. 2011) (signed written declaration affirming that signee was named plaintiff and describing facts of underlying lawsuit satisfies written consent requirement); *Mayhew v. Loved Ones in Home Care, LLC*, 2018 WL 6816073, at *2 (S.D.W. Va. Dec. 27, 2018) (signed affidavit attached to motion for conditional certification in which signee asserts she is a plaintiff and summarizes the allegedly

illegal pay practices "constitutes [plaintiff's] written consent to join the collective action as required by the FLSA, despite her not having filed a formal consent to sue in accordance with the [approved] notice"); *Salazar v. Brown*, 1996 WL 302673, at \*11 (W.D. Mich. Apr. 9, 1996) ("Where possible, courts have characterized affidavits filed along with the complaint as sufficient 'consents' to satisfy the statutory requirement.").

Several district courts have also concluded, based on the *Barrentine* footnote, that signed interrogatory responses constitute a sufficient form of written consent. *See Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 800 (D. Md. 2014) (signed interrogatory answers and declaration in support of conditional certification were both sufficient written consent to be a party plaintiff, because "the documents refer to facts underlying the litigation and express his view that the alleged practices applied to all technicians"); *Faust v. Comcast Commc'n Mgmt., LLC*, 2013 WL 5587291, at \*5-6 (D. Md. Oct. 9, 2013) (finding that "a signed declaration that 'manifests a clear intent to be a party plaintiff' is sufficient to operate as a consent," and plaintiffs' signed declarations and signed answers to interrogatories that identify the party plaintiffs and describe the underlying allegations suffice).[10]

That is not to say that there are no limitations on what may constitute a proper form of consent. For example, in *Frye*, the Sixth Circuit considered the plaintiff's argument that "certain conduct discharged his written-consent obligation: (1) hiring counsel to file a collective action on his behalf; (2) filing a complaint as a class representative; and (3) appearing for a deposition." *Frye*, 495 F. App'x at 676. The court rejected that position, observing that "even allowing

---

[10] In an older case, the Second Circuit found that signed retainers, authorizing class counsel to represent named plaintiffs and filed with the court, constitute "consents" under the FLSA. *See Brown v. Dunbar & Sullivan Dredging Co.*, 189 F.2d 871, 873-74 (2nd Cir. 1951).

latitude of form, the requirement remains a *filed written consent.*"  *Id.*  The retainer agreement hiring counsel to file a collective action on plaintiff's behalf did not satisfy § 256 because it was not *filed* with the court within the two- or three- year FLSA statute of limitations; and neither the filing of the complaint nor the deposition testimony satisfied § 256 because they were not *signed* by plaintiff.  *Id.*

In any event, plaintiffs here contend that (1) the signed declaration of Jose Pineda, (2) the signed interrogatory responses of the four named plaintiffs, and (3) the deposition testimony of the four named plaintiffs satisfy the requirement of § 256, separately and as a whole.  Because the declaration and interrogatory responses are adequate, the Court does not reach the issue of the deposition testimony.[11]

### a.     The Signed Declaration of Pineda

Pineda's declaration, which was signed and filed alongside plaintiffs' motion for conditional certification on July 19, 2017, clearly satisfies the written consent requirement.[12] The declaration is signed under penalty of perjury, identifies himself as a named plaintiff, and summarizes his personal experience being undercompensated for his work time in a manner consistent with the complaint.  (Pl SMF ¶ 24).  Under the circumstances, the declaration is sufficient to demonstrate his "written consent to become a party plaintiff" as required by 29 U.S.C. § 256, and it was timely filed after his claims accrued on February 29, 2016, even assuming a two-year limitations period and no tolling.

---

[11] Defendants take the position that because plaintiffs chose a specific "consent to sue" form for opt-in plaintiffs, they should be estopped from asserting that alternate forms satisfy the "consent to sue" requirement.  The Court declines to adopt this position; choosing to use one form of a document does not preclude the acceptability of other forms, and defendants have cited no authority for their estoppel argument.

[12] Plaintiffs also filed a second declaration signed by Pineda on February 16, 2018, in support of a motion to compel, and a third declaration signed by Pineda on September 25, 2018, supporting a motion for contempt.  (Pl. SMF ¶ 24).  In all three declarations, Pineda identified himself as a party plaintiff.

### b.      The Interrogatory Responses

Each of the four named plaintiffs signed interrogatory responses under oath.  Each interrogatory response identifies the relevant individual as a plaintiff, and each summarizes his observations of the allegedly illegal company policy that caused him, and other workers similarly situated, to be under-compensated for hours worked.  (Pl. SMF ¶ 24).  All four responses were filed with the court—not by plaintiffs, but by defendants, who filed them with their opposition to conditional certification on August 18, 2017.

Those signed interrogatory responses, like the declaration, are sufficient to demonstrate the "written consent" of the four individuals "to become a party plaintiff" as required by 29 U.S.C. § 256, and they were timely filed after their claims accrued, even assuming a two-year limitations period and no tolling.  *See Barrentine*, 450 U.S. at 736 n.11.

As noted, the interrogatory responses were filed by defendants in connection with an opposition to a motion, not by plaintiffs themselves.  That is an odd, indeed bizarre, circumstance, particularly if it preserves claims against the defendants that would otherwise be time-barred.  But it does not appear to be part of the statutory requirement that the *plaintiff* actually file the document that is deemed to be the written consent.  Neither § 256 nor § 216 specifies who must make the filing; both statutes are written in the passive voice.  *See* 29 U.S.C. § 256 (providing that the date on which a collective action is "considered to be commenced in the case of any individual claimant" derives from the date on which the written consent "*is filed*") (emphasis added); § 216 ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent *is filed* in the court in which such action is brought") (emphasis added).  It appears, therefore, that all that is required is that the consents be filed in the court in which the FLSA action is brought.  The

signed interrogatory responses were in fact filed with the court, albeit by defense counsel, on

August 18, 2017, and that satisfies the filing requirement of the statute.

In sum, the signed declaration of named plaintiff Pineda, filed on July 19, 2017, and the

signed interrogatory responses of named plaintiffs Pineda, Montenegro, Lopez, and Hernandez,

filed on August 18, 2017, constituted written consents to become a party plaintiff pursuant to 29

U.S.C. §§ 216 and 256.  These filings were sufficient to commence plaintiffs' FLSA collective

action within the applicable limitations period after the accrual date of February 29, 2016, even if

the Court were to assume no tolling and a two-year limitations period.

### 5.     Whether Plaintiffs Also Filed Individual FLSA Claims

In their opposition to defendants' motion for summary judgment on and dismissal of

Counts 1 and 3, plaintiffs contend that even if the court grants dismissal of the collective FLSA

claims, each named plaintiff also filed his claim in an individual capacity, and those claims

should survive.  Because the Court is not dismissing the collective action, that argument is moot,

and the Court does not reach it.

### C.     Whether Defendants Are Entitled to Summary Judgment as to Damages

Defendants' second motion for summary judgment seeks to dismiss the entire complaint,

contending that the court lacks subject-matter jurisdiction over the remaining claims if it

dismisses the FLSA collective action as requested in the first motion, and in the alternative

because plaintiffs have not provided sufficient evidence of damages.  Because defendants'

motion to dismiss the collective action will be denied, that motion is moot except as to the

damages issue.

Defendants contend that plaintiffs have not met their burden of providing evidence of the

hours of unpaid straight time and overtime for which they seek to recover.  They seek summary

31

judgment of the action on the ground that the evidence, even when viewed in the light most favorable to plaintiffs, would not permit a reasonable juror to determine weekly uncompensated hours and appropriate damages for each plaintiff.

A key challenge for plaintiffs is the fact that defendants did not keep records of all the time that its employees spent reporting to the yard, working in the yard, and traveling to and from jobsites—all time that plaintiffs contend should have been compensated because it was mandatory to report to the yard at the beginning and the end of workdays.  Employers bear the obligation to make, keep, and preserve accurate records of their employees' hours under the FLSA, 29 U.S.C. § 211(c), and the Massachusetts Fair Wage Law, Mass. Gen. Laws ch. 151, § 15.  Such a duty is non-delegable under the FLSA.  *Kuebel v. Black & Decker Inc.,* 643 F.3d 352, 363 (2nd Cir. 2011).

Where the employer's time records are inaccurate or inadequate, even if due to a "bona fide mistake," "the solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work."  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946).  Rather, in such situations, courts employ a burden-shifting analysis:

> [A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 687-88.  In other words, "where the employer has failed to keep adequate employment records, it pays for that failure at trial by bearing the lion's share of the burden of proof."  *Sec'y of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991).

At the first step, the employee's initial burden of proof is "minimal," though "not nonexistent." *DeSisto*, 929 F.2d at 793.  The employee can satisfy the burden through "estimates based on his own recollection." *Kuebel*, 643 F.3d at 362.  Courts have routinely found that plaintiffs' testimony estimating their daily or weekly uncompensated hours and explaining the basis for their estimates is sufficient to meet their initial burden of proof, especially at the summary judgment stage.  For example, in *Kuebel*, 643 F.3d at 364-65, the Second Circuit overturned the district court's decision granting summary judgment to the employer on the ground that plaintiff had failed to meet his burden of showing the amount of uncompensated work "as a matter of just and reasonable inference" under *Anderson*.  It found that plaintiff's testimony that he "averaged one to five hours of uncompensated overtime each week," coupled with his description of "shaving" hours at his employer's behest so that his weekly total did not exceed forty, was "sufficient evidence for a reasonable jury to conclude that he has shown the amount of his uncompensated work 'as a matter of just and reasonable inference.'" *Id.* at 364 (quoting *Anderson*, 328 U.S. at 687).  The employer was not entitled to summary judgment simply because plaintiff's estimate of uncompensated hours was "somewhat inconsistent" and "not precise." *Id.* at 364, 365.  In *Chen v. C & R Rock Inc.*, 2016 WL 1117416, at *5 (D.N.H. Mar. 22, 2016), the district court found, following a bench trial, that plaintiff had provided sufficient evidence of his weekly hours worked, based on his sworn testimony estimating the hours he worked each day and the employer's work schedules detailing the days that he worked.  Similarly, in *Professional Appraisal Services, Inc. v. Melton*, 2006 WL 3203901, at *2 (W.D. Mich. Nov. 3, 2006), the court found that an employee's estimate of weekly hours worked, when corroborated by coworkers' affidavits, was sufficient to meet his burden under *Anderson* and to defeat a motion for summary judgment.

To meet the initial burden of proof, plaintiffs may "rely on testimony and evidence from representative employees"—not every single employee seeking redress needs to testify. *Sec'y of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991); *see also Reich v. Gateway Press, Inc.*, 13 F.3d 685, 702 (3rd Cir. 1994) ("[N]ot all employees need to testify in order to prove the violations or to recoup back wages.  Rather, the Secretary [of Labor] can rely on testimony and evidence from representative employees to meet the initial burden of proof requirement."); *Garcia v. E.J. Amusements of New Hampshire, Inc.*, 98 F. Supp. 3d 277, 287 (D. Mass. 2015) (approving representative testimony as common proof of hours worked by the class, in evaluating motion for class certification); *Mooney v. Domino's Pizza, Inc.*, 2016 WL 4576996, at *7 (D. Mass. Sep. 1, 2016) (same).

To be sure, not every proffer meets plaintiff's burden under *Anderson* of producing sufficient evidence of the amount of his uncompensated work.  Defendants rely heavily on *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1060 (8th Cir. 2014), a case in which the court affirmed the grant of summary judgment to the employer because plaintiff's evidence "provides no details which would allow a jury to determine [that he] worked beyond forty hours in any specific week of his employment."   In that case, the plaintiff's testimony was insufficient to give rise to a "just and reasonable inference" as to the amount and extent of uncompensated work, as required under *Anderson*, because he did not put forth any evidence regarding specific weeks when he worked over forty hours, did not explain how he arrived at his final estimate of sixty hours a week, every week, did not check his estimated hours worked against any business records, and did not account for any paid holidays or vacation.  *Id.* at 1059-60.  In another example, the court in *DeSisto,* 929 F.2d at 793, found that plaintiff did not meet this burden, because the testimony used to estimate uncompensated hours and back pay, given by a single

34

employee, was insufficiently representative of the claims of 244 employees holding a variety of positions at several locations.

Here, plaintiffs' expert report, which relied on employee testimony and an apparently reasonable methodology, would allow a reasonable jury to conclude that plaintiffs have satisfied their burden of showing the amount and extent of uncompensated work "as a matter of just and reasonable inference." *Anderson,* 328 U.S. at 687.  Plaintiffs' expert based his report on various primary sources that corroborated each other, including the interrogatory responses of 39 plaintiffs, the timesheets of 15 representative employees that logged the location of time punches, the payroll files for all employees, and the deposition transcripts of at least all four named plaintiffs and nine opt-in plaintiffs.  (Pl. SMF ¶¶ 137-49; Pl. Ex. CCC, Breshears Aff. and Report, at 6-8, 36-38).  He calculated plaintiffs' daily uncompensated time spent waiting in the yard by averaging the estimates that each plaintiff gave in his interrogatory response, and calculated uncompensated time spent traveling by using Google Maps to model the travel time between the yard and the first and last time-punches in the timesheet software.  (Pl. SMF at ¶¶ 135-143).  For all of his calculations, he discounted his estimates to account for the roughly 20% of days when employees were not subject to defendants' reporting policy; the 20% figure was drawn from deposition testimony where each plaintiff estimated the proportion of time he was subject to the reporting policy.  (*Id.* at ¶¶ 140-41, 143).

In short, the expert report here appropriately relied on employees' own estimates of their average uncompensated time, cross-referenced and was corroborated by timesheet records, and explained its methods of calculating, discounting, and averaging uncompensated time.  *See Kuebel*, 643 F.3d 352; *Chen*, 2016 WL 1117416; *Professional Appraisal Services*, 2006 WL 3203901.  Plaintiffs' expert identified specific weeks in which individual plaintiffs were

undercompensated, explained how he arrived at estimates of hours worked, checked his estimates against payroll records, and fully accounted for days off or days not covered by the reporting policy.  And all of the employees fell within a single job category (manual laborers) with similar working conditions and knowledge of workplace policies, and it was therefore appropriate for the expert to rely on testimony and evidence from representative employees.  *See DeSisto*, 929 F.2d 789; *Gateway Press*, 13 F.3d 685.

Defendants' arguments rely primarily on excerpts from plaintiffs' deposition testimony, in which some plaintiffs stated that they could not calculate their total number of uncompensated hours on the spot.  But plaintiffs must only produce sufficient evidence—which can include individual recollections and estimates, time sheets, and an explanation of an expert's methods— that would allow a reasonable jury to calculate the amount and extent of uncompensated work performed, as a matter of just and reasonable inference.  *Anderson,* 328 U.S. at 687.  Plaintiffs have met that burden here.

Accordingly, defendants' second motion for summary judgment and dismissal of the complaint will be denied.

### D.     Whether Defendants David Skinner, Sandro Santos, and Elber Diniz Can Be Held Individually Liable

Defendant's third motion for summary judgment seeks dismissal of plaintiffs' claims against individual defendants David Skinner, Sandro Santos, and Elber Diniz on the basis that those persons are not individually liable under the FLSA or the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, §§ 148 *et. seq.* (the "MWA").  Specifically, it seeks summary judgment as to Counts 1 through 5, the wage and hour claims, against Skinner, Santos, and Diniz, because they did not have the necessary level of authority and control over the company's decisions to justify individual liability under the FLSA and the MWA.  It also seeks summary judgment as to Counts

6 through 8, the retaliation claims, against Skinner and Santos, because they did not personally participate in the allegedly retaliatory actions against plaintiffs.

Under the FLSA, an individual corporate officer "with operational control of a corporation's covered enterprise" may be deemed an "employer" and held jointly and severally liable for unpaid wages. *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983). An "economic reality" test is used to determine personal liability. *Id.* at 1510; *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 677 (1st Cir. 1998). The critical elements in the analysis include (1) "the significant ownership interest of the corporate officers;" (2) "their operational control of significant aspects of the corporation's day to day functions, including compensation of employees;" and (3) whether "they personally made decisions to continue operating the business despite financial adversity and the company's inability to fulfill its statutory obligations to its employees." *Baystate*, 163 F.3d at 677-678 (citing *Agnew*, 712 F.2d at 1511-14). The first two factors, ownership interest and operational and financial control, are important because they "suggest a strong degree of authority over the corporation's finances" and a "high level of dominance over the company's operations." *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 48 (1st Cir. 2013). They are "relevant" but "not dispositive" indicia of the ultimately determinative factor: the role played by the individual in "caus[ing] the corporation to compensate (or not to compensate) employees in accordance with FLSA." *Baystate*, 163 F.3d at 678.

Under that test, the First Circuit has upheld decisions finding persons individually liable under the FLSA for corporate employment practices if they "controlled [the corporation's] purse-strings," "made corporate policy about . . . compensation practices," and bore "personal responsibility for making decisions about the conduct of the business that contributed to the

violations of the Act." *Baystate*, 163 F.3d at 678; *see also Manning*, 725 F.3d at 49; *Chao v. Hotel Oasis*, 493 F.3d 26, 34 (1st Cir. 2007). At the same time, however, the court has cautioned that "not every corporate employee who exercised supervisory control should be held personally liable." *Hotel Oasis*, 493 F.3d at 34; *see also Agnew*, 712 F.2d at 1513.

Under the Massachusetts Wage Act ("MWA"), the president, treasurer, and "any officers or agents having the management of such corporation" are considered to be employers who may be individually liable for violations of the Act. Mass. Gen. Laws ch. 149, § 148; *Wiedmann v. The Bradford Group*, 444 Mass. 698, 711 (2005). The MWA imposes personal liability on people who may not have the title of president or treasurer, but who have "assumed and accepted as individuals significant management responsibilities over the corporation similar to those performed by a corporate president or treasurer, particularly in regard to the control of finances or payment of wages." *Segal v. Genitrix, LLC*, 478 Mass. 551, 559 (2017). The Supreme Judicial Court has cautioned that "merely holding a managerial position over some branch, division, or office of a corporation does not, by itself, mean that that manager has the 'management' of the 'corporation' as a whole." *Wiedmann*, 444 Mass. at 712. Rather, a person who has management of the corporation necessary to impose individual liability "controls, directs, and participates to a substantial degree in formulating and determining policy of a corporation." *Id.* at 711.

Under the Massachusetts Fair Wage Law ("MFWL"), "personal liability attaches to the officer or agent of [the] corporation who pays or agrees to pay any employee less than the overtime rate of compensation required." *O'Leary v. New Hampshire Boring, Inc.,* 176 F. Supp. 3d 4, 12 n.5 (D. Mass. 2016); Mass. Gen. Laws ch. 151, § 1B. Furthermore, it is illegal for any "employer" to pay an employee less than minimum wage, Mass. Gen. Laws ch. 151, §§ 1, 20,

where the relevant regulations define an employer as "an individual, corporation, partnership or other entity, *including any agent thereof*, that employs an employee or employees for wages, remuneration or other compensation."  454 C.M.R. 27.02 (emphasis added).

### 1.  Whether Defendants Waived Their Arguments Under the Massachusetts Fair Wage Law

In their motion for summary judgment, defendants analyzed the individual liability of David Skinner, Sandro Santos, and Elber Diniz under the FLSA and the MWA, but included no analysis of their liability under the MFWL.  Plaintiffs contend that defendants have therefore waived their arguments that they are entitled to summary judgment as to the claims against individual defendants under the MFWL, Counts 2 and 4.

Defendants counter that they have not waived this argument because they specifically requested that Counts 2 and 4 be dismissed against the individuals.  But "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).  Defendants also assert that the MFWL was "substantively raised" because they "merged the reasoning" for individual liability under the MFWL and the MWA.  That mischaracterizes their motion, which did not even state the standard for individual liability under the MFWL, let alone apply it to the facts of the case.

It is true that the category of persons who may incur individual liability under the MWA (that is, "any officers or agents having the management of such corporation") is broader than the category of persons who may incur individual liability under the MFWL (that is, any "officer or agent" who "pays or agrees to pay" less than adequate overtime wages).  *Tomei v. Corix Utilities (U.S.) Inc.*, 2009 WL 2982775, at *16 (D. Mass. Sep. 14, 2009) (finding that the "prevailing wage" standard for individual liability, Mass. Gen. Laws ch. 149, § 27, which is identical to the

MWA standard, Mass. Gen. Laws ch. 149, § 148, is broader than MFWL standard); *O'Leary*, 176 F. Supp. 3d. at 12 n.5 (same).  Defendants therefore contend that, to the extent they would succeed at summary judgment on the MWA because no reasonable juror could find that the individuals were "officers or agents having management of [the] corporation," they would also succeed under the MFWL because no reasonable juror could find that they were "officers or agents" who paid, or agreed to pay, less than adequate wages.

While that may be true, that is not a reason to *grant* summary judgment to defendants on an argument that they did not even brief.  Indeed, defendant's briefings do not contain even a single sentence stating whether Skinner, Santos, and Diniz are officers or agents of Skinner Services, and whether there is evidence that they paid or agreed to pay employees less than adequate overtime wages and minimum wage, as is necessary to establish personal liability under the MFWL. To the extent, therefore, that defendants seek summary judgment as to the claims under the MFWL, Counts 2 and 4, it will be denied.

### 2.   <u>Individual Liability of David Skinner</u>

The parties agree on very little regarding David Skinner's role in Skinner Services, which does business as Skinner Demolition.  According to defendants, he is an outside consultant and estimator for the company, whose work focuses on creating the price estimates for new jobs and occasionally overseeing complex demolition projects.  (Def. SMF ¶¶ 30, 34, 36, 40).  They allege that he is not part of the management team, does not exercise control over the corporation's payroll, finances, or compensation policies, does not involve himself in the day-to-day operations of the company, and has little or no contact with laborers.  (*Id.* ¶¶ 30-39). Further, defendants deny that David Skinner has any ownership interest in the company.  (*Id.* at ¶ 37).  It is undisputed that he is not listed as an officer or director in the Skinner Demolition

corporate filings.  (Def. SMF ¶¶ 26, 150).[13]

Plaintiffs contend that David Skinner works as a *de facto* chief executive officer and head of Skinner Demolition.  They point to a variety of evidence from which, they contend, a reasonable jury could find that he exercises control over the company's entire enterprise, including finances, operations, and wage policies, thus creating individual liability under the FLSA and MWA.

First, Skinner Demolition has repeatedly held out David Skinner publicly as a founder and principal.  The company's website and LinkedIn profile indicate that he was the founder and principal leader of the company, and the Facebook page for Skinner Demolition was converted to a personal page for David.  (Pl. SMF ¶ 30).  He was identified as the sole author of two out of three company employment policies issued during the collective period, the "time padding memo" and the "lunch break memo."  (Pl SMF ¶ 30; Pl. Ex. P, Time Padding Memo; Pl. Ex. Q, Lunch Break Pay Memo).[14]

Second, David Skinner identified himself to employees as an owner and primary decision-maker at Skinner Demolition, and acted in that role while attempting to resolve labor disputes at Skinner.  Named plaintiff Jose Pineda testified that David Skinner confronted him about this lawsuit and said that he "wanted [the suit] to stop here," that he had "the last word" at Skinner Demolition and was "the owner of Skinner," that "the [corporation's] money was his," and that "he was sick and tired of spending money on lawyers" and "had spent $165,000 on lawyers so far."  (Pl. SMF ¶ 30; Pl. Ex. U, Pineda Dep. 109-114).  Jose Montenegro likewise testified that David Skinner told him that he was the owner of the company, and that when

---

[13] Thomas Skinner (David Skinner's son) is the only listed officer and director in Skinner Demolition corporate filings.  (*Id.*).

[14] Thomas Skinner authored the third memorandum, which concerned "use of company vehicles to commute to job sites."  (Pl. SMF ¶ 30; Pl. Ex. R, Reporting Memo).

Montenegro wanted to discuss workplace policies concerning vacation with the other supervisors, Sandro Santos, Elber Diniz, and Thomas Skinner, they told him to discuss it with David, the owner of the company.  (Pl. SMF ¶ 37; Ex. FF, Montenegro Dep. 124-25).  During a 2015 EEOC discrimination case against Skinner, David Skinner was alleged to have come to a worker meeting at Jose Pineda's home to attempt to settle the case on behalf of the company by offering pay raises to people who did not participate.  (Pl. SMF ¶ 30; Pl. Ex B, Pineda Decl.; Pl. Ex. G, Thomas Skinner Dep. 125-26; Pl. Ex. D, David Skinner Dep. 121; Pl. Ex. T, EEOC Charge and Determination).  Furthermore, plaintiffs allege that David Skinner acted on behalf of Skinner Demolition in at least two other labor disputes: requesting that an employee not file worker's compensation and intervening in a separate lawsuit for nonpayment of wages.  (Pl. SMF ¶ 30; Pl. Ex. D, David Skinner Dep. 154-155; Pl. Ex. V, Frazier Dep. 41-43).[15]

Third, plaintiffs contend that David Skinner's outsized compensation and involvement in interlinked, Skinner-affiliated corporate entities are indicia of his *de facto* control and leadership of Skinner Demolition.  It appears to be undisputed that David Skinner is the highest-earning member of Skinner Demolition, receiving approximately $198,000 a year, more than twice the compensation of the official president and only listed officer, Thomas Skinner.  (Pl. SMF ¶ 30).  Skinner provides him with a company car, a Cadillac Escalade; he is the only employee who receives a luxury vehicle.  (Pl. SMF ¶ 30; Pl. Ex. D, David Skinner Dep. 55-57; Pl. Ex. K, Santos Dep. 97-98 (other foremen and managers receive Ford F-150 pickup trucks)).  Plaintiffs also contend that David Skinner's involvement in Skinner-affiliated corporate entities illustrates a general scheme to hide his leadership role at Skinner Demolition and shield him from official

---

[15] Plaintiffs also emphasize the criminal prosecution of David Skinner for an assault on a person identified as a debtor to Skinner Demolition.  (Pl. SMF ¶ 30).  This is not particularly relevant to David's leadership role at Skinner, as assaulting a client or vendor is not typically a business task that a corporation would authorize an agent to perform.

liability.  By way of example, David Skinner and Sandro Santos are the two founders, officers,

and directors of Skinner Disposal, a company with a revenue of $1.5 million in 2017, $1 million

of which came from contracts with Skinner Demolition.  (Pl. SMF ¶¶ 154-155).  David Skinner

is the sole owner of Skinner Consulting, a business whose sole client is Skinner Demolition, and

either owns the headquarters of all three businesses (Skinner Demolition, Skinner Disposal, and

Skinner Consulting) at 155 Bodwell Street in Avon, or is the co-trustee with his wife of the

company that owns the property.  (Pl. SMF ¶ 30; Pl. Ex. D, David Skinner Dep. 163-64 (first

stating he owns the property, then stating that his wife owns it, and then stating that a trust owns

it)).

Plaintiffs also point to David Skinner's background and experience in running

construction and demolition companies for over twenty years, in partnership with Sandro Santos

and Elber Diniz, prior to the founding of Skinner Demolition.  (Pl. SMF ¶ 160-61).  David

Skinner sold the last one of these disclosed companies in 2007, around the time that Skinner

Demolition was founded.  (*Id.*).  The website confirms this "origin story," emphasizing that

David Skinner built on his decades of experience in construction to "re-emerge" and "start[]

Skinner Demo with Elber Diniz . . . and his son Thomas."  (Pl. SMF ¶ 30, Pl. Ex. L, Skinner

Demolition Website).  Essentially, plaintiffs rely on this circumstantial evidence, combined with

direct evidence of David Skinner's outsized compensation, to draw an inference that Skinner

Demolition is simply the latest in a long string of construction companies founded and run by

David Skinner (with the express purpose of profiting David Skinner), operated in conjunction

with his trusted business partners Santos and Diniz.

Defendants contest the accuracy of many of those statements, and contend that plaintiffs

are drawing unreasonable inferences from the evidence.  Nonetheless, plaintiffs have produced

sufficient evidence to raise genuine issues of material fact about David Skinner's role in controlling Skinner Demolition's finances, corporate policy, and the general business decisions that gave rise to the allegations of illegal compensation practices.  A reasonable juror could conclude that he had a "significant ownership interest," exercised "operational control of significant aspects" of the corporation, and, most critically, formulated the policy that "cause[d] the corporation to compensate (or not compensate) employees," giving rise to individual liability under the FLSA.  *Baystate Alt. Staffing, Inc. v. Herman,* 163 F.3d 668, 678 (1st Cir. 1998). Similarly, a reasonable juror could find that he has "significant management responsibilities" and "controls, directs, and participates in a substantial degree in formulating and determining policy of a corporation," giving rise to individual liability under the MWA.  *Segal v. Genitrix, LLC*, 478 Mass. 551, 561 (2017).  Under the circumstances, summary judgment as to the issue of the individual liability of David Skinner for the wage and hour claims, Counts 1 through 5, will be denied.

### 3.   Individual Liability of Sandro Santos

Sandro Santos is a manager at Skinner Demolition who has at least some responsibility over the day-to-day operations of the company and the management of its finances.  (Def. Third Mot. for Summ. J. at 11-12).  He is not identified as an officer or director of the company in its corporate disclosures.

According to defendants, Santos has no ownership interest in the company, and has a largely administrative role.  They contend that his responsibilities include organizing the office, filing paperwork, assigning and dispatching workers, and managing jobsite supervisors.  (*Id.* ¶¶ 59, 64).  They further contend that he has no decision-making power over the company's compensation or employment policy, which is solely the provenance of the only listed officer

and director, Thomas Skinner.  (*Id.* ¶ 27).  Finally, defendants allege that an employee named
Edlei Gomes, not Santos, was in charge of handling the company's payroll.  (*Id.* ¶ 29).

According to plaintiffs, Santos is the *de facto* treasurer or chief financial officer of
Skinner Demolition, with direct authority over the company's finances and payroll.  According
to the Rule 30(b)(6) deposition of Thomas Skinner, the president of Skinner Demolition, Santos
is the "handler" of Skinner Demotion's finances—he keeps the company financially "head above
water"; purchases workmen's compensation policies; obtains loans for the company; tracks the
inflow and outflow of money; reviews jobs to determine if they are overstaffed and/or over-
budget and implements changes when they are; and monitors expenses, overhead, job costs, and
payroll.  (Pl. SMF ¶ 58; Pl. Ex. G, Thomas Skinner Dep. 130-36).  Santos and Thomas Skinner
are the only people authorized to sign checks for the company.  (Pl. SMF ¶ 58; Ex. K., Santos
Dep. at 63-64).  Other Skinner employees, including Ubirata de Oliveira Ferreira, Elber Diniz,
and David Skinner, also confirmed that Santos is in charge of the company's finances.  (Pl. SMF
¶ 58).

Furthermore, plaintiffs contend that Santos had direct authority over Skinner
Demolition's payroll and pay policies.  Although Edlei Gomes, the human resources manager,
managed the TimeStation software, he reported directly to Santos and took orders from him.  (Pl.
SMF ¶¶ 58, 63).  It was ultimately Santos's decision to implement changes to the company's
timesheet and scheduling software. (*Id.* ¶ 65).  Plaintiffs further allege that he altered employees'
time punches in the TimeStation software 812 times and was personally responsible for paying
employees in cash or "off the books" from the company's finances.  (Pl. SMF ¶¶ 62, 122).

Finally, plaintiffs cite Santos' experience partnering with David Skinner and his
ownership stake in Skinner-affiliated corporations, Skinner Disposal and 155 Shakedown Street,

as evidence that he acted as a full partner to Thomas and David Skinner in managing this company, with broad decision-making authority.  (Pl. SMF ¶¶ 152, 156).

Again, plaintiffs have established a genuine issue of material fact as to Santos's role in Skinner's compensation practices.  The economic reality test for individual liability under the FLSA focuses heavily on who controls the company's finances, precisely because those people are more likely to have made the decisions that resulted in under-compensation of employees. *Baystate*, 163 F.3d at 678.  A reasonable juror could certainly find that Santos's responsibilities for managing the company's finances and payroll caused him to "ma[ke] decisions to continue operating the business despite financial adversity," and that he directly "caus[ed] the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits." *Id.*  Plaintiffs have offered sufficient evidence to permit a factfinder to conclude that Santos was an "executive who not only possessed, but repeatedly exercised the authority to establish company-wide policy regarding employment-related matters" and "made significant decisions regarding the allocation of financial resources that directly affected . . . employees," like the executive in *Manning* whose motion to dismiss a FLSA claim on the basis of lack of individual liability was denied.  *Manning v. Boston Med. Ctr. Corp.,* 725 F.3d 34, 49 (1st Cir. 2013).  In addition, he is directly implicated in some of the actions considered to be indicia of willfulness of the company's FLSA violations: altering timesheet entries and paying workers "off the books."

Similarly, the MWA imposes liability upon people who have assumed "significant management responsibilities . . . *similar to those performed by a* corporate president or *treasurer*, particularly in regard to the *control of finances or payment of wages.*"  *Segal v. Genitrix, LLC*, 478 Mass. 551, 559 (2017) (emphasis added).  There is at least a genuine factual dispute as to

whether Santos had responsibilities similar to a corporate treasurer, and it appears undisputed

that he had significant control over Skinner's finances; all of these factors suggest that he could

be individually liable under the MWA.   There is likewise a genuine factual dispute as to whether

Santos was an "agent or officer" of Skinner Demolition who was responsible for paying, or

agreeing to pay, employees less than their earned wages.   *O'Leary v. New Hampshire Boring,*

*Inc.,* 176 F. Supp. 3d 4, 12 n.5 (D. Mass. 2016); Mass. Gen. Laws ch. 151, § 1B.   Summary

judgment will therefore be denied as to the issue of the individual liability of Santos for the wage

and hour claims, Counts 1 through 5.

### 4.        Individual Liability of Elber Diniz

Elber Diniz is a field supervisor at Skinner Demolition who manages jobsite supervisors

and is involved with the day-to-day operations of the company in the field.   (Def. SMF ¶¶ 41-

47).   He is part of the management team at Skinner.   (*Id.* ¶ 48).   Defendants deny that he has any

ownership interest in Skinner, and he is not listed as an officer or director of the company.   (*Id.* at

¶ 44).   He is not listed as an officer of any of the Skinner-affiliated corporations, such as Skinner

Disposal, 155 Shakedown Street LLC, or Skinner Consulting.   (Pl. SMF ¶¶ 150-56).

According to defendants, Diniz has no involvement with Skinner Demolition's finances,

payroll, or decision-making concerning employees' hours and compensation.   (Def. SMF ¶ 53).

Defendants characterize him as a "supervisor of supervisors" or "field senior foreman" who

oversees the completion of construction jobs in the field, assists with more complex jobs, selects

workers and equipment for jobsites, and gives out work assignments.   (*Id.* ¶¶ 42, 43, 49).

According to plaintiffs, Diniz acts as a *de facto* chief operating officer or general

manager of the company.   They contend that he should be individually liable as a person who

caused or controlled the illegal compensation policies for three reasons.   First, plaintiffs contend

that Diniz personally implemented the Reporting Policy that allegedly violated state and federal

labor laws.  Allegedly, Diniz specifically instructed employees that they must first report to

Skinner Demolition's yard to receive jobsite assignments and load tools.  (*Id.* ¶ 41).  On a daily

basis, he would arrive at the yard and assign workers to teams and jobsites on an *ad hoc* basis, as

well as assigning workers to be drivers (for which they would receive up to an hour of

compensation for their travel time) or passengers (for which they would receive none).  (*Id.*).

Second, plaintiffs contend that Diniz had significant responsibilities over hiring, firing, and

personnel matters.  At least six employees testified that Diniz hired them; he fired at least one

worker; and he evaluated employees for promotions.  (*Id.* ¶¶ 48, 53).   He gave raises, resolved

complaints about incorrect payment for hours worked, and on at least one occasion instructed

laborers to write down specific hours on their time cards, regardless of how long they had

actually worked.  (*Id.* ¶ 53).  Third, plaintiffs argue that Diniz's high salary ($101,400/year) and

his statement to Pineda that he received a portion of the firm's profits indicate an ownership

interest in the company.  (*Id.* ¶ 44; Pl. Ex. JJ, Pineda II Dep. at 27-29).

Even if plaintiffs' allegations about Diniz's role are true, which the Court must assume

for the purposes of summary judgment, it is not clear that his operational responsibilities are

enough to create liability under the FLSA and state law.  The First Circuit has cautioned that "the

exercise of control by a corporate officer . . . over the 'work situation" should not automatically

subject that person to individual liability under the FLSA, especially if they are a "supervisory

employee . . . without any control over the corporation's payroll."  *Baystate Alt. Staffing, Inc. v.*

*Herman,* 163 F.3d 668, 679 (1st Cir. 1998); *Donovan v. Agnew*, 712 F.2d 1509, 1513 (1st Cir.

1983).  While Diniz may have had operational control over significant aspects of the business,

including hiring, firing, and promotional decisions, those facts do not necessarily "suggest that

[he] controls a corporation's financial affairs and can cause the corporation to compensate (or not

to compensate) employees in accordance with the FLSA," which is necessary to establish

individual liability. *Baystate*, 163 F.3d at 678. In fact, in *Baystate*, the court held that a manager

who had the authority to hire, supervise, instruct, and refer workers for misconduct—a list of

responsibilities similar to Diniz's—was not personally liable for the business's misconduct

despite the manager's "routine supervisory and administrative responsibilities as non-owners of

the business." *Id.* Even after drawing all inferences in plaintiffs' favor, Diniz's role in the

company appears similar to that of the manager in *Baystate* or the human resources director in

*Manning*, whose responsibilities were "more akin to a senior employee than a corporate official."

*Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 50 (1st Cir. 2013). Although there the director

implemented and executed the allegedly illegal pay practices, the court found that he was simply

"performing his job functions" rather than "setting and enforcing the unlawful pay practices" and

"engaging in conduct that led to the alleged violations." *Id.* In that case, the plaintiffs did not

produce sufficiently specific allegations that the director "controlled [the corporation's] purse-

strings or made decisions about the allocation of financial resources." *Id.*

Similarly, here, although Diniz certainly implemented and executed the allegedly illegal

pay practices (by instructing workers to report to the yard and giving them assignments there),

plaintiffs have offered no evidence that he created the policy, had decision-making power over

"setting and enforcing" the policy, or was doing anything other than following orders and

"performing his job functions." *Id.* Without any specific evidence that Diniz "controlled [the

corporation's] purse-strings or made decisions about the allocation of financial resources," there

is simply not enough to find Diniz individually liable under the FLSA as a matter of law. *Id.*

A similar analysis applies to the state-law claims against Diniz. While plaintiffs certainly

allege that he had "significant management responsibilities," those responsibilities were not "similar to those performed by a corporate president or treasurer" and did not seem to involve "control of finances or payment of wages."  *Segal v. Genitrix, LLC,* 478 Mass. 551, 559 (2017). Therefore, even viewed in the light most favorable to plaintiffs, individual liability cannot attach to Diniz under the Massachusetts Wage Act.  Further, from the facts presented by plaintiff, a jury would not reasonably infer that Diniz was an "officer" or "agent" who "controls, directs, and participates to a substantial degree in formulating and determining the policy" of Skinner Demolition.  *Wiedemann v. The Bradford Group*, 444 Mass. 698, 711 (2005).  Because plaintiff has not presented evidence that would allow a rational factfinder to conclude that Diniz was an officer or agent of Skinner Demolition, let alone one who controlled or directed company finances and policy, he cannot be individually liable under the MWA.

For the foregoing reasons, that portion of defendants' motion seeking summary judgment on the issue of Elber Diniz's individual liability for the wage and hour claims under FLSA, Counts 1 and 3, and under the MWA, Count 5, will be granted.

### 5.    Individual Liability of David Skinner and Sandro Santos for Retaliation Claims

Defendants contend that summary judgment should be entered for David Skinner and Sandro Santos on plaintiffs' claims of retaliation in violation of state and federal law, because Skinner and Santos did not personally participate in the retaliatory conduct (Counts 6 through 8).[16]  That argument is barely developed in the motion and not addressed at all in defendants' reply brief, and the Court will decline to enter summary judgment as to those claims.

First, there appear to be disputed issues of fact as to whether, and how, David Skinner and Santos participated in the retaliatory actions against named plaintiffs Pineda, Hernandez, and

---

[16] Plaintiffs do not seek summary judgment and dismissal of the retaliation claims against Elber Diniz.

Lopez for bringing this lawsuit.  Pineda testified that both Santos and David Skinner approached

him to try to intimidate him into ending the suit.  (Pl. SMF ¶ 70; Pl. Ex. U, Pineda II Dep. at 96-

98, 109-11).  Furthermore, Lopez testified that Santos retaliated against him by refusing to

provide proper safety equipment, and that David Skinner retaliated against him by ordering him

to perform physically punishing work by himself.  (Pl. SMF ¶ 70; Pl. Ex. HH, Lopez Dep. at

153-56).

Second, it is not clear that defendants are using the correct legal standard to determine

individual liability for retaliation.  They cite to the FLSA and the Massachusetts Wage Act for

their proposition that "implicit in any claim of retaliation against an individual, a plaintiff must

establish that the individual caused the retaliatory act."  But the text of those statutes prohibits

retaliation by *employers*.  *See* Mass. Gen. Laws ch. 149, § 148A; Mass. Gen. Laws ch. 151, §

19(5); 29 U.S.C. § 215(a)(3).[17]  The Court has already extensively analyzed whether Santos and

David Skinner, based on the totality of their responsibilities at the company, have met the

standard to be considered "employers" subject to individual liability based on Skinner

Demolition's violations of the FLSA and the MWA.  Plaintiffs contend, and defendants do not

refute, that if Santos and David Skinner are found to be "employers" subject to individual

liability for Skinner Demolition's violations of the FLSA and MWA, they can also be liable for

Skinner Demolition's retaliatory conduct in violation of those laws.  *See, e.g.*, *Moore v.

Appliance Direct, Inc.*, 708 F.3d 1233, 1237 (11th Cir. 2013) (upholding personal liability for

retaliation claim where individual is considered "employer").

Accordingly, the portion of defendants' motion seeking summary judgment and dismissal

of Counts 6 through 8 against defendants David Skinner and Sandro Santos will be denied.

---

[17] While the FLSA prohibits retaliation by "persons," "person" means "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons" and clearly includes employers.  29 U.S.C. § 203(a).

**IV.    Conclusion**

For the foregoing reasons,

1. Defendants' first motion for summary judgment and dismissal of Counts 1 and 3, the FLSA claims of the named plaintiffs (Docket No. 310), is DENIED;

2. Defendants' second motion for summary judgment and dismissal of the complaint (Docket No. 311) is DENIED;

3. Plaintiffs' motion to strike (Docket No. 327) is DENIED;

4. Defendants' motions to strike (Docket Nos. 340 and 349) are DENIED; and

5. Defendants' third motion for summary judgment and dismissal of claims against individual defendants (Docket No. 312) is DENIED as to the claims against David Skinner and Sandro Santos, and GRANTED as to Counts 1, 3, and 5 against Elber Diniz.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:   September 28, 2020                     Chief Judge, United States District Court