## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| JOSE PINEDA, JOSE MONTENEGRO, MARCO LOPEZ, and JOSE HERNANDEZ on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| | ) | C.A. No. 1:16-cv-12217 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SKINNER SERVICES, INC. d/b/a SKINNER DEMOLITION, THOMAS SKINNER, DAVID SKINNER, ELBER DINIZ, and SANDRO SANTOS, | ) ) ) | |
| | ) | |
| Defendants, | ) | |

---

## JOINT PRETRIAL MEMORANDUM

**(1)    Concise summary of the evidence that will be offered by:**

    **(A) Plaintiffs:**

       (i)     Reporting Class - Liability

Plaintiffs will introduce evidence showing that, from at least August 5, 2013, through February 29, 2016, Defendants maintained a policy ("Reporting Policy") requiring employees within the Reporting Class, as defined in Dkt. No. 307 at 11, to report to Defendants' headquarters in Avon, Massachusetts ("the Yard") at the beginning of their workday before they reported to jobsites in order to receive jobsite assignments and load tools into vehicles. For a typical work schedule, the reporting time would be 5:45 A.M. Plaintiffs will also show that under the Reporting Policy, Defendants required employees within the Reporting Class to return to the Yard at the end of their workday to unload tools.

Plaintiffs will further present evidence that they were not paid for any period before they arrived at their first jobsite for the day or after they departed their final jobsite for the day. Plaintiffs will show the only exceptions to this were certain situations in which class members were assigned to drive other employees to jobsites. On those particular occasions, drivers were almost always paid a maximum of one hour per day for driving, regardless of whether they drove for longer than an hour. Plaintiffs' evidence on this point will include testimony and Defendants' own timekeeping records, including documents showing over a thousand instances in which driver time was manually reduced to within one minute of an hour.

Plaintiffs will present testimony that Defendants repeatedly told Reporting Class that they had to report to the Yard in order to receive job assignments. They will further testify that if they had not reported to the Yard, they would not have known which jobsite they were supposed to work at. Plaintiffs will present evidence that they were infrequently given their job assignments the day before and/or allowed to report directly to jobsites when the jobsites were close to their homes. Plaintiffs will present evidence that jobsite assignments were often made on the fly in the morning by Defendant Elber Diniz from among the assembled workers. As a result, jobsite assignments changed frequently.

Plaintiffs will show that beginning in or around February of 2016, Defendants phased out the Reporting Policy. On February 26, 2016, Defendants issued a written policy which purported to "clarify" their reporting policy. In the memo, Defendants asserted that their policy had always been that workers could either voluntarily report to the Yard to receive rides or report directly to jobsites. Plaintiffs will show that the written policy was actually a substantial change to the status quo. Evidence of this change may include testimony from Plaintiffs, deposition testimony from representatives of Skinner Services, and payroll and timekeeping records showing changes in who received pay for what types of work beginning in February of 2016.

Plaintiffs will show that Defendants' claim that Plaintiffs reported to the Yard on a voluntary basis to receive transit to jobsites, and their evidence supporting it which consists almost entirely of self-serving testimony, lacks credibility. By way of example, Plaintiffs will introduce evidence that, during the course of this case, Defendants deceitfully obtained and potentially falsified signatures from Plaintiffs on inaccurate affidavits regarding the Reporting Policy and the Uniform Policy (see below) which Plaintiffs were not allowed to and/or not able to read. Plaintiffs will show Defendants introduced these falsified Reporting and Uniform Policy affidavits to the Court along with affidavits from office workers who performed no field work and did not wear uniforms but nonetheless signed affidavits about the terms under which they performed field work and wore uniforms.

Plaintiffs will present evidence that Defendants' failure to pay them for this time was willful. Defendants were aware of the obligation to pay overtime under the FLSA because, *inter alia*, they paid overtime when employees' work on job sites exceeded 40 hours in a week and a federal FLSA payroll poster was present at the the Yard. Plaintiffs will further show that Defendants knew that when they required employees to report to the Yard or perform work there, they had to pay them through deposition testimony of Skinner Services managers. Plaintiffs will also present evidence that Defendants intentionally failed to track the time employees spent after reporting to the Yard, working at the Yard, and traveling to job sites and that Defendants paid multiple Plaintiffs off the record in cash. Defendants' timekeeping records will also show that Defendants manually altered the punch-in/punch-out times of workers on multiple occasions to eliminate the time after they were required to report to the Yard and to reduce the time they spent driving to a single hour. Plaintiffs will further show that Defendants ignored repeated complaints from employees requesting to be paid for their reporting and travel time and never consulted an attorney about paying for reporting and travel time.

A summary of Plaintiffs' evidence on Reporting Class liability is set forth more fully in Plaintiffs' Memorandum in Support of Class Certification, Dkt. No. 238, at 3-10.

       (ii)     Reporting Class – Damages

Plaintiffs seek lost wages, lost overtime, prejudgment interest, treble and/or liquidated damages, and attorney's fees and costs for the Reporting Class. Plaintiffs will show that Defendants willfully withheld pay to which they were legally entitled for two periods of their workdays: 1) From when they arrived at the Yard until they reported to jobsites; and 2) from when they departed jobsites until they finished any tasks they performed at the Yard. Plaintiffs will testify in regard to the frequency with which they were required to report to the Yard and routine time spent at the Yard related to Defendants' operational needs. Plaintiffs' expert, David Breshears, will present his analysis, calculating damages suffered by the Reporting Class based on this testimony, a standardized Google application programming interface calculating drive-time between the Yard and Defendants' projects, and Defendants' timekeeping and payroll records.

A summary of Plaintiffs' evidence on Reporting Class damages is set forth more fully in Breshears' Expert Report and accompanying Exhibits, Dkt. No. 326-48.

       (iii)    Uniform Class – Liability

Plaintiffs will show that in August of 2013, Defendants required all current laborers employed by them to sign up for the CINTAS Uniform Program. Under the program, Defendants deducted one hour of pay per week for uniforms and "laundering" of those uniforms. Plaintiffs will present testimony showing that Defendants told individuals who said they did not want to sign up for the program that they had to sign up. Plaintiffs will present testimony that some of the Uniform Class were told they would be terminated if they did not sign up for the program. Plaintiffs will present documentary evidence that certain members of the Uniform Class refused to sign up for the CINTAS Uniform Program and nonetheless had money deducted from their paychecks. Plaintiffs will also contend that these deductions, even if the jury finds them voluntary, are *per se* illegal attempts to shift the ordinary costs of doing business onto employees.

A summary of Plaintiffs' evidence on Uniform Class liability is set forth more fully in Plaintiffs' Memorandum in Support of Class Certification, Dkt. No. 238, at 10-12.

       (iv)    Uniform Class – Damages

The Uniform Class Plaintiffs seek reimbursement for the deductions taken from their weekly paychecks, interest, treble damages, attorney's fees, and costs for the Uniform Class. Plaintiffs will demonstrate the amounts deducted using Defendants' payroll records. These amounts will be summarized for the jury through Plaintiffs' expert report and Plaintiffs' expert, David Breshears.

A summary of Plaintiffs' evidence on Uniform Class damages is set forth more fully in Breshears' Expert Report, Dkt No. 326-48.

> (v)    Retaliation – Liability

Named Plaintiffs Jose Pineda, Marco Lopez, and Jose Hernandez will show that they suffered retaliation for bringing this claim, including being subjected to frequent multiple write-ups for the first time, being assigned to less favorable jobs that were farther from home, denial of previously available transportation to jobs, and reduction in hours.

> (vi)    Retaliation – Damages

Pineda, Lopez, and Hernandez will present evidence of loss of pay, emotional distress, and punitive damages suffered as a result of Defendants' retaliation.

> (vii)    Individual Liability

Plaintiffs will demonstrate that Thomas Skinner is the official President and Treasurer of Skinner Demolition and is thus individually liable under the Massachusetts Wage Act.

The evidence will show that, while Thomas Skinner was the President and Treasurer of Skinner Demolition on paper, David Skinner, Thomas's father, in fact ran the company and functionally served as its true President. Plaintiffs will present witness testimony of David Skinner's role in Skinner Demolition, together with documentary evidence showing that Defendants repeatedly held David Skinner out as the founder and leader of the company on social media, in hiring, and in internal company memorandums. Plaintiffs will also present evidence of David Skinner's long history of running demolition companies with Sandro Santos and Elber Diniz, his outsized compensation at Skinner Demolition, and the diversion of payments to him through a nominally existent "consulting" company. Plaintiffs will further present evidence of David Skinner taking collections disputes into his own hands on behalf of Skinner Demolition, repeatedly acting as Skinner Demolition's spokesperson in trying to pay leaders of the present suit to drop these and prior claims, and serving as the negotiator for the sale of Skinner Disposal to a third party, among other things.

Plaintiffs will present evidence that Sandro Santos operated as Skinner Demolition's *de facto* Treasurer, despite Defendants' identification of Thomas Skinner as the Treasurer. Plaintiffs will show that Santos managed finances on a daily and long-term basis, was one of a small group of people with access to company bank accounts, and was the person who made the ultimate decisions about payroll matters. Plaintiffs will show Santos made decisions such as when to pay people on payroll and when to pay them under-the-table in cash. Further, Plaintiffs will demonstrate that Santos was responsible for significant organizational and operational changes at Skinner Demolition for "efficiency." Plaintiffs will also show Santos' history of running companies together with David Skinner and Elber Diniz up to and including Skinner Demolition.

Plaintiffs will present evidence that Elber Diniz operated as Skinner Demolition's Chief of Operations who oversaw all of its demolition work and was a founder of Skinner Demolition. Further, Plaintiffs will show that he played an integral role in implementing the Reporting Policy. Plaintiffs will present evidence that Diniz had the power to hire, fire, and promote workers. Plaintiffs will also show that Diniz had a significant role in the company's finances in

that he had the power to give pay raises, handle disputes regarding compensation, and instructed workers to write a set number of hours on their timesheets regardless of the actual amount of work they performed. Further, Plaintiffs will present evidence that Elber Diniz participated in the retaliation against Plaintiffs Pineda, Lopez, and Hernandez through his role in assigning work.

A summary of Plaintiffs' evidence on Individual liability are set forth more fully in Plaintiffs' Response to Defendants' Statement of Undisputed Facts and Plaintiffs' Statement of Additional Facts, Dkt. No. 326, at 10-39.

**(B) Defendants:**

**(i)      Plaintiffs' Wage and Hour Claims Against Skinner Demolition.**

**(a)      The Reporting Class and Collective Claims.**

The Defendants expect the evidence to show that Skinner Services, Inc. d/b/a Skinner Demolition ("Skinner Demolition" or the "Company") did not and does not have an unwritten company policy requiring its demo team members to report to its headquarters located in Avon, Massachusetts (the "Yard") at the beginning and end of each workday to receive their respective jobsite assignments and/or load and unload tools. Rather, the evidence will show that demo team members were notified of their jobsite assignments by their supervisors the day before and were encouraged to make their own arrangements to travel directly to and from those jobsites each day. The next day's schedule was usually provided to supervisors and then to demo team members between 12:00 p.m. and 2:00 p.m. at the latest.

The evidence will show that demo team members were given the option to meet at the Yard for a ride in company vehicles, for their own benefit and convenience, or to report directly to the jobsite, particularly when a jobsite was closer to the employee's home and they wanted to save gas and money and avoid wear and tear on their personal vehicle. The evidence will show that scheduling assignments were sent to the demo team supervisors by text message. The supervisors were then responsible for notifying their demo team crew members of the next day's jobsite location, which was done in person, by text message, or by telephone call.

The Defendants expect the evidence will show that many employees voluntarily travelled to the yard in the mornings, for their own benefit and convenience, to take advantage of company provided transportation, particularly when faced with difficult traffic and parking issues in and around greater Boston. The evidence will show that many demo team members did not possess a valid driver's license and/or did not own a personal vehicle. Therefore, these demo team members would voluntarily travel to the yard to avail themselves of the use of Skinner Demolition vans and trucks. At the end of their shifts these employees returned to the yard in company vans and trucks and then would commute home with their respective rides. Still other employees relied on public transportation to commute to and from their respective jobsites each day. Indeed, each employee's daily travel routine depended upon his individual commuting situation. Those employees who wanted to avail themselves of the benefit of using company-provided transportation were instructed to arrive at the Yard prior to 6:00 a.m. but were not required to.

The evidence will show that, to the extent an employee was specifically asked to report to the Yard to work or serve as a driver, which was usually determined by each demo team supervisor based on a specific individualized team need, those employees "punched-in" using the Timestation application and were paid for their time. The demo team supervisors were responsible for ensuring that each demo crew had the proper tools for the job site, which was usually prepared the day before. The evidence will show that most Skinner Demolition jobs span multiple days, the demo team members are told in advance the number of days the job is going to last, and the necessary tools are left on the jobsite. When additional tools are required, they are loaded into the vans and trucks by the supervisor or team members who are paid for their time. Such loading time takes only a few minutes.

The Defendants expect the evidence to further show that time spent loading or unloading tools at the Yard was *de minimus,* and, therefore, not compensable time under the Fair Labor Standards Act, 29 U.S.C. § 203, *et seq.* (the "FLSA"), the Massachusetts Wage Act, Mass. Gen. Laws Ch. 149, §§ 148 *et. seq.* (the "Wage Act") or the Massachusetts Fair Wage Law Mass. Gen. Laws Ch. 151, §§ 1, 1A and 20 ("MFWL"). The evidence will further show that any time spent by demo team members waiting at the Yard to avail themselves of Skinner Demo's vans and truck for rides to their respective jobsites and loading or unloading their personal protective equipment, hand tools, and other tools during that waiting time was not integral to the demo team members' principal activities and removed from each demo team member's productive activity at their jobsite. Thus, constitutes non-compensable preliminary and postliminary activities. The evidence will show that the Plaintiffs are seeking to be paid for normal commuting time and that the demo team members workday, unless otherwise instructed, commenced when they arrived at their respective jobsites. The evidence will further show that Skinner Demolition did not willfully or recklessly violate or disregard any state or federal laws regarding employee compensation. Conversely, the Plaintiffs can offer no specific evidence as to the particular days and/or times that they worked but were not compensated for their time, thereby causing and evidentiary vacuum as to the frequency of the claim and resulting amount of damages.

**(b)     The Uniform Class and Collective Claims.**

The Defendants expect the evidence to show that, on or about August 2, 2013, Skinner Demolition began to offer its employees a voluntary uniform laundering and repair service through outside vendor Cintas Corporation (the "Cintas Program"), which has since been discontinued. The Cintas Program was voluntary and terminable by any participating employee at any time. The evidence will show that not all Skinner Demolition employees participated in the Cintas Program. Most Skinner Demolition employees who wished to participate in the Cintas program signed an agreement form (the "Cintas Agreements"). As part of the Cintas Program, employees were provided with eleven (11) free polo shirts and eleven (11) free pairs of Carhartt carpenters' jeans. Participants in the Cintas Program agreed to a weekly payroll deduction of approximately one-hour's pay. The evidence will show that the payroll deductions for the Cintas program did not reduce any of the specific Collective or Class members' hourly pay below the state or federal minimum wage.

The evidence will show that some Skinner Demolition employees who wanted to participate in the Cintas Program were wary of signing the Cintas Agreements. However, those

same individuals still voluntarily took the free shirts and pants and voluntarily utilized the Cintas Program. Each participant in the Cintas Program was assigned an employee-specific identification number by which Cintas could track use of its services and thereby bill Skinner Demolition accordingly. For example, the evidence will show that while Named Plaintiff Joes Pineda claims that he "never" had his clothes laundered by Cintas, Cintas billing records show that in 2014 and 2015, Pineda (assigned Cintas employee number 43) regularly had his shirts and pants laundered by Cintas. The evidence will show that the Uniform Class and Collective members voluntarily used and benefitted from the Cintas Program.

The Defendants expect the evidence to show that during the Cintas Program, Skinner Demo maintained a room at its Avon offices where employees would drop off their dirty or damaged uniform pants and shirts on racks and then would subsequently pick up their laundered and repaired shirts and pants after they were returned by Cintas. The evidence will show that the Cintas Program and the corresponding employee payroll deductions were discontinued in or about August 2016.

      **(ii)**      **Plaintiffs' Wage and Hour Claims Against the Individual Defendants.**

            **(a)**      **Elber Diniz.**

On September 28, 2020, this Court (Saylor, J.) found, as a matter of law, that there is not enough evidence for a jury to find Diniz individually liable under the FLSA or the Massachusetts Wage Act. See Memorandum and Order on Defendants' Motions for Summary Judgment and Dismissal and Related Motions to Strike ("Memo and Order") [Document No. 385], pp. 49-50. In dismissing Counts I, III, and V against Diniz, the Court found that: i) the "'facts do not necessarily suggest that Diniz controls a corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees in accordance with the FLSA,' which is necessary to establish individual liability"; ii) Diniz's role with Skinner Demolition appeared "more akin to a senior employee than a corporate official"; and iii) there was no evidence that Diniz created an illegal policy, "had decision-making power over 'setting and enforcing' the policy, or was doing anything other than following orders and 'performing his job functions.'" Id. at pp. 48-49. The Court further found that Diniz's responsibilities were not "similar to those performed by a corporate president or treasurer" and did not seem to involve control of finances or payment of wages." Id. at p. 50, citing Segal v. Genitrix, LLC, 478 Mass. 551, 559 (2017). Thus, "a jury would not reasonably infer that Diniz was an 'officer' or 'agent' who 'controls, directs, and participates to a substantial degree in formulating and determining the policy' of Skinner Demolition." Id. citing Wideman v. The Bradford Group, 444 Mass. 698, 711 (2005).

With respect to the surviving Counts II and IV and the Plaintiffs' contention that Diniz is individually liable for Skinner Demolition's alleged violations of the MFWL, the Defendants expect that the evidence will show, just as this Court found in dismissing Counts I, III and V, that Diniz was not an officer or agent who paid or agreed to pay Skinner Demolition's employees less than adequate overtime or minimum wages. Therefore, the evidence will show that Skinner Demolition did not violate the FLSA, Wage Act or MFWL and, regardless, Diniz is not

individually liable under the MFWL for any such violations, willful or otherwise.

### (b)    David Skinner.

The Defendants expect the evidence to show that Skinner Demolition did not violate the FLSA, the Wage Act or the MFWL.  The Defendants further expect the evidence to show that David Skinner did not have individual control or ownership of Skinner Demolition such that individual liability would attach under the FLSA, the Wage Act, or the MFWL.  Specifically, the evidence will show that, at all times during the Collective and Class periods, David Skinner was an estimator and advisor to the Company, was not an owner, officer, or director, and did not exercise control over the Company payroll, finances, or compensation policies, and had no role in the hiring, firing, or assignment of employees.

The evidence will show that as an estimator, David was not involved generally in the day-to-day operations of the Company and was not part of the management team.  On occasion, David helped oversee unique and complex demolition projects, but had little to no contact with the demo team laborers and was not involved in dispatching team members to jobsites and was not involved at all with compensation of Skinner Demolition's employees. Further David is not identified as an owner, officer, or director of Skinner Demolition anywhere in the Company's corporate filings.

The evidence will further demonstrate that David Skinner was not an officer or agent who paid or agreed to pay Skinner Demolition's employees less than adequate overtime or minimum wages.  Thus, David Skinner is not individually liable under the FLSA, Wage Act or MFWL for any such violations, willful or otherwise.

### (c)  Sandro Santos.

The Defendants expect the evidence to show that Skinner Demolition did not violate the FLSA, Wage Act or MFWL.  The Defendants further expect the evidence to show that although Santos was part of the management team involved with the day-to-day operations of the Company, his managerial role did not rise to the level of being an "employer" such that he is individually liable.  While Santos did take part in the management of the Company's finances, he did not control payroll such that he could cause the Company to "undercompensate its employees."  The evidence will show that Tom Skinner, not Santos determined the Company's compensation policy, including hourly rates for manual laborers.

Moreover, the evidence will show that at all times relevant hereto, Edlei Gomes was in charge of handling the Company's payroll.  While he is part of the Company's management team, Santos has never been an officer or owner and is not "principally" in charge of directing employment practices or formulating policy.  The evidence will show that Santos has simply performed the functions of his job, which is insufficient to establish individual liability under both the FLSA, the Wage Act, and the MFWL.  Specifically, since he joined Skinner Demolition in 2013, Santos has worked in a largely administrative role in the Company's offices.  Santos has been involved with assigning and dispatching workers and assists in managing the jobsite supervisors.  Santos also has no ownership interest in Skinner Demolition and has never served

as an officer or director of the Company.  Moreover, the evidence will show that Sandro Santos was not an officer or agent who paid or agreed to pay Skinner Demolition's employees less than adequate overtime or minimum wages.  Thus, Sandro Santos is not individually liable under the FLSA, Wage Act or MFWL for any such violations, willful or otherwise.

### (d) Thomas Skinner.

The Defendants expect the evidence to show that Skinner Demolition did not violate the FLSA, the Wage Act, or the MFWL.  The Defendants further expect the evidence to show that at no time did Thomas Skinner engage in intentional, knowing, or reckless violations of the FLSA, Wage Act, or MFWL.  The evidence will demonstrate that at no time did Thomas Skinner instruct, direct, or control Skinner Demolition to undercompensate the Company's employees. At all times during the Class and Collective period, Skinner Demolition's employees were paid by and through the Company's human resources department and its third-party payroll vendors. The evidence will show that Thomas Skinner reasonably relied upon the paid expertise and advice of the Company's human resources and payroll professionals to ensure that Skinner Demolition complied with state and federal wage and hour laws.  Once a concern was brought to Thomas Skinner, he timely and properly consulted legal counsel.  Therefore, the evidence will demonstrate that Thomas Skinner is not individually liable under the FLSA, Wage Act or MFWL for any such violations, willful or otherwise.

### (iii)    Named Plaintiffs' Retaliation Claims Against the Individual Defendants.

The Defendants expect the evidence to show that Thomas Skinner and Elber Diniz are the only individual Defendants that Named Plaintiffs Lopez, Hernandez, or Pineda have claimed were responsible for retaliation.  In that regard, the evidence will show that the Company, Thomas Skinner and Elber Diniz did not retaliate against Named Plaintiffs Jose Pineda, Marco Lopez, and Jose Hernandez by reducing their hours, ceasing to provide them transportation to the worksites, or by any other adverse employment actions.  Rather, the evidence will show that to the extent Pineda, Lopez and Hernandez's hours were reduced after service of the Complaint in November 2016, it was due to a slowdown of work during the November and December Holiday Season.

The evidence will further show that, after service of the Complaint Pineda, Lopez, and Hernandez, had the same transportation options they always had – to travel directly to and from the jobsite or travel to the Yard for a ride in the Company vans and trucks.  The evidence will show that prior to and after service of the Complaint, Pineda, Lopez, and Hernandez were assigned jobsite locations in the ordinary course based on type of job, skill of workers, location of workers, ability to drive other employees, and time frame of the particular jobs pending with the Company.  In addition, the evidence will show that on numerous occasions immediately after the service of the Complaint, the Named Plaintiffs refused to show up for work at their scheduled jobsite without notification ("no show-no call"). On other days, the Named Plaintiffs would choose their own jobsite to work at without approval of the site supervisor or would simply decide to take the day off without prior approval of Skinner Demolition.

(2)    **Facts established by pleadings or by stipulations or admissions of counsel.**[1]

    a.    Skinner Demolition is engaged in commerce in excess of $500,000 in the Commonwealth of Massachusetts and its neighboring states.

    b.    Between August 5, 2013 and February 29, 2016, Skinner Demolition's headquarters, also known as the Yard, were located at 155 Bodwell Street, Avon, Massachusetts.

    c.    Between August 5, 2013 and approximately January 31, 2014, Skinner Demolition used paper Employee Weekly Reports for timekeeping.

    d.    Between approximately January 31, 2014 and February 29, 2016, Skinner Demolition used the TimeStation attendance and time keeping software system and application ("TimeStation").

(3)    **Contested issues of fact.**

    A.    **Plaintiffs:**

Plaintiffs believe the following will be contested issues of fact for trial:

    a.    Whether Defendants and their agents typically instructed Plaintiffs Defendants to report to the Yard at the beginning of the workday prior to February 29, 2016.

    b.    Whether Plaintiffs typically learned of their day's jobsite assignments at the Yard at the beginning of their workday prior to February 29, 2016.

    c.    Whether Defendants typically required Plaintiffs to load tools when they were at the Yard at the beginning of the workday prior to February 29, 2016.

    d.    How long Plaintiffs typically spent at the Yard at the beginning of the workday prior to February 29, 2016.

    e.    Whether Defendants typically required Plaintiffs to return to the Yard at the end of their workdays prior to February 29, 2016.

    f.    Whether Defendants typically required Plaintiffs to unload tools and/or perform other work when they were at the Yard at the end of the workday prior to February 29, 2016.

---

[1] Plaintiffs additionally believe that Paragraph 26 of their Amended Complaint, which states "Defendant David Skinner co-founded Defendant Skinner Services," should be included as a fact established by the pleadings, because Defendants admitted to Paragraph 26 in their Answers. Dkt. Nos. 11 and 20, ¶ 26. Defendants do not agree.

g.  Whether Plaintiffs who were not instructed to drive vehicles by Skinner Demolition received any compensation prior to reporting to their first jobsite for the day prior to February 29, 2016.

h.  Whether Plaintiffs who were not instructed to drive vehicles by Skinner Demolition received any compensation after leaving their final jobsite for the day prior to February 29, 2016.

i.  Whether Plaintiffs who were instructed to drive vehicles by Skinner Demolition had their compensation for such driving capped at a single hour per day prior to February 29, 2016.

j.  Whether all Plaintiffs who were instructed to drive vehicles by Skinner Demolition received compensation every time they were instructed to drive.

k.  Whether Defendants altered the time records of Plaintiffs to eliminate driving work beyond an hour at a time prior to February 29, 2016.

l.  Whether Defendants altered the time records of Plaintiffs to eliminate hours reported in timekeeping records before they arrived at their first jobsite prior to February 29, 2016.

m.  Whether Defendants altered the time records of Plaintiffs to eliminate hours reported in timekeeping records after they left their final jobsite prior to February 29, 2016.

n.  How frequently Plaintiffs were instructed to report directly to their first jobsite rather than the Yard prior to February 29, 2016.

o.  Whether the written policy issued by Defendants in February 29, 2016 represented a change from the Reporting Policy in place before that time.

p.  Whether Defendants were aware that Plaintiffs legally had to be compensated on a straight-time and overtime basis for the periods after they were required to report to the Yard and before they arrived at the first jobsite for the day and after they departed the final jobsite of the day but before they finished performing work at the Yard.

q.  Whether Defendants showed reckless disregard for the possibility that Plaintiffs legally had to be compensated on a straight-time and overtime basis for the periods after they were required to report to the Yard and before they arrived at the first jobsite for the day and after they departed the final jobsite of the day but before they finished performing work at the Yard.

r.  The total amount of uncompensated hours worked by each Plaintiff between when they were instructed to arrive at the Yard and when they arrived at their first jobsite for the day during the Class/Collective Period.

s.  The total amount of uncompensated hours worked by each Plaintiff between when they departed their final jobsite for the day and when they returned to the Yard and finished performing work there during the Class/Collective Period.

t.  Whether Defendants required the Uniform Class to sign up for the CINTAS Uniform Program and threatened the employment of those who did not want to.

u.  Whether members of the Uniform Class who did not sign up for the CINTAS Uniform Program nonetheless had deductions for the CINTAS Uniform Program taken out of their paychecks.

v.  The total amount deducted from the paychecks of each of Plaintiffs in the Uniform Class for the CINTAS Uniform Program.

w.  Whether Defendants assigned Named Plaintiffs Jose Pineda, Marco Lopez, and Jose Hernandez to less favorable jobs that were farther from home as a result of their participation in this lawsuit.

x.  Whether Defendants denied Named Plaintiffs Jose Pineda, Marco Lopez, and Jose Hernandez available transportation to jobs as a result of their participation in this lawsuit.

y.  Whether Defendants reduced the hours of Named Plaintiffs Jose Pineda, Marco Lopez, and Jose Hernandez as a result of their participation in this lawsuit.

z.  Whether the discipline Defendants issued to Named Plaintiffs Jose Pineda, Marco Lopez, and Jose Hernandez was issued because of their participation in this lawsuit.

aa. The amount of lost pay and emotional distress Named Plaintiffs Jose Pineda, Marco Lopez, and Jose Hernandez suffered as a result of the actions taken by Defendants listed in the prior four disputed facts.

bb. Whether Defendant David Skinner effectively served as the Chief Executive Officer, or otherwise, as an agent having the management of Skinner Demolition with substantial control over the companywide policies and decision-making.

cc. Whether Defendant Sandro Santos effectively served as the Treasurer of Skinner Demolition, or otherwise, as an agent having the management of Skinner Demolition with substantial control over the company's financial decisions and over companywide policies.

dd. Whether Defendant Elber Diniz effectively served as the Chief of Operations of Skinner Demolition, or otherwise, as an agent having the management of Skinner Demolition, with substantial control over companywide polices.

**B. Defendants:**

It is the Defendants position that the following issues of fact are contested in this matter:

1.      Skinner Demolition did not and does not have an unwritten company policy requiring its demo team members to report to the Yard at the beginning and end of each workday to receive their jobsite assignments and/or load tools.

2.      Rather, employees are notified of their jobsite assignments by their supervisors the day before and are encouraged to make their own arrangements to travel directly to and from those jobsites each day.

3.      The next day's schedule is usually provided to supervisors and then to demo team members between 12:00 p.m. and 2:00 p.m.

4.      Demo team members are given the option to meet at the Yard for a ride in Company vehicles or to report directly to the jobsite, depending on the following considerations: (i)the convenience of the jobsite location to the employee's home, (ii) cost to commute directly to the jobsite, (iii) distance to the job site ; and (iv)employee vehicle fuel costs and wear and tear .

5.      Supervisors were responsible for notifying their demo team crew members of the next day's jobsite location, if the site was changing, which was done in person, by text or by telephone call.

6.      Many demo team members were discouraged from traveling and parking at the Yard in the mornings because it would cause congestion, parking, and noise issues with the neighboring properties.

7.      However, many employees voluntarily traveled to the Yard in the mornings, for their own benefit and convenience, to take advantage of company-provided transportation, particularly when faced with difficult traffic and costly parking issues in and around greater Boston.

8.      At the end of their shifts these employees returned to the Yard in Company vans and trucks and then commuted home.

9.      Each employee's daily travel routine depended upon his individual commuting situation as many did not own cars or possess a valid driver's license and relied on public transportation or getting rides from coworkers who resided nearby.

10.    To avail themselves of the benefit of using Company transportation, employees were instructed to arrive at the yard prior to 6:00 a.m.

11.    To the extent an employee was specifically asked to report to the Yard to serve as a company-vehicle driver, which was usually determined by demo team supervisors based on a specific individualized team need, those employees "punched-in" using the Timestation app and were paid for their time.

12.    The demo team supervisors were responsible for ensuring that each crew had the proper tools for the jobsite, which was usually prepared the day before.

13.    Most Skinner Demolition jobs spanned multiple days and the tools were left on the job site.

14.    When additional tools were required, they were loaded into the vans and trucks by the supervisor or demo team members who were paid for their time.

15.    The time which demo team members spent loading or unloading tools at the Yard was *de minimus,* and, therefore, not compensable time under the FLSA, Wage Act or the MFWL.

16.    The time which demo team members incurred waiting at the Yard to avail themselves of Skinner Demolition's vans and truck for rides to their respective jobsites and loading or unloading their personal protective equipment, hand tools, and other tools during that waiting time was not integral to the demo team members' principal activities and, thus, constituted non-compensable preliminary and postliminary activities.

17.    The Plaintiffs are seeking to be paid for normal commuting time voluntarily spent in Company vans and trucks, as opposed to the scenario where the employee elected to drive himself directly to a specific jobsite wherein the workday commenced when he arrived at his particular jobsite.

18.    At all times during the Collective and Class Period, Thomas Skinner was the president, sole owner, sole officer, and director of Skinner Demolition and was in charge of hiring and firing employees.

19.    During that time period, Thomas Skinner determined the Company's compensation policy, including the hourly pay rates for manual laborers.

20.    Thomas Skinner, Elber Diniz, Sandro Santos, and Edlei Gomes managed Skinner Demolition's day-to-day operations as the Company's management team.

21.    At all times relevant to this action, Edlei Gomes was in charge of handling HR and payroll for Skinner Demolition.

22.    David Skinner worked as an estimator and advisor at Skinner Demolition and was not a part of the management team.

23.    Prior to working for Skinner Demolition, David Skinner owned and operated his own demolition and disposal businesses.

24.    David Skinner was not involved with payroll or human resources at Skinner Demolition.

25.    During the early days of Skinner Demolition, David worked as a consultant. David started consulting in 2010 and while he was still a part of his other disposal company, Wrecking Demolition Specialists.

26.    As an estimator, David Skinner's job duties include the creation of the price or the budget for the job and job bidding.

27.    At Skinner Demolition, estimators do not assign employees to the jobsite.  Only managers and supervisors assign employees to the jobsites.

28.    David Skinner was not involved in the day-to-day operations of Skinner Demolition outside of his employment as an estimator.

29.    Estimators are separate from supervision and management because their role is to focus on new estimates.

30.    David Skinner does not have any ownership interest in Skinner Demolition and is not an officer or director.

31.    David Skinner has no role in hiring, firing or setting compensation for Skinner Demolition's employees.

32.    David Skinner has little to no contact with the laborers and is not involved in dispatching employees to jobsites.

33.    On occasion, David Skinner helped oversee unique and complex demolition projects.

34.    During the Collective and Class Period, Diniz was a supervisor of all the jobsite supervisors and was involved in managing the day-to-day operations of the Company.

35.    Diniz initially worked at Skinner Demolition as a jobsite supervisor.

36.    Beginning in June 2012, Diniz's role with Skinner Demolition was that of a "field senior foreman" overseeing the logistics and completion of all jobs in the field and assisting with the more complex demolition jobs.

37.     Diniz has never had an ownership interest in Skinner Demolition and has never served as an officer or director of the Company.

38.     Diniz generally did not work in the office, but at Skinner Demolition's various jobsites.

39.     Diniz generally did not come to the headquarters, but occasionally stopped by the Yard.

40.     On occasion, Diniz provided input as part of the management team, but Diniz does not make any hiring or firing decisions.

41.     Diniz selected workers and equipment for jobsites.  In doing so, Diniz considered safety, type of job, skills of workers, location of worker, ability to drive other employees, and time frame of the particular job.

42.     The individual supervisors under Diniz were tasked with informing demo team members of the logistics of going to the jobsite and to keep track of the hours worked.

43.     The individual supervisors have the discretion to decide whether a demo team member should report to the Yard or directly to the jobsite in the morning.

44.     Diniz was not involved in the alleged policy making of ordering the employees to the Yard or whether to compensate the employees for that time.

45.     Diniz is not involved in policy making and only receives notices of policies through the receipt of his paychecks and postings at the office.

46.     Diniz was unaware of any policy of requiring employees coming to the Yard before and after each workday.

47.     Diniz did not decide salaries for supervisors or laborers and did not punch employees in or out of Timestation.

48.     Santos joined Skinner Demolition around 2013.

49.     Santos does not have a formal title, but is considered a manager at Skinner Demolition and is part of the team involved in the management of the Company's day-to-day operations.

50.     At the start, Santos organized the office and filing paperwork.

51.     Santos has never had any ownership stake in Skinner Demolition and has never been an officer or director of the Company.

52.     Santos discovered and recommended that Skinner Demolition implement the TimeStation attendance and time-keeping software system.

53.    However, Santos does not manage TimeStation.

54.    Santos delegated the task of managing TimeStation to Edlei Gomes, the head of HR during the Class and Collective Period, after TimeStation was implemented.  Edlei Gomes had access to the email account which manages TimeStation.

55.    Santos manages Skinner Demolitions day-to-day operations, which includes assignment of supervisors, dispatch of workers to various job sites, and general management of supervisors.

56.    Santos does not order employees to go to the yard each morning.

57.    Thomas Skinner has been the sole owner, officer, and director or Skinner Demolition since its 2011 inception.

58.    At all times during the Collective and Class Period, Thomas Skinner was in charge of the hiring, firing, and compensation of Skinner Demolition employees.

59.    The Plaintiffs' Class and Collective Action Complaint and Demand for Jury Trial (the "Complaint") was served upon the Defendants on or about November 14, 2016.

60.    After service of the Complaint, Named Plaintiff Jose Pineda engaged in insubordinate misconduct.

61.    Jose Pineda misappropriated Skinner Demolition assets by taking a rental truck home without permission.

62.    On more than one occasion after service of the Complaint, Pineda refused to show up for work at his scheduled jobsite without notification ("no show-no call").

63.    On other days Pineda would choose his own jobsite to work at without approval of his site supervisor or would simply decide he was taking the day off without prior approval of Skinner Demolition.

64.    Pineda was also disrespectful and insulting to supervisor Elber Diniz and threatened to "take him to Court."

65.    Named Plaintiffs Pineda, Lopez, and Hernandez were not subject to retaliation after service of the Complaint in November 2016.

66.    To the extent Pineda, Lopez, and Hernandez's hours were reduced it was the result of a refusal to report to their assigned jobsites, and end-of-the-year work slowdown during the November and December holiday season, which resulted in the reduction in the hours of numerous employees.

67.    At all time prior to and after service of the Complaint, Pineda, Lopez, and Hernandez had the option of traveling to the Yard each morning to avail themselves of Company-provided transportation or of travelling directly to and from the jobsite each day from their homes.

68.    Pineda, Lopez, and Hernandez's jobsite assignments prior to and after service of the Complaint were made in the ordinary course of Skinner Demolition's business and were not intended to retaliate against them.

69.    Defendants Thomas Skinner and Elber Diniz are the only individual Defendants Lopez, Hernandez, or Pineda have claimed were responsible for these alleged adverse actions.

70.    On or about August 2, 2013, Skinner Demolition began to offer its employees a voluntary uniform laundering and repair service through outside vendor Cintas Corporation (the "Cintas Program"), which has since been discontinued.

71.    The Cintas Program was voluntary and could be cancelled by any participating employee at any time.

72.    Not all Skinner Demolition employees participated in the Cintas Program.

73.    Most Skinner Demolition employees who wished to participate in the Cintas program signed an agreement form.

74.    As part of the Cintas Program, employees were provided with eleven (11) free polo shirts and eleven (11) free pairs of Carhartt carpenters jeans, free of cost and with no deposit.

75.    The polo shirts and carpenter jeans did not require dry-cleaning, commercial laundering, or other special treatment, but were made of "wash and wear" materials.

76.    Participants in the Cintas Program agreed to a weekly payroll deduction of approximately one-hour's pay (the "Uniform Deduction").

77.    Some Skinner Demolition employees who were wary of signing the Cintas Agreements still voluntarily took the free shirts and pants and voluntarily utilized the Cintas Program to have their uniforms laundered and repaired.

78.    Each participant in the Cintas Program was assigned an employee-specific identification number by which Cintas could track use of its services and thereby bill Skinner Demolition accordingly.

79.    During the Cintas Program, Skinner Demo maintained a room at its Avon offices where employees would drop off their dirty or damaged uniform pants and shirts on racks and then would subsequently pick up their laundered and repaired shirts and pants after they were returned by Cintas.

80.    The last Uniform Deductions were taken from Plaintiffs pay occurred on in August 2016.

81.    The Cintas Program was discontinued in August 2016.

82.    No further Cintas payroll reductions were taken after August 2016.

**(4)    Jurisdictional questions.**

    **A.    Plaintiffs:**  None.

    **B.    Defendants:**

The Defendants maintain that this Court lacks jurisdiction over the Plaintiffs' FLSA, Wage Act, MFWL, and retaliation claims for the reasons set forth in the Defendants' Rule 56 motions and papers filed in this Court as [Documents 310-314 and 339-342], which Motions were denied by this Court (Saylor, C.J.) on September 28, 2020.  See [Document 385] (the "Summary Judgment Order").

The Defendants further challenge this Court's jurisdiction to enter the December 23, 2019 Memorandum and Order on Preliminary Injunction (Saylor, C.J.) (the "Preliminary Injunction Order") [Document 358] and the January 24, 2020 with Memorandum and Order on Defendants' Motion for Reconsideration [Document 370] (the "Reconsideration Order"), which are currently on appeal as consolidated Case No. 20-1097 and 20-1141.  While the facts underlying the Defendants' jurisdictional challenges have not been fully included in their statement of Contested Issues of Fact, Defendants appear for trial without waiver of and reserving all rights to appeal the Summary Judgment Order, the Preliminary Injunction Order, and the Reconsideration Order.

**(5)    Questions raised by pending motions.** None.

**(6)    Issues of law, including evidentiary questions.**

Plaintiffs believe the following will be issues of law for trial:

    a.    Plaintiffs anticipate that, if Defendants intend to introduce the supervisor's conclusions in the report from the Department of Labor, they will seek to exclude it as multi-level hearsay. Fed. R. Evid. 801.

    b.    Plaintiffs may seek to exclude or limit evidence of Defendants' mode of operation after March 2016 as irrelevant and likely to confuse the issues or mislead the jury. Fed. R. Evid. 401 and 403. Plaintiffs do not seek damages for the Reporting Class after February 2016. Evidence regarding whether a change in policy regarding reporting to the Yard and performing work there occurred in February 2016 will

help the jury determine the nature of the prior policy. However, evidence from substantially beyond February 2016 is not relevant and is likely to confuse the issues before the jury or mislead the jury into ruling on whether liability exists for a period other than the Class/Collective Period. In addition, given that much of the testimony in this case will be translated, questions regarding the period substantially after February 2016 is likely to elicit confused testimony as it did during discovery that will further confuse the jury.

c.  Plaintiffs will seek to exclude and seek other relief for text messages produced for the first time by Defendants on November 11, 2020, 3.5 years after they were first requested, two years after the close of discovery, and two months after the court's ruling on Defendants' Motions for Summary Judgment. See, e.g., Fed. R. Civ. P. 26(g) and 37.

d.  Plaintiffs will seek to exclude any speculative testimony regarding the reasons for bringing this case. Throughout discovery, Defendants made baseless and wholly inaccurate speculations about Plaintiffs' motives for pursuing this case that ranged from Plaintiffs wanting a "lottery ticket" to Plaintiffs and a union not named or implicated by this litigation trying to force Defendants to accept a union contract by bringing this suit. These speculations have no evidentiary value and would be used to distract or attempt to inflame the jury. As such, they are excludable under Fed. R. Evid. 401 and 403.

e.  Plaintiffs will seek to clarify what constitutes an adequate representative sample upon which the jury can make rulings for each of the classes. This is a legal question that should be preliminary to the jury's ruling, to avoid the need for post-trial litigation on the subject that could result in a retrial.

f.  Whether to allow Plaintiffs to prove damages through expert testimony or, alternatively, to bifurcate damages and appoint a special master for damages.



It is the Defendants' position that a jury trial will involves the following issues of law:

**A.  Defendants' Anticipated Evidentiary Motion Practice Including Daubert Motions and Motions in Limine.**

The Defendants intend to raise objections, including, without limitation, to the admissibility of any documentary or testimonial evidence concerning, referring, or relating to

this Court's Protective Order [Document 66], the Manual Goncalves civil contempt proceedings, and the Order Concerning Sanctions for Defendants' Contempt of Court [Document 233]. The Defendants also intend to assert objections to the Plaintiffs' anticipated trial plan, and assert other evidentiary objections by way of motions *in limine* and other pre-trial motion practice, upon a subsequent briefing schedule set by this Court. As part of that pre-trial motion schedule, the Defendants intend to file a *Daubert* motion to exclude the purported expert report and preclude the testimony of David M. Breshears ("Breshears"). Breshears' report and testimony violate the standards for expert testimony established in the Federal Rules of Evidence and *Daubert* and its progeny. District Courts are charged with the responsibility of ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). Breshears testimony and reports satisfy neither criteria.

Breshears is unqualified, his opinion is unreliable and irrelevant, is unnecessary, and will not be helpful to the trier of fact. For example, Breshears testimony and report does not rely upon actual reporting to the Yard, but on an assumed spectrum of potential reporting dates between sixty (60%) percent and ninety (90%) percent. Breshears report and testimony is more likely to confuse the jury than help. Moreover, the Defendants have produced the entirety of the Company's payroll and TimeStation timekeeping records, which contain the date and time each employee punched-in and punched-out of jobsites and the time each driver punched-out when they returned to the Yard. Therefore, the Plaintiffs have all of the information they need to calculate their alleged Class and Collective damages. Accordingly, this Court should exercise its gatekeeping function under Fed. R. Evid. 702 and *Daubert* and its progeny and exclude the report and preclude Breshears from testifying at trial.

**B.      Whether the Defendants have a Constitutional Right to an In-Person Jury Trial.**

To date, the Plaintiffs have refused to disclose their trial plan to the Defendants. The Defendants anticipate that the Plaintiffs will attempt to seek a bench trial. The Defendants maintain their demand for an in-person jury trial. The "federal policy favoring jury trials is of historic and continuing strength." Simler v. Conner, 372 U.S. 221, 222 (1963). Furthermore, Rule 38 of the Federal Rules of Civil Procedure makes it clear that "[t] right of trial by jury as declared by the Seventh Amendment to the Constitution – or as provided by a federal statute – is preserved to the parties inviolate."

The Defendants further expect that the Plaintiffs will attempt to limit the number of witnesses that testify in person in front of a jury and will, instead, seek to proceed by remote means. The Defendants object to any such trial plan and insist on an in-person jury trial. In a case that relies almost entirely on witness credibility, it is essential that the witnesses are able to be observed, in person, by the judge, jury, and Defendants, as they testify in order to fully observe their demeanor, tone, facial expressions and body language, all of which will be severely limited via remote testimony. Trial by video conference can make credibility determinations harder as it serves as an additional layer of separation between the witness and the jurors, contains a self-conscious and performative aspect that can change how witnesses behave, and opens up the risk that witnesses may be using notes, aids, are being coached, or are in

communication with a third-party.  Trial by video conference also hampers counsel's ability to pick up on nonverbal cues from witnesses.

A trial conducted by electronic means or with remote video witness testimony also presents the risk of reduced juror attentiveness that is not present in an in-person trial and particularly prejudices the Defendants as a jury may be more willing to impose a larger award if they are not in the same room and face-to-face with the Defendants.  Given the significant claimed damages involved in this matter, the Defendants are entitled to a prejudice-free and fair trial, with the witnesses testifying in front of the jury, in person.

While videoconference may allow some jury trials to proceed in the District Courts, it will be substantially more difficult in a case involving as may witnesses, exhibits, Defendants, and attorneys as in this case.  To avoid substantial prejudice to the Defendants, the trial of this matter should be scheduled at such a date when the parties, witnesses, and attorneys may participate in the courtroom.

C.    **Whether the Question of Defendant Elber Diniz's Individual Liability for Alleged Violations of the MFWL Should be Presented to the Jury.**

On September 29, 2020, this Honorable Court (Saylor, C.J.) partially allowed Diniz's Motion for Summary Judgment as to Counts I, III, and V, ruling that there "is not enough evidence to find Diniz individually liable under the FLSA."  See Memorandum and Order on Defendants' Motions for Summary Judgment and Dismissal and Related Motions to Strike ("Memo and Order") [Document No. 385], p. 49.  The Court also ruled that, based on the evidence "viewed in the light most favorable to plaintiffs, individual liability cannot attach to Diniz under the Massachusetts Wage Act ["MWA"]."  Id. at p. 50.

Specific to the Court's dismissal of Counts I, III, and V were the Court's findings that: i) the "'facts do not necessarily suggest that [he] controls a corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees in accordance with the FLSA,' which is necessary to establish individual liability"; ii) Diniz's role with Skinner Demolition appeared "more akin to a senior employee than a corporate official"; and iii) there was no evidence that Diniz created an illegal policy, "had decision-making power over 'setting and enforcing' the policy, or was doing anything other than following orders and 'performing his job functions.'"  Id. at pp. 48-49.

Moreover, the Court found that Diniz's responsibilities were not "similar to those performed by a corporate president or treasurer" and did not seem to involve control of finances or payment of wages."  Id. at p. 50, citing Segal v. Genitrix, LLC, 478 Mass. 551, 559 (2017).  Thus, "a jury would not reasonably infer that Diniz was an 'officer' or 'agent' who 'controls, directs, and participates to a substantial degree in formulating and determining the policy' of Skinner Demolition." Id. citing Wideman v. The Bradford Group, 444 Mass. 698, 711 (2005).

Based on these findings, Diniz was also entitled to judgment as a matter of law on Plaintiffs' MFWL claims (Counts II and IV).  Because the category of persons who may incur individual liability under the MWA is broader than the category of persons who may incur

liability under the MFWL and because Diniz is entitled to judgment as a matter of law on the Plaintiffs' MWA claims, no reasonable jury could find that Diniz was an officer or agent who paid or agreed to pay Skinner Demolition's employees less than adequate overtime or minimum wages.  See Memorandum and Order [Document 385], at p. 40.  Given these prior findings by the Court, Diniz bears no individual liability under the MFWL as a matter of law and the MFWL claims constitute "marginal claims or issues that do not warrant a full-dress trial" go before a jury due to a procedural technicality.  Rogan v. Menino, 175 F.3d 75, 80 (1st Cir. 1999).

To allow the MFWL claims against Diniz to proceed would create the real danger of an inconsistent judgment that Diniz is individually liable under the MFWL, which would be unconscionable, would impugn the validity of the jury's verdict, and would likely be vacated upon appeal, wasting judicial resources and forcing an individual defendant to defend against claims that have no colorable claim in fact and law.  Therefore, Plaintiffs' Counts II and IV should be dismissed prior to trial.

### D.    Whether Plaintiffs' Purported Reporting Time is Compensable.

Skinner Demolition's demo team members were not required to report to the Yard each morning prior to commencement of the workday.  Rather, demo team members were given the option to meet at the Yard for a ride to the jobsite in Company vehicles for the employee's benefit and convenience, or to report directly to the jobsite, particularly when a jobsite was closer to the employee's home and they wanted to save gas and money and avoid wear and tear on their personal vehicle.  Demo team members living south of Boston would voluntarily stop at the Yard on the way to Boston to use Company transportation and to avoid a difficult parking situation.  Therefore, that reporting time is not considered "hours worked" and is not compensable under the Wage Act or the MFWL.  See 454 CMR 27.04.

The Class and Collective Plaintiffs' reporting time is not compensable under the FLSA either.  When an employee stops at the home office or shop when travelling from his home to the jobsite for his own convenience, the time traveling from the office to the jobsite is not compensable.  See Saribekian v. Concrete Drilling & Sawing Co., No 89-C-7902, 1990 WL 133431 (N.D. Ill. 1990) (employee was not required to stop at the shop on the way from his home to the jobsite but did so for his own convenience and thus, his travel time was noncompensable).  Travel time spent in an employer provided vehicle for the convenience of the employee is non compensable.  Tanaka v. Richard K.W. Tom, Inc., 299 F. Supp. 732 (D. Hawaii 1969).

Even in cases where an employer maintained a carpooling requirement, which is not the case here, carpooling travel time is not compensable unless the travel time is "integral and indispensable" to Skinner Demolition's principal activity – site demolition.  See Smith v. Aztec Well Servicing, Co., 462 F.3d 1274 (10th Cir. 2006); D.A. & S. Oil Well Servicing, Inc. v. Mitchell, 262 F.2d 552 (10th Cir. 1958).  The Portal-to-Portal Act, 29 U.S.C. § 254(a) et seq. (the "Portal-to-Portal Act"), contains a statutory carveout eliminating from "working time" travel and other activities "that are 'preliminary' or 'postliminary' to the workday – that is, they are performed before or after the principal activity."  § 604 Preliminary and Postliminary Activities, in EMPLOYER'S GUIDE TO THE FAIR LABOR STANDARDS ACT 1, 1 (Susan Prince ed., 2019).

The Supreme Court has held that the applicable analysis is whether the activities in question were "integral and indispensable" to the employees' principal activities. See Integrity Staffing Solutions, Inc. v. Busk, 574 U.S. 27, 33 (2014); IBP, Inc. v. Alvarez, 546 U.S. 21, 29–30 (2005); Steiner v. Mitchell, 350 U.S. 247, 252–53 (1956). An activity is "integral and indispensable" to the employee's principal activities "if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." Integrity Staffing Solutions, Inc., 574 U.S. at 33. Demo team members time spent waiting to ride in Company vans for their own convenience and loading spare tools, personal hand tools and personal protective equipment is non-compensable because it is "two steps removed from the productive activity" at a Skinner Demo jobsite and is for the employee's convenience. Id. at 34, quoting IBP, Inc., 546 U.S. at 42. Each demo team member was free to travel directly to the Skinner Demolition jobsite each morning "without impairing the employees' ability to complete their work." Id. at 35. The demo team members reporting time is non-compensable because their reporting to avail themselves of rides in Company vans and trucks, for their own convenience. See 29 C.F.R. § 785.24 (activity that is merely a convenience and not directly related to employee's principal activity is considered non-compensable "preliminary" or "postliminary"). Simply put, the reporting time the Class and Collective Plaintiffs are seeking to recover is not considered activities or "travel that is all in the day's work." 29 C.F.R. § 785.38.

> **E.      Whether the Plaintiffs are Entitled to Compensation for *De Minimus* Work and Waiting Time.**

The tools and equipment needed by each demo team were loaded into Company vans and trucks by Skinner Demolition's site supervisors or was left at the jobsite each night. If a demo team member was specifically asked to arrive at the Yard to load and unload tools, that employee "punched-in" and was paid for that time. However, the Reporting Class and Collective Plaintiffs are also seeking to be paid for time spent loading a spare tool or loading personal hand tools and personal protective equipment during their alleged reporting time. This time is non compensable under the *de minimis* rule.

The courts and the Department of Labor have recognized, under the *de minimis* rule, "that insubstantial or insignificant periods outside scheduled working hours may be disregarded in recording working time." § 602 De Minimis Rule, *in* EMPLOYER'S GUIDE TO THE FAIR LABOR STANDARDS ACT 1, 1 (Susan Prince ed., 2019); 29 C.F.R. § 785.47. "Most courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable." Lindow v. United States, 738 F.2d 1057, 1062 (9th Cir. 1984). See also Anderson v. Pilgrim's Pride Corp., 147 F. Supp. 2d 556, 564 (E.D. Tex. 2001) (same). The First Circuit has found that "effort involved in transporting light equipment" to be de minimis. Dooley v. Liberty Mut. Ins. Co., 307 F.Supp.2d 234, 247-248 (D. Mass. 2004) and cases cited therein. Here, the *de minimis* rule should be applied to the Collective Plaintiffs' alleged reporting time claims.

### F.    Whether the Cintas Program Payroll Reductions Violate State or Federal Law.

The Cintas Program complied with the FLSA, the Wage Act, and the MFWL.  There is no law that prohibits an employer from requiring an employee to pay for a uniform.  An employer may not require an employee to put a deposit down for a required uniform unless approved by the Mass. Department of Labor and Workforce Development.  See Mass. Min. Wage Reg. 454 CMR 27.05(4); Mass. Office of Labor and Workforce Uniform Deposit Waiver Application Policy.  An employer may not require an employee to pay for the cost of the maintenance of uniforms requiring dry-cleaning, commercial laundering, or other special treatment if the cost reduces the employee's effective wage rate below minimum wage. See Mass. Min. Wage Reg. 454 CMR 27.05(4).  This restriction does not apply to "wash and wear" uniforms.  See Mass. Min. Wage Reg. 454 CMR 27.05(4).

As part of the Cintas Program, Skinner Demolition provided each participating employee with eleven (11) wash and wear shirts and eleven (11) pairs of carpenter's pants, free of charge.  There is no evidence that any employee paid for any uniform.  The employees were not required to put a deposit down and the employees were not required to dry clean or maintain these uniforms with any special treatment.  Instead, the employees opted to use the laundering and repair service provided by Cintas Corporation, which was paid for by weekly payroll deductions.   These payroll deductions did not reduce any of the employees pay rates below state or federal minimum wage.

Moreover, under Massachusetts law, the Cintas Program uniform deductions for laundering are permissible as a valid set-off if the deductions "are at an employee's discretion and in the employee's interests" which "should involve a written policy or written consent of the employee."  Cormier v. Landry's Seafood House-North Carolina, Inc., Case No. 13-11822-NMG (Feb. 23, 2015), 2015 WL 12732419 *7, citing Camara v. Attorney Gen., 458 Mass. 756, 762 (2011) and Somers v. Converged Access, Inc., 454 Mass. 582, 592-593 n. 13 (2009).  Where, as here, the employees voluntarily used and benefitted from the Cintas laundering program, the payroll deductions for that service are legal under state and federal law so long as the employee's wages are not reduced below the hourly minimum wage.  Cormier, 2015 WL 12732419 at * 8; see also U.S. Department of Labor Fact Sheet # 16, and Reich v. Priba Corporation, 890 F. Supp. 586 (N.D. Tex. 1995).

### G.    Whether Plaintiffs are Precluded from Presenting Evidence of Subsequent Remedial Measures at Skinner Demolition.

The Defendants expect that the Plaintiffs will attempt to introduce evidence of subsequent remedial measures taken by Skinner Demolition in response to a Department of Labor investigation and the Plaintiffs' wage and hour claims, including changes to timekeeping procedures.  As a matter of law, evidence of subsequent remedial measures is inadmissible to prove liability or culpable conduct in an FLSA action.  Torres v. Rock & River Food, Inc., 201 F. Supp. 3d 1373, 1374-74 (S.D. Fla. 2016), citing Fed. R. Evid. 407; Wey v. City of Petersburg, Case No. 19-cv-1314 (M. D. Fla. Nov. 30, 2020), 2020 WL 7024907; Smith v. Family Video Movie Club, Inc., Case No. 11C1773 (N.D. Ill. Feb. 13, 2017), 2017 WL 568992.  See also,

<u>Holick v. Cellular Sales of N.Y., LLC</u>, No. 13–CV–738 (NAM/RFT), 2014 WL 4771719, at \*2-3 (N.D.N.Y. Sept. 24, 2014) (finding that the defendants' reclassification of their work force after the plaintiff's FLSA suit was a remedial measure).  "This rule has two justifications. First, subsequent remedial measures generally are of limited probative value as an admission of fault; and, second, there is a strong 'social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety.'"  <u>Id.</u>  Defendants intend to file a *motion in limine* to preclude any evidence of Defendants' subsequent remedial measures at trial.

### (7)    Requested amendments to the pleadings.

Plaintiffs will request that the pleadings be amended to conform to the evidence presented at trial.  The Defendants oppose any attempt to amend the pleadings at this late stage in the litigation.

### (8)    Additional matters to aid in the disposition of the action.

The Parties and the Court will need to address how to appropriately provide for translation from Spanish and Portuguese to English for the jury. Many potential witnesses do not speak or are not fluent in English.

### (9)    Probable length of the trial.

Plaintiffs anticipate a trial that lasts two to three weeks.  The Defendants' estimate that a trial will last four (4) weeks.

### (10)    Names, addresses, and telephone numbers of witnesses to be called (expert and others) and whether testimony of such witness is intended to be presented by deposition.

#### A. Plaintiffs:

Plaintiffs anticipate calling some or all of the following fact witnesses:

Name:         Jose Pineda
Address:

Telephone:

Name:         Jose Montenegro
Address:

Telephone:

Name:         Marco Lopez
Address:



Telephone:

Name:        Jose Hernandez
Address:

Telephone:

Name:        David Aguilar
Address:

Telephone:

Name:        Brijido Alvarez
Address:

Telephone:

Name:        Wilfredo Arocho
Address:

Telephone:

Name:        Andre Atkins
Address:

Telephone:

Name:        Luis Benitez
Address:

Telephone:

Name:        Carlos Bermudez Glean
Address:

Telephone:

Name:        Juan Cante
Address:

Telephone:

Name:        Ricardo Cante
Address:

Telephone: ████

Name: Vidal Cante
Address: ████████
Telephone: ████

Name: Richard Capo
Address: ████████
Telephone: ████

Name: Frowilan Chacaj
Address: ████████
Telephone: ████

Name: Gustavo Coconubo
Address: ████████
Telephone: ████

Name: Selvin Contreras
Address: ████████
Telephone: ████

Name: Pedro Cordero Soto
Address: ████████
Telephone: ████

Name: Noe Cosigua
Address: ████████
Telephone: ████

Name: Hesbin Cruz
Address: ████████
Telephone: ████

Name: William Cruz
Address: ████████
Telephone: ████

Name:           Charles Dos Santos
Address:

Telephone:

Name:           Abelino Escobar
Address:

Telephone:

Name:           Vanildo Fernandez
Address:

Telephone:

Name:           Cesar Fortes
Address:

Telephone:

Name:           Dieusel Francis
Address:

Telephone:

Name:           David Frazier
Address:

Telephone:

Name:           Marcos Garcia
Address:

Telephone:

Name:           Cesar Gomes
Address:

Telephone:

Name:           Manuel Goncalves
Address:

Telephone:

Name:          Douglas Henriquez
Address:


Telephone:

Name:          Angel Hernandez
Address:


Telephone:

Name:          Jermone Hodge
Address:


Telephone:

Name:          Martin Lagunes
Address:



Telephone:

Name:          Erick Lopez
Address:


Telephone:

Name:          Jose Lopez
Address:

Telephone:

Name:          Marco A. Lopez
Address:



Telephone:

Name:          Juan Marroquin Vasquez
Address:


Telephone:

Name:          Marco Mendez
Address:

Telephone:

Name:          Joao Miranda

Address:

Telephone:

Name:        Edgar Molina
Address:

Telephone:

Name:        Carlos Morataya
Address:

Telephone:

Name:        Gregg Natale
Address:

Telephone:

Name:        Jefry Ochoa
Address:

Telephone:

Name:        Melvin Ochoa
Address:

Telephone:

Name:        Dwayne Paisely
Address:

Telephone:

Name:        Argelio Pedrosa
Address:

Telephone:

Name:        Ruben Pedroza
Address:

Telephone:

Name:        Cristian Perez
Address:

Telephone: █████████

Name:      Elder Antonio Ochoa Pineda
Address:   █████████

Telephone: █████████

Name:      Carlos Sosa
Address:   █████████

Telephone: █████████

Name:      Kevyn B. Tavares
Address:   █████████

Telephone: █████████

Name:      Dayshaun Thompson
Address:   █████████

Telephone: █████████

Name:      Mario Valenzuela
Address:   █████████

Telephone: █████████

Name:      Luis Nunes Velasquez
Address:   █████████

Telephone: █████████

Name:      Elmer Veliz
Address:   █████████

Telephone: █████████

Name:      Jose Vicente
Address:   █████████

Telephone: █████████

Name:      Marconio Pinto
Address:   █████████

Telephone: ████████

Name: Manuel Teixeira
Address: ████████

Telephone:

Name: Pedro Rodrigues
Address: ████████

Telephone:

Name: Temi Murray
Address: ████████

Telephone:

Name: Jon Shocket
Address: ████████

Telephone:

Name: Michael Drake
Address: ████████

Telephone:

Name: Kalvin Rodriguez
Address: ████████

Telephone:

Name: Michelle Forrester
Address: ████████

Telephone:

Name: Tyla Skinner
Address: ████████

Telephone:

Name: Patsy Sperduto
Address: ████████

Telephone:    ██████

Name:    Chris Van █████████

Telephone:    ██████████

In addition, Plaintiffs may call additional managers and/or supervisors of Defendant Skinner Services. Plaintiffs further reserve the right to call any witnesses listed by Defendants.

Plaintiffs anticipate calling the following witnesses and/or providing their testimony by deposition transcript:

Name:    Thomas Skinner (Individually and as 30(b)(6) Representative)
Address:    ██████████

Telephone:

Name:    David Skinner
Address:    ██████████

Telephone:

Name:    Sandros Santos
Address:    ██████████

Telephone:

Name:    Elber Diniz
Address:    ██████████

Telephone:

Name:    Ubirata Ferreira
Address:    ██████████

Telephone:

Name:    Brian Fitzgerald
Address:    ██████████

Telephone:

Name:    Edlei V. Gomes
Address:    ██████

Telephone:        ███████████████

Plaintiffs anticipate calling the following expert witness:

Name:             David Breshears
Address:          ████████████████
                  ████████████████

Telephone:

### B. Defendants:

In addition to the witnesses listed by the Plaintiffs, the Defendants intend to call one or more of the following individuals as fact witnesses. This list of witnesses does not include rebuttal witnesses. The Defendants reserve the right to supplement this list seasonally, and/or with leave of Court prior to trial, and to call any witnesses necessary to rebut evidence offered at trial by the Plaintiffs or to rebut Plaintiffs' challenges to the authenticity or veracity of documentary evidence. The witnesses are as follows:

1.   Thomas Skinner
     Hanson, MA

2.   David Skinner
     Canton, MA

3.   Sandro Santos
     Stoughton, MA

4.   Elber Diniz
     Easton, MA

5.   Brian Fitzgerald
     Brockton, MA

6.   Michele Forrester
     Avon, MA

7.   Ubirata Ferreira
     Walpole, MA

8.   Christian Durham
     Quincy, MA

9.   Leonardo Almeida
     Fall River, MA

10.    Marcio Calixto
       Stoughton, MA

11.    Derek Horner
       Plymouth, MA

12.    Thomas Kelley
       Holbrook, MA

13.    Fidel Lara
       Chelsea, MA

14.    Joao Marcolino
       Stoughton, MA

15.    Thiago Otoni
       Fall River, MA

16.    Marconino Pinto
       Stoughton, MA

17.    Carlos Robinson
       Roxbury, MA

18.    Alex Silva
       Stoughton, MA

19.    Alex Rowe
       Taunton, MA

20.    Temi Murray
       Randolph, MA

21.    Jose Pineda
       Central Falls, RI

22.    Jose Hernandez
       Central Falls, RI

23.    Marco Lopez
       Central Falls, RI

24.    Jose Montenegro
       Central Falls, RI

25.    Nilton Barros
       Brockton, MA

26.    Edson Andrade
       Brockton, MA

27.    Douglas Henriquez
       East Boston, MA

28.    Christopher Pollick
       Brockton, MA

29.    Francisco Pedroza
       Chelsea, MA

30.    Henri Aguilar
       Central Falls, RI

31.    Brijido Alvarez
       Central Falls, RI

32.    Vidal Cante
       Central Falls, RI

33.    Frowilan Chacaj
       Central Falls, RI

34.    Noe Cosigua
       Central Falls, RI

35.    Edgar Molina
       Central Falls, RI

36.    Marcos Garcia
       Central Falls, RI

37.    Cesar Gomez
       Central Falls, RI

38.    Carlos Morataya
       Central Falls, RI

39.    Juan Vasquez-Marroquin
       Central Falls, RI

40.    Gustavo Coconubo
       Chelsea, MA

41.    Marco Mendez
       Dorchester, MA

42.    Jose Vicente
       Dorchester, MA

43.    Cesar Fortes
       Brockton, MA

44.    Carlos Bermudez-Glean
       Roxbury, MA

45.    Manuel Teixeira
       Fall River, MA

46.    Manuel Goncalves
       Brockton, MA

47.    Edlei Gomes
       Worcester, MA

48.    Keeper of Records of CINTAS Corporation

49.    Keeper of Records of Paychex

50.    Keeper of Records of ADP

51.    Keeper of Records of TimeStation


**(11)  Proposed exhibits.**

**A.  Plaintiffs:**

Plaintiffs intend to submit some or all of the following exhibits at trial:

1.  February 26, 2016, Memorandum from Tom Skinner to Demolition Employees.
    SK000414-000415.

2.  September 25, 2015, Memorandum from Dave Skinner to all employees of Skinner
    Services Inc. SK000412.

3. December 13, 2013, Memorandum from David Skinner to All Employees. SK000031.

4. December 02, 2011, Memorandum to All Skinner Demo Employees. SK004754.

5. Cintas Rental Program – Skinner Demolition Employee Forms. SK004096-004141.

6. 2013-2014 paper timekeeping and payroll records. SK0001547-4095.

7. Employee Earnings Record Jan-Dec 2014. SK000424-000545.

8. ADP Earnings Jan-June 2015. SK000546-000988.

9. ADP Earnings Jul-Dec 2015. SK000989-001084.

10. Employee Earnings Record Jan 2016-April 2017. SK001085-001420.

11. Employee Earnings Record April 2017-July 2017. SK1421-1546.

12. Manual Time Adjustments TimeStation Report. SK004284.

13. Employee Activity TimeStation Report. SK004277.

14. Skinner Google Calendars. SK5148-5552.

15.  Skinner SmartSheets Calendars. SK000262-000401, SK4142-4231.

16. Phone Records Produced by Verizon Wireless.

17. Declarations of Skinner Services Employees. Dkt. Nos. 50-2, 57.

18. Report of David Breshears Dkt. No. 326-48.

19. Documents relied upon by David Breshears in preparing his Report, listed at Dkt. No. 326-48, 54-56.

20. Skinner Demolition "About Us" Page as of October 30, 2017. Dkt. No. 326-11.

21. Skinner Demolition "About Us" Page as of December 11, 2017. Plaintiff's Depo. Ex. 24.

22. Skinner Disposal "About Us" Page as of December 11, 2017. Plaintiff's Depo. Ex. 25.

23. Skinner Demo LinkedIn page as of February 28, 2018. Dkt No. 326-12.

24. David Skinner Facebook page as of January 17, 2018. Dkt. No. 326-14.

25. Skinner Demo Facebook page as of October 30, 2017. Plaintiff's Depo. Ex. 38.

26. Skinner Consulting Inc. Secretary of State Business Entry Summary as of October 16, 2019. Dkt. No. 326-23.

27. Skinner Services Inc. Secretary of State Business Entry Summary as of October 16, 2019. Dkt. No. 326-49.

28. Skinner Services, LLC Secretary of State Business Entry Summary as of October 16, 2019. Dkt. No. 326-50.

29. Asset Purchase Agreement between JAW Waste Services, Inc. and Skinner Services, LLC.

30. 155 Shakedown Street LLC Secretary of State Business Entry Summary as of October 16, 2019. Dkt. No. 326-51.

31. Affidavit of David Skinner filed in the Whitney matter on February 28, 2014. Dkt. No. 344-7.

32. Declaration of Thomas Skinner dated August 18, 2018. Dkt. No. 50-1.

33. Affidavit of Patsy Sperduto dated July 29, 2019. Dkt. No. 326-25.

34. Affidavit of Patsy Sperduto dated September 3, 2019. Dkt. No. 326-27.

35. Affidavit of Laura A. O'Toole dated August 27, 2019. Dkt. No. 326-28.

36. Declaration of Sandro Santos dated November 13, 2019. Dkt. No. 344-1.

37. Declaration of David Skinner dated November 13, 2019. Dkt. No. 344-2.

38. Declaration of Thomas Skinner dated November 15, 2019. Dkt. No. 344-12.

39. Transcript of the November 28, 2017, deposition of Thomas Skinner.

40. Transcript of the September 20, 2018, deposition of Thomas Skinner as 30(b)(6) Representative.

41. Transcript of the March 5, 2018, deposition of David Skinner.

42. Transcript of the January 19, 2018, deposition of Sandro Santos.

43. Transcript of the December 12, 2017, and March 26, 2018, deposition of Elber Diniz.

44. Transcript of the March 20 and 28, 2018, deposition of Edlei Gomes.

45. Transcript of the December 7, 2017, deposition of Ubirata Ferreira.

46. Transcript of the October 30, 2018, deposition of Brian Fitzgerald.

47. Transcript of the June 29, 2018, deposition of Manuel Goncalves.

48. Transcript of the August 24, 2018, deposition of Cesar Fortes.

49. Transcript of the August 23, 2018, deposition of Richard Capo.

50. Transcript of the July 9, 2018, deposition of Gustavo Coconubo.

51. Transcript of the August 28, 2018, deposition of David Frazier.

52. Transcript of the December 5, 2017, and June 12, 2018, deposition of Jose Pineda.

53. Transcript of the June 22, 2018, deposition of Jose Vicente.

54. Transcript of the June 8, 2018, deposition of Dieusel Frances.

55. Transcript of the January 23, 2018, deposition of Jose Hernandez.

56. Transcript of the December 14, 2017, deposition of Marco Lopez.

57. Transcript of the June 21, 2018, deposition of Juan Vasquez.

58. Transcript of the June 9, 2018, deposition of Marco Mendez.

59. Transcript of the November 20, 2017, deposition of Jose Montenegro.

60. Transcript of the Contempt Hearing held on October 26, 2018, November 7, 2018, and November 13, 2018.

61. Termination Notice from Michelle Forrester to Manuel Goncalves, August 24, 2018.

62. Memo regarding Manuel Goncalves by Michelle Forrester, August 24, 2018.

63. Letter of Verbal Warning to Manuel Goncalves dated March 9, 2018, as introduced at the Contempt Hearing as Exhibit 39.

64. Defendant Skinner Services, Inc.'s Answers to Plaintiffs' First Set of Interrogatories.

65. Defendant Thomas Skinner's Answers to Plaintiffs' First Set of Interrogatories.

66. Defendant David Skinner's Answers to Plaintiffs' First Set of Interrogatories.

67. Defendant Sandro Santos's Answers to Plaintiffs' First Set of Interrogatories.

68. Defendant Elber Diniz's Answers to Plaintiffs' First Set of Interrogatories.

69. Defendant Skinner Services, Inc.'s Responses to Special Interrogatories.

70. Defendant Thomas Skinner's Response to Special Interrogatories.

71. Defendant David Skinner's Response to Special Interrogatories.

72. Defendant Sandro Santos's Responses to Special Interrogatories.

73. Defendant Elber Diniz's Responses to Special Interrogatories.

74. Plaintiff Jose Pineda's Answer to Defendant Skinner Services' First Set of Interrogatories.

75. Plaintiff Jose Montenegro's Answer to Defendant Skinner Services' First Set of Interrogatories.

76. Plaintiff Marco Lopez's Answer to Defendant Skinner Services' First Set of Interrogatories.

77. Plaintiff Jose Hernandez's Answer to Defendant Skinner Services' First Set of Interrogatories.

78. Opt-in Plaintiffs' Answers to Defendant Skinner Services' First Set of Interrogatories.

79. Application for Criminal Complaint as to David N Skinner Jr., Application No. 13-1260.

80. Excerpts from Defendant Skinner Services, Inc.'s Supplemental Answers to Plaintiffs' First Set of Interrogatories.

81. Excerpts from Plaintiff Lopez's Text Messages. SP 497-512.

82. EEOC Charge and Probable Cause Determination, SP 00584-00585, 00594, 00644-00645.

83. Documents related to Attorney General's investigation into Skinner Services, SP04523-04929.

84. Department of Labor – Personal Interview Statements, SP 12096-12097, 12116-12119, 12122-12123, 12135-12136, 12139-12143, 12148-12152, 12155-12159.

85. Discipline Issued to Plaintiffs Lopez, Gonzalez, Hernandez, and Pineda. SK000006, 000009, 000011-000012, 000014-000016, 000028, 000033, 000416-000419, 004813; Plaintiff Depo. Ex. 63.

86. Chalk(s) summarizing Defendants' payroll, calendars, and timekeeping records pursuant to inter alia FRE 1006.

Plaintiffs reserve the right to introduce any documents listed by the Defendants.

**B.  Defendants:**

The Defendants propose the following trial exhibits without waiver of their right to admit any exhibits necessary to rebut evidence presented by the Plaintiffs and to impeach Plaintiffs' witnesses:

1.  Articles of Organization of Skinner Services, Inc.;

2.  Annual Reports of Skinner Services, Inc. 2007-2016;

3.  Payroll Records of Jose Pineda dated August 5, 2013-February 29, 2016;

4.  Paper Employee Weekly Reports of Jose Pineda dated August 5, 2013-January 2014;

5.  Timestation Employee Detail Reports of Jose Pineda dated January 2014-February 29, 2016;

6.  Payroll Records of Jose Hernandez dated August 5, 2013-February 29, 2016;

7.  Paper Employee Weekly Reports of Jose Hernandez dated August 5, 2013-January 2014;

8.  Timestation Employee Detail Reports of Jose Hernandez dated January 2014-February 29, 2016;

9.  Payroll Records of Marco Lopez dated August 5, 2013-February 29, 2016;

10.  Paper Employee Weekly Reports of Marco Lopez dated August 5, 2013-January 2014;

11.  Timestation Employee Detail Reports of Marco Lopez dated January 2014-February 29, 2016;

12.  Payroll Records of Jose Montenegro dated August 5, 2013-February 29, 2016;

13.    Paper Employee Weekly Reports of Jose Montenegro dated August 5, 2013-January 2014;

14.    Timestation Employee Detail Reports of Jose Montenegro dated January 2014-February 29, 2016;

15.    Payroll Records of Nilton Barros dated August 5, 2013-February 29, 2016;

16.    Paper Employee Weekly Reports of Nilton Barros dated August 5, 2013-January 2014;

17.    Timestation Employee Detail Reports of Nilton Barros dated January 2014-February 29, 2016;

18.    Payroll Records of Edson Andrade dated August 5, 2013-February 29, 2016;

19.    Paper Employee Weekly Reports of Edson Andrade dated August 5, 2013-January 2014;

20.    Timestation Employee Detail Reports of Edson Andrade dated January 2014-February 29, 2016;

21.    Payroll Records of Douglas Henriquez dated August 5, 2013-February 29, 2016;

22.    Paper Employee Weekly Reports of Douglas Henriquez dated August 5, 2013-January 2014;

23.    Timestation Employee Detail Reports of Douglas Henriquez dated January 2014-February 29, 2016;

24.    Payroll Records of Christopher Pollick dated August 5, 2013-February 29, 2016;

25.    Paper Employee Weekly Reports of Christopher Pollick dated August 5, 2013-January 2014;

26.    Timestation Employee Detail Reports of Christopher Pollick dated January 2014-February 29, 2016;

27.    Payroll Records of Francisco Pedroza dated August 5, 2013-February 29, 2016;

28.    Paper Employee Weekly Reports of Francisco Pedroza dated August 5, 2013-January 2014;

29.    Timestation Employee Detail Reports of Francisco Pedroza dated January 2014-February 29, 2016;

30.    Payroll Records of Henri Aguilar dated August 5, 2013-February 29, 2016;

31.    Paper Employee Weekly Reports of Henri Aguilar dated August 5, 2013-January 2014;

32.    Timestation Employee Detail Reports of Henri Aguilar dated January 2014-February 29, 2016;

33.    Payroll Records of Brijido Alvarez dated August 5, 2013-February 29, 2016;

34.    Paper Employee Weekly Reports of Brijido Alvarez dated August 5, 2013-January 2014;

35.    Timestation Employee Detail Reports of Brijido Alvarez dated January 2014-February 29, 2016;

36.    Payroll Records of Vidal Cante dated August 5, 2013-February 29, 2016;

37.    Paper Employee Weekly Reports of Vidal Cante dated August 5, 2013-January 2014;

38.    Timestation Employee Detail Reports of Vidal Cante dated January 2014-February 29, 2016;

39.    Payroll Records of Frowilan Chacaj dated August 5, 2013-February 29, 2016;

40.    Paper Employee Weekly Reports of Frowilan Chacaj dated August 5, 2013-January 2014;

41.    Timestation Employee Detail Reports of Frowilan Chacaj dated January 2014-February 29, 2016;

42.    Payroll Records of Noe Cosigua dated August 5, 2013-February 29, 2016;

43.    Paper Employee Weekly Reports of Noe Cosigua dated August 5, 2013-January 2014;

44.    Timestation Employee Detail Reports of Noe Cosigua dated January 2014-February 29, 2016;

45.    Payroll Records of Edgar Molina dated August 5, 2013-February 29, 2016;

46.    Paper Employee Weekly Reports of Edgar Molina dated August 5, 2013-January 2014;

47.    Timestation Employee Detail Reports of Edgar Molina dated January 2014-February 29, 2016;

48.    Payroll Records of Marcos Garcia dated August 5, 2013-February 29, 2016;

49.    Paper Employee Weekly Reports of Marcos Garcia dated August 5, 2013-January 2014;

50.    Timestation Employee Detail Reports of Marcos Garcia dated January 2014-February 29, 2016;

51.    Payroll Records of Cesar Gomez dated August 5, 2013-February 29, 2016;

52.    Paper Employee Weekly Reports of Cesar Gomez dated August 5, 2013-January 2014;

53.    Timestation Employee Detail Reports of Cesar Gomez dated January 2014-February 29, 2016;

54.    Payroll Records of Carlos Morataya dated August 5, 2013-February 29, 2016;

55.    Paper Employee Weekly Reports of Carlos Morataya dated August 5, 2013-January 2014;

56.    Timestation Employee Detail Reports of Carlos Morataya dated January 2014-February 29, 2016;

57.    Payroll Records of Juan Vasquez-Marroquin dated August 5, 2013-February 29, 2016;

58.    Paper Employee Weekly Reports of Juan Vasquez-Marroquin dated August 5, 2013-January 2014;

59.    Timestation Employee Detail Reports of Juan Vasquez-Marroquin dated January 2014-February 29, 2016;

60.    Payroll Records of Gustavo Coconubo dated August 5, 2013-February 29, 2016;

61.    Paper Employee Weekly Reports of Gustavo Coconubo dated August 5, 2013-January 2014;

62.    Timestation Employee Detail Reports of Gustavo Coconubo dated January 2014-February 29, 2016;

63.    Payroll Records of Marco Mendez dated August 5, 2013-February 29, 2016;

64.   Paper Employee Weekly Reports of Marco Mendez dated August 5, 2013-January 2014;

65.   Timestation Employee Detail Reports of Marco Mendez dated January 2014-February 29, 2016;

66.   Payroll Records of Jose Vicente dated August 5, 2013-February 29, 2016;

67.   Paper Employee Weekly Reports of Jose Vicente dated August 5, 2013-January 2014;

68.   Timestation Employee Detail Reports of Jose Vicente dated January 2014-February 29, 2016;

69.   Payroll Records of Cesar Fortes dated August 5, 2013-February 29, 2016;

70.   Paper Employee Weekly Reports of Cesar Fortes dated August 5, 2013-January 2014;

71.   Timestation Employee Detail Reports of Cesar Fortes dated January 2014-February 29, 2016;

72.   Payroll Records of Carlos Bermudez-Glean dated August 5, 2013-February 29, 2016;

73.   Paper Employee Weekly Reports of Carlos Bermudez-Glean dated August 5, 2013-January 2014;

74.   Timestation Employee Detail Reports of Carlos Bermudez-Glean dated January 2014-February 29, 2016;

75.   Payroll Records of Manuel Teixeira dated August 5, 2013-February 29, 2016;

76.   Paper Employee Weekly Reports of Manuel Teixeira dated August 5, 2013-January 2014;

77.   Timestation Employee Detail Reports of Manuel Teixeira dated January 2014-February 29, 2016;

78.   Payroll Records of Manuel Goncalves dated August 5, 2013-February 29, 2016;

79.   Paper Employee Weekly Reports of Manuel Goncalves dated August 5, 2013-January 2014;

80.   Timestation Employee Detail Reports of Manuel Goncalves dated January 2014-February 29, 2016;

81.    Skinner Demolition All Employee Activity Reports January 2014-February 29, 2020;

82.    Selected TimeStation Employee Activity/Detail Reports November 2, 2016-December 31, 2016;

83.    Selected Plaintiff and Opt-in Plaintiff Text Messages (SKINNER PLAINTIFF250-257; 497-553; 654-655; 13176-13228; and 13526-13585);

84.    Thomas Skinner Text Messages (SKINNER006532-006696);

85.    Cintas Employee Agreements (SKINNER000402-405; 4096-004141);

86.    Cintas Invoices (SKINNER005555-005683);

87.    Google Sheets Calendars;

88.    Jose Montenegro TimeStation Employee Card;

89.    TimeStation CSV Exports (SKINNER004272-004286);

90.    Photographs of 155 Bodwell Street, Avon, MA;

91.    Maps of MA and RI;

92.    Declarations of Jose Pineda;

93.    Declarations of Manuel Goncalves;

94.    Declarations of Opt-in Plaintiff;

95.    Declarations of Class Members;

96.    Department of Labor ADD Loria Memo;

97.    Jose Pineda Personnel File Excerpts (SKINNER000006, 000011-16);

98.    Manuel Goncalves Personnel File Excerpts (SKINNER004806-004815);

99.    Manuel Goncalves March 9, 2018 Letters of Verbal Warning;

100.    Jose Montenegro Personnel File Excerpts (SKINNER000036-38);

101.    Named Plaintiff Personnel Files (SKINNER000026-000046);

102.    Opt-in Plaintiff Personnel Files (SKINNER004729-005147);

103.    Interrogatory Answers of Named Plaintiffs;

104.    Deposition Transcripts of Named Plaintiffs;

105.    Interrogatory Answers of Opt-Plaintiffs;

106.    Deposition Transcripts of Opt-in Plaintiffs;

107.    February 26, 2016 Memorandum (SKINNER000413-000414);

108.    Expert Report of David Breshears, CPA/CFF; and

109.    Communications with Hemming Morse, LLP (SP13844-13905).

**(12)  Parties' respective positions on any remaining objections to the evidence identified in the pretrial disclosure required by Fed. R. Civ. P. 26(a)(3).**

The Parties have attached their objections to evidence identified in the pretrial disclosures hereto as Exhibits A and B.


Respectfully submitted,

JOSE PINEDA,
JOSE MONTENEGRO,
MARCO LOPEZ, and
JOSE HERNANDEZ
on behalf of themselves and all others similarly situated,

By their attorneys,


/s/ Jasper Groner
Nicole Horberg Decter, Esq. BBO No. 658268
Nathan Goldstein, Esq. BBO No. 666101
Jasper Groner, Esq. BBO No. 682403
Paige Walker McKissock, Esq. BBO No. 688753
**Segal  Roitman, LLP**
33 Harrison Avenue, 7th Floor
Boston, MA 021111
Telephone:  617-742-0208
Facsimile:  617-742-2187
ngoldstein@segalroitman.com

AND:

**SKINNER SERVICES, INC., d/b/a
SKINNER DEMOLITION,
THOMAS SKINNER, DAVID SKINNER,
ELBER DINIZ and
SANDRO SANTOS,**
By their attorneys,

/s/ Michael B. Cole
Gregory J. Aceto (BBO# 558556)
aceto@acetolegal.com
Michael B. Cole (BBO# 679596)
mcole@acetolegal.com
**ACETO, BONNER & COLE, P.C.**
One Liberty Square, Suite 410
Boston, MA  02109
(617) 728-0888


Dated: January 19, 2021

## **CERTIFICATE OF SERVICE**

     I hereby certify that the above document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by first class mail, postage prepaid, to those indicated as non-registered NEF participants on this 21st day of January, 2021.

                                  /s/ Jasper Groner_____
                                  Jasper Groner